Kevin J. Leichter, Esq.  (SBN 154143)
Steven J. Aaronoff, Esq. (SBN 158921)
Andrew E. Hewitt, Esq. (SBN 314504)
THE LEICHTER FIRM, APC
10203 Santa Monica Boulevard
Fourth Floor
Los Angeles, California 90067
Tel: 310.229.0000 / Fax: 310.229.1299
Email: kleichter@theleichterfirm.com
Email: saaronoff@theleichterfirm.com
Email: ahewitt@theleichterfirm.com

Attorneys for Defendants/Third-Party Plaintiffs
Echo Bridge Acquisition Corp., LLC,
Steven Paul, and SP Releasing, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARVEST AID, LLC, a California limited liability company,<br><br>       Plaintiff,<br><br>v.<br><br>STEVEN PAUL, an individual; ECHO BRIDGE ACQUISITION CORP., LLC, a Delaware limited liability company; and SP RELEASING, LLC, a California limited liability company,<br><br>       Defendants.<br><br>AND RELATED THIRD-PARTY COMPLAINT. | Case No. 2:21-cv-4154-SSS-KS<br><br>(Hon. Sunshine S. Sykes, Ctrm. 2)<br><br>**MOTION FOR MISTRIAL**<br><br>Complaint Filed: May 19, 2021<br>Trial Date:     June 17, 2024 |

THE LEICHTER FIRM
A PROFESSIONAL CORPORATION

THE LEICHTER FIRM
A PROFESSIONAL CORPORATION

1   **TO THE HONORABLE COURT, ALL PARTIES, AND THEIR**
2   **COUNSEL OF RECORD:**

3       **PLEASE TAKE NOTICE** that, Defendants and Third-Party Plaintiffs
4   Steven Paul, SP Releasing, LLC and Echo Bridge Acquisition Corp., LLC
5   (collectively, "Defendants") hereby move the Court for a mistrial on the grounds
6   that the Court committed prejudicial error by improperly interrupting Defendants'
7   counsel's closing argument and admonishing Defendants' counsel in front of the
8   jury.   By doing so, and refusing to give a curative instruction, the Court committed
9   prejudicial error such that a mistrial should be granted.

10       As set forth on the Trial Transcript of June 26, 2024, attached hereto as
11   Exhibit A, the Court improperly interrupted Defendants' counsel's closing argument
12   to improperly admonish Defendants' counsel in front of the jury as follows:

13           Well, argument doesn't permit calling counsel a liar or
14           saying what -- attacking counsel individually. You can
15           attack his case, but you cannot attack him individually.
16           …[¶] You need to be more mindful of your words.
17   (Exh. A, Trial Transcript 6/26/24, pg. 91:8-14).  The Court further admonished
18   Defendant's counsel in front of the jury as follows:

19           So there is a way to attack argument and
20           there is a way that attacks counsel. So there is -- obviously
21           there's -- the line here, I think, has been breached so I'm
22           going to advise you again that you can attack the
23           arguments being made, you can attack the case itself, but
24           not directly attacking counsel.
25   (Exh. A, Trial Transcript 6/26/24, pg. 93:18-23).  Further, when requested, the Court
26   refused to provide a curative instruction to cure the prejudice inflicted by the
27   improper admonitions before the jury.

28

THE LEICHTER FIRM
A PROFESSIONAL CORPORATION

1    The United States Supreme Court in *U.S. v. Young*, 470 U.S. 1, 13-14 (1985)

2    stated "interruptions of arguments, either by an opposing counsel or the presiding

3    judge, are matters to be approached cautiously. At the very least, a bench

4    conference might have been convened out of the hearing of the jury once defense

5    counsel closed, and an appropriate instruction given."  But the Court did not do that.

6    Rather, the Court admonished Defendants' counsel in front of the jury that he was

7    behaving improperly, thus prejudicing the jury against Defendants.

8    However, under the "invited response" doctrine, where the Court fails to act to

9    improper vouching, opposing counsel is permitted to comment.  *Id*.  "Improper …

10   vouching also occurs when the prosecutor 'indicate[s] that information not presented

11   to the jury supports the witness's testimony.'"  *U.S. v. Smith*, 962 F.2d 923, 934

12   (1992) (quoting *U.S. v. Roberts*, 618 F.2d 530, 533 (1980)).  To the extent they

13   could be considered as directed to opposing counsel individually, Defendants'

14   counsel's remarks were clearly proper as an invited response to Plaintiff's counsel's

15   improper vouching; in his words::

16         I truly thought Mr. Jackson was a very credible witness

17         and a solid human being.

18   (Exh. A, Trial Transcript 6/26/24, pg. 50:11-12).  Had the Court issued a curative

19   instruction instructing the jury that was improper argument, then Defendants'

20   counsel would not have needed to respond to it.  But the Court did not.  Instead, the

21   Court admonished Defendants' counsel in front of the jury undermining his

22   credibility with them and ascribing to him improper conduct.  Not only should that

23   have been done outside of the presence of the jury, it should not have been done in

24   the middle of the closing argument.

25   This constitutes prejudicial error such that a mistrial should be granted.  But if

26   the Court wants to rectify the situation, rather than grant a mistrial, the Court should

27   offer the following instruction:

28

THE LEICHTER FIRM
A PROFESSIONAL CORPORATION

> During Mr. Leichter's closing argument, I improperly admonished him in your presence, including stating that Mr. Leichter crossed a line.  In fact, Mr. Leichter's argument was proper.  He was responding to improper statements made by Mr. Doniger whereby Mr. Doniger improperly vouched for the credibility of Mr. Jackson personally and stated his opinion of his character.  I should not have allowed that, and Mr. Leichter's remarks were not improper.  Mr. Doniger's were.  Therefore, to the extent my comments influenced your deliberations or verdict in any way, please tell me so that you may return to deliberations in light of this instruction to see if you will reach a different verdict.

Absence the giving of a curative instruction such as the one above, the Court must declare a mistrial.  *See* Fed. Trial Handbook: Civil § 70:2 (2023) ("A mistrial is appropriate when the questioned circumstance or misconduct affects a substantial right of a party or is so prejudicial and inflammatory that the objecting party is placed in a position making it difficult, if not impossible, to receive a fair trial … where the prejudice is substantial and uncured by an admonishment instruction, a mistrial may be required").

In addition to the foregoing, the Court will note that, after admonishing defense counsel regarding speaking objections, the court allowed Mr. Doniger to do so several times without rebuke, including in the midst of closing argument in the very colloquy noted.  This too was prejudicial.

///
///
///
///

1    Accordingly, Defendants respectfully request that the Court grant the Motion

2    and declare a mistrial.

3

4    Dated:  June 27, 2024                    THE LEICHTER FIRM,
                                              A Professional Corporation
5

6                                            By:  /s/ Kevin J. Leichter
7                                                 Kevin J. Leichter, Esq.
8                                                 Steven J. Aaronoff, Esq.
                                                  Andrew E. Hewitt, Esq.
9                                                 Attorneys for Defendants/Third
                                                  Party Plaintiffs Echo Bridge
10                                                Acquisition Corp. LLC, Steven
11                                                Paul, and SP Releasing, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

REALTIME UNEDITED TRANSCRIPT ONLY

1                           ROUGH DRAFT ONLY

2

3          Rough draft cannot be quoted from nor used as a final

4                              transcript.

5

6

7

8

9

09:19AM   10           THE COURTROOM DEPUTY:  All rise for the jury.

11               (Jury enters the courtroom at 9:20 a.m.)

12           THE COURTROOM DEPUTY:  Calling Item No. 1, CV

13     21-4254, Harvest Aid, LLC versus Steven Paul et al.

14         Can I have please have counsel state their name for the

09:22AM   15     record.

16           MR. DONIGER:  Good morning.  Stephen Doniger for

17     plaintiff, Harvest Aid.

18           MS. SCHULTZ:  Good morning.  Kelsey Schultz for

19     plaintiff, Harvest Aid.

09:22AM   20           MR. LEICHTER:  Good morning, everybody.  My name is

21     Kevin Leichter and I'm here representing the defendants and the

22     third party plaintiff.

23           MR. HEWITT:  Good morning.  Andrew Hewitt on behalf

24     of the same parties.

09:22AM   25           MR. KATRINAK:  Good morning.  Paul Katrinak on

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1    behalf of Wax Works Inc.

2         THE COURT:  Okay.  Good morning, everyone.  We are

3    ready to proceed.  You all can be seated.  I'm going to read

4    the jury instructions.

09:22AM   5         So I hope you all had a good evening.  We're ready to

6    get going.  I'm going to read you several instructions now.  As

7    I told you at the beginning of the trial, these are -- all of

8    these instructions will be given to you when you go back to the

9    jury room to deliberate.  At the end of closing arguments, I'm

09:23AM  10    going to give you a few more instructions, and then you will be

11    able to go back and begin your deliberations.

12         So, let me just go ahead and get through these.

13         A deposition is sworn testimony of witness taken before

14    trial.  The witness is placed under oath to tell the truth, and

09:23AM  15    lawyers for each parti may ask questions.

16         The questions and answers are recorded.  When a person

17    is unavailable to testify at trial, the deposition of that

18    person may be used at the trial.

19         The deposition of Marion Thompson was taken on April

09:23AM  20    4th, 2023.  Insofar as possible, you should consider deposition

21    testimony presented to you in court in lieu of live testimony

22    in the same way as if the witness had been present to testify.

23         Do not place any significance on the behavior or tone of

24    voice of any person reading the questions or the answers.

09:24AM  25         The evidence that a witness has, for example, lied under

─────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────

1    oath on a prior occasion, made a prior inconsistent statement,

2    maybe considered along with all other evidence in deciding

3    whether or not to believe the witness and how much weight to

4    give to the testimony of the witness and for no other purpose.

09:24AM    5          Evidence was presented to you in the form of answers of

6    one of the parties to written interrogatories submitted by the

7    other side.

8          These answers have been given in writing and under oath

9    before the actual trial in response to questions that were

09:24AM   10   submitted in writing under established Court procedures.

11          You should consider the answers, insofar as possible, in

12   the same way as if they were made from the witness stand.

13          The parties have agreed to the following facts as true:

14          Plaintiff holds a valid copyright registration in *I*

09:25AM   15   *Believe* under Registration No. PAU 3-897-191.

16          On July 21st, 2017, Harvest Aid entered into a

17   distribution agreement with Wax Works Inc in connection with

18   the public distribution of *I Believe*.

19          On January 17th, 2018, Wax Works entered into a

09:25AM   20   sub-distribution agreement with SP Releasing to distribute DVDs

21   of *I Believe* exclusively to Walmart Inc., brick-and-mortar

22   stores.

23          EBAC was a sub-sub-distributor of SP Releasing who

24   distributed DVDs of *I Believe* exclusively to Walmart Inc.,

09:25AM   25   brick-and-mortar stores.

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1              You must therefore treat these facts as true.

2              If a party admits to matters and papers in the Court,

3      you must accept them as true.  No further evidence is required

4      to prove them.

09:26AM    5         Certain charts and summaries have been admitted into

6      evidence to illustrate information brought out in the trial.

7              Charts and summaries are only as good as the testimony

8      or other admitted evidence that supports them.

9              You should therefore give them only such weight as you

09:26AM   10      think the underlying evidence deserves.

11             Under the law, a corporation is considered to be a

12     person.  It can only act through its employees, agents,

13     directors, or officers.  Therefore, a corporation is

14     responsible for the acts of its employees, agents, directors,

09:26AM   15      and officers performed within the scope of authority.

16             The plaintiff, Harvest Aid LLC, claims ownership of a

17     copyright in a motion picture and seeks damages against

18     defendants Steven Paul, Echo Bridge Acquisition Corp LLC, and

19     SP Releasing for alleged copyright infringement.

09:27AM   20          The defendants deny infringing the copyright.

21             To help you understand the evidence in this case, I will

22     explain some of the legal terms you heard during the trial.

23             Definition of copyright.

24             The owner of a copyright has the right to exclude any

09:27AM   25      other person from reproducing, distributing, performing,

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    displaying, or preparing derivative works from the work covered

2    by copyright for a specific period of time.

3            Plaintiff's burden of proof.

4            In this case, the plaintiff, Harvest Aid LLC contends

09:27AM    5    that the defendants have infringed the plaintiff's copyrights

6    by making unauthorized counterfeit copies of the movie *I*

7    *Believe*.  The plaintiff has the burden of proving by a

8    preponderance of the evidence that the plaintiff is the owner

9    of the copyright.  And also as to each defendant, that the

09:27AM    10   defendant either made unauthorized copies of the DVDs or

11   distributed unauthorized copies of the DVDs.

12           Preponderance of the evidence means that you must be

13   persuaded by the evidence that it is more probably true than

14   not true that the copyrighted work was infringed.

09:28AM    15           Liability for infringement.

16           One who reproduces a copyrighted work without authority

17   from the copyright owner or distributes unauthorized copies of

18   the copyrighted work during the term of the copyright infringes

19   the copyright.

09:28AM    20           Copyright is the exclusive right to copy.  This right to

21   copy includes exclusive rights to:

22           One, reproduce the copyrighted work in copies.

23           Two, distribute copies of the copyrighted work to the

24   public by sale or other transfer of ownership.

09:28AM    25           It is the owner of the copyright who may exercise these

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    exclusive rights.  The term "owner" includes the author of the

2    work or an assignee.  In general, copyright law protects

3    against reproduction and public distribution of identical or

4    substantially similar copies of the owner's copyrighted work

09:29AM   5    without the owner's permission.

6         An owner may enforce these rights to exclude others in

7    an action for copyright infringement.

8         The work involved in this trial is a motion picture

9    entitled *I Believe*.

09:29AM   10        Motion pictures are also sometimes referred to as visual

11   works.

12        You are instructed that a copyright may be obtained in *I

13   Believe*.

14        The plaintiff is the owner of a valid copyright in *I

09:29AM   15   Believe* if the plaintiff proves by a preponderance of the

16   evidence that, one, the plaintiff's work is original; and two,

17   the plaintiff is the author or creator of the work.

18        All parties have agreed that the movie is an original

19   work.

09:29AM   20        A copyright owner may transfer exclusively to another

21   person any of the rights comprised in the copyright.

22        Let me read that again.

23        A copyright owner may transfer exclusively to another

24   person any of the rights comprised in the copyright.  To be

09:30AM   25   valid, the transfer must be in writing, signed by the copyright

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    owner.

2          If you find for the plaintiff on the plaintiff's

3    copyright infringement claim, you must determine the

4    plaintiff's damages.

09:30AM  5          The plaintiff seeks a statutory damage award established

6    by Congress for the work infringed.

7          In determining statutory damages, you may consider the

8    following factors.

9          One, the revenue lost by the copyright holder as a

09:30AM  10   result of the infringement.

11         Two, the profits earned by the defendant as a result of

12   the infringement.

13         Three, the need to deter future infringement.

14         Four, the need to penalize the infringer.

09:30AM  15         Five, the circumstances of the infringement.

16         And six, whether the infringement was intentional.

17         You may not award as statutory damages less than $750

18   nor more than $30,000 for each work you conclude was infringed.

19         However, if you find the infringement was innocent, you

09:31AM  20   may award as little as $200.

21         If you find the infringement was willful, you may award

22   as much as $150,000.

23         An infringement is considered innocent when a defendant

24   has proved both of the following elements by a preponderance of

09:31AM  25   the evidence:

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1          One, the defendant was not aware that its acts

2     constituted infringement of the copyright.

3          And two, the defendant had no reason to believe that its

4     acts constituted an infringement of the copyright.

09:31AM   5          An infringement is considered willful when the plaintiff

6     has proved both of the following elements by a preponderance of

7     the evidence:

8          First, the defendant engaged in acts that infringed the

9     copyright.

09:32AM  10          And second, the defendant knew that those acts infringed

11     the copyright or the defendant acted with reckless disregard

12     for or willful blindness to the copyright holder's rights.

13          In this case, the plaintiff Harvest Aid LLC also

14     contends that defendants circumvented technological measures

09:32AM  15     controlling access to *I Believe*.

16          A technological measure, also known as a technological

17     protection measure, is a means such as encryption, relied on by

18     authors and other rights owners to control unauthorized

19     copying, transmission, and use of their products.

09:32AM  20          To circumvent a technological measure means to avoid,

21     bypass, remove, deactivate, or impair a technological measure

22     without the authority of the copyright owner.

23          Circumvention requires proof of descrambling,

24     decrypting, avoiding, bypassing, removing, deactivating, or

09:33AM  25     impairing a technological measure.

─────────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────────

1    In this case, the plaintiff Harvest Aid LLC contends

2    that defendants have circumvented technological measures

3    controlling access to the film *I Believe*.  To prove that

4    defendants circumvented the plaintiff's work, the plaintiff

09:33AM  5    must show that it owns a work protected under the Copyright

6    Act, that that work uses a technological measure that

7    effectively controls access to that work, that defendant

8    affirmatively accessed what protected by those technological

9    measures without authorization, and that the defendant actually

09:33AM  10   circumvented that technological measure to do so.

11   If you find for plaintiff on the plaintiff's

12   circumvention of copyright protection systems claim, you must

13   determine the plaintiff's damages.

14   The plaintiffs seek a statutory damage award established

09:34AM  15   by Congress for each act of circumvention.

16   Its purpose is not only to compensate the plaintiff for

17   its losses, which may be hard to prove, but also to penalize

18   the infringer and deter future violations of the Copyright and

19   Digital Millennium Copyright Act.

09:34AM  20   The amount you may award as statutory damages is not

21   less than $200, nor more than $2,500 per each act of

22   circumvention, device, product, component, offer, or

23   performance of service.

24   Defendants and third party plaintiffs also claim that

09:34AM  25   they and Wax Works entered into a contract for -- entered into

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1       a written contract for sub-distribution of the movie *I Believe*

2       to Walmart.

3               Third party plaintiffs claim that Wax Works breached

4       this contract by:

09:34AM   5               One, supplying third party plaintiffs counterfeit DVDs

6       in violation of the contracts express warranties.

7               And two, failing to indemnify third party plaintiffs for

8       costs arising from these counterfeit DVDs and subsequent legal

9       action.

09:35AM   10              Third party plaintiffs also claim that Wax Works'

11      breaches of the contract caused harm to third party plaintiffs

12      for which Wax Works should pay.

13              Wax Works denies having breached the contract.

14              To recover damages from Wax Works for breach of

09:35AM   15      contract, third party plaintiffs must prove:

16              One, that Wax Works and third party plaintiffs entered

17      into a contract.

18              Two, that Wax Works breached the contract.

19              Three, that Wax Works' breach was a substantial factor

09:35AM   20      in causing third party plaintiffs harm.

21              To be a substantial factor, Wax Works' breach must be a

22      factor that a reasonable person would consider to have

23      contributed to the harm.

24              It must be more than a remote or trivial factor.

09:36AM   25              It does not have to be the only cause of the harm.

─────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────

1    If you decide that third party plaintiff, SP Releasing

2   LLC, has proved its claim against Wax Works LLC for breach of

3   contract, you must also decide how much money would reasonably

4   compensate SP Releasing by the harm caused by the breach.  This

5   compensation is called damages.

6    The purpose of such damages is to put SP Releasing in as

7   good a position as it would have been if Wax Works had

8   performed as promised.  To recover damages for any harm, SP

9   Releasing must prove that when the contract was made, both

10   parties knew or could reasonably have foreseen that the harm

11   was likely to occur in the ordinary course of events as a

12   result of the breach of contract.

13    SP Releasing also must prove the amount of damages

14   according to the following instructions.

15    It does not have to prove the exact amount of damages.

16   You must not speculate or guess in awarding damages.  SP

17   Releasing claims damages for indemnity.  That means that if you

18   find in favor of Harvest Aid and Harvest Aid's claims and make

19   an award of damages, if any, against SP Releasing, then you

20   must determine if Wax Works is liable to SP Releasing for some

21   or all of those damages.

22    Some evidence was admitted only for a limited purpose.

23   When I instructed you that an item of evidence was admitted

24   only for a limited purpose, you must consider it only for that

25   limited purpose and not for any other purpose.

──────── REALTIME UNEDITED TRANSCRIPT ONLY ────────

1     And during the trial, ladies and gentlemen, in regards

2  to Exhibit 23, Exhibit 23 also is to be admitted only for a

3  limited purpose and not for the truth of the statements found

4  within that exhibit.  It was an e-mail.

09:38AM  5     So that Exhibit 23 is only to be admitted for the

6  purpose of understanding the state of mind of Mr. Jackson when

7  he wrote the e-mail, and the effect on the recipient when they

8  received the e-mail.  So that is as to Exhibit 23.

9     I think that is all.

09:38AM  10     Okay.  So now we will turn to closing arguments.  So the

11  attorneys will have an opportunity to have final word with you

12  all so go ahead.

13         MR. DONIGER:  Your Honor, before closing, there is

14  something I need to speak to the Court about outside the

09:38AM  15  presence of the jury.  My apologies, but it is very important.

16         THE COURT:  Okay.  Well, we were here all morning.

17         MR. DONIGER:  It is extremely important.

18         THE COURT:  Why don't you come to sidebar.

19             (Sidebar begins.)

09:39AM  20         MR. DONIGER:  Your Honor, there was an error in

21  these stipulated facts, and I just realized it.  I don't know

22  if something changed between when we were doing the pretrial

23  conference that we didn't catch.  Number 4, which says EBAC was

24  a sub-distributor of SP Releasing who distributed DVDs of *I*

09:39AM  25  *Believe* exclusively to Walmart, that was supposed to say

┌─ REALTIME UNEDITED TRANSCRIPT ONLY ─┐

1    "authorized to distribute DVDs to Walmart."

2         As you know, from the beginning of this case, our whole

3    point has been that they sent these to Jax.  We do not

4    stipulate -- and this is an error, it's a mistake,

09:39AM   5    inadvertence, excusable neglect -- I need this corrected,

6    please, before this goes to the --

7         THE COURT:  It's already been read.  This is the

8    second time I have read it.

9         MR. DONIGER:  I understand.  But that is -- this has

09:40AM   10   never been -- I think the Court knows that this is a mistake,

11   that this has never been something that we have agreed to.

12        THE COURT:  I just read and say what is stipulated

13   to, what you all agreed to, and this is the second time it's

14   been read.

09:40AM   15        MR. DONIGER:  I understand, Your Honor.  I need --

16   I'm going to throw myself on the Court for relief for a

17   mistake, inadvertence, neglect, in not realizing this earlier.

18   This was not going back to the point from when we were

19   discussing even the final pretrial conference and negotiating

09:40AM   20   this.  This was not like -- this is a mistake.  This is clearly

21   a mistake, and, like, I just realized the mistake.

22        THE COURT:  Okay.

23        MR. LEICHTER:  It is not a mistake, and if it is a

24   mistake, it's late.  No. 1, this is a -- back in February we

09:40AM   25   agreed to these facts, and we submitted a pretrial conference

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1    order by stipulation containing these as admitted facts under

2    Section 4, I think it is.

3         We, then -- after that was submitted to the Court by

4    stipulation, we then had jury instructions.  And after that we

09:41AM  5    had a second stipulation, an actual stipulation that we

6    submitted to the Court, filed by him saying these four facts

7    are stipulated as true in the case.  It was filed in this case.

8         Finally, this is coming up after the reading of the

9    instructions, and after the Court said any objections to the

09:41AM  10    instructions need to be filed by this day.

11        Yesterday we had a conference about them.  This was not

12    raised.  And finally -- Mr. Hewitt is looking it up -- but I

13    distinctly recall that the Federal Rules of Civil Procedure

14    state that any objections to instructions of the jury must be

09:41AM  15    made before they are read.

16        I don't think it's timely at all, and I don't think

17    there is a basis to claim excusable neglect or anything like

18    that.  And it's prejudiced because I'm prepared to give my

19    opening based on the agreed instructions from yesterday.  And

09:42AM  20    on the admitted facts from February.  I tried my case based on

21    the admitted facts, Your Honor.

22            THE COURT:  Well, I would have to go back and look,

23    but if this is the same admitted facts that were in the

24    pretrial document, the same admitted facts that I read, it's

09:42AM  25    not a -- what you are telling me, it's not a typo or something

────────────── REALTIME UNEDITED TRANSCRIPT ONLY ──────────────

1    that we made a mistake on --

2            MR. DONIGER:  Correct.

3            THE COURT:  -- because that, I would understand.  If

4    for some reason the transfer of the stipulated facts in the

09:42AM  5    document that was filed to put into this instruction, we made

6    some sort of mistake, I would understand that.

7            MR. DONIGER:  No.  It's my mistake.

8            THE COURT:  But if it's your mistake, then, as far

9    as I'm concerned, it's waived.

09:42AM  10           Because this has been, as counsel stated, this has been

11   the stipulated facts for the duration -- pretrial, during

12   trial, when it was submitted to the Court, and it's in the

13   Court's record already, and then we put it on this, and then

14   we're right before closing arguments.  So I'm --

09:43AM  15           MR. DONIGER:  At some point from February, the

16   language changed from the pretrial conference, and we did not

17   realized it and we've been copy and pasting, assuming that this

18   is what we have agreed to all along.  And I realize this is not

19   right.  I mean, we cannot -- we can certainly try to go around

09:43AM  20   it, but I don't think this case should be going to the jury

21   based on an error that everyone here knows has never been our

22   position and never been --

23           THE COURT:  Well, I don't think -- maybe you know.

24   I don't know if Mr. Leichter knows.  I certainly don't know.

09:43AM  25   Because I'm just reading what you all stipulated to.  It's not

REALTIME UNEDITED TRANSCRIPT ONLY

1   my job and question and ask "Are you sure?"  "Are you sure this

2   is what you want?"  I don't do that.

3           MR. DONIGER:  I understand.

4           THE COURT:  But if your representation is that this

09:43AM   5   has always been this, since at least the pretrial conference

6   going forward, then --

7           MR. DONIGER:  In the back and forth, this is copy

8   and pasted on the final pretrial conference order.  In the back

9   and forth I believe this language must have changed.  I don't

09:44AM   10   know.  I can't explain it.

11           MR. LEICHTER:  Your Honor, if I can say just to

12   reference it, in Document 146-1, filed on February 16th -- four

13   months ago -- of this year, it is stated and signed by

14   Mr. Doniger, quote, the following facts are admitted and

09:44AM   15   require no proof.

16           MR. DONIGER:  I know.  That's what I'm saying.

17           MR. LEICHTER:  The time for him to pay attention to

18   this and raise it and so forth passed long ago, Your Honor.

19           THE COURT:  So you are saying February it was the

09:44AM   20   same thing, and you agree with that?

21           MR. LEICHTER:  Document No. 146-1.

22           THE COURT:  Okay.  I'm just asking.

23           MR. DONIGER:  Back in February we filed the final

24   pretrial conference documents in this case.  This is a holdover

09:44AM   25   from that mistake.

```
                    ─── REALTIME UNEDITED TRANSCRIPT ONLY───
```

            1           THE COURT:  But it's been consistently wrong -- or

            2   consistently the -- what has been presented since at least

            3   February, and now we're right before closing argument.  The

            4   jury is literally sitting behind us, and now you are asking me

09:45AM     5   to make this change, so I'm not going to do it.

            6        It's been presented.  This is the second time it's been

            7   read.  If that's something that shouldn't have been in there,

            8   it should have been discovered long ago.  I don't find any type

            9   of excusable neglect that would warrant me changing it.

09:45AM    10           MR. DONIGER:  Okay.  We will proceed.

           11           THE COURT:  Okay.

           12                        (Sidebar ends.)

           13           MR. LEICHTER:  I'm so sorry.  May I enter the well

           14   to pick up a piece of paper?

09:45AM    15           THE COURT:  Yes.  Go ahead.

           16           MR. LEICHTER:  Thank you.

           17           THE COURT:  Okay.  We're ready now, ladies and

           18   gentlemen of the jury.  Sorry for that delay.  So let's go

           19   ahead and begin.

09:45AM    20           MR. DONIGER:  All right.  If the Court will give me

           21   just a moment to get set up.

           22           THE COURT:  Yes.  That's fine.

           23           MR. DONIGER:  All right.  Ladies and gentlemen of

           24   the jury, again, my name is Stephen Doniger.  I represent

09:46AM    25   Harvest Aid.  With me here is Mr. Peretzki, one of the owners

—— REALTIME UNEDITED TRANSCRIPT ONLY——

1   of Harvest Aid, who has spent years working on being a

2   filmmaker and an artist and trying to do something that makes a

3   difference in the world.

4        I want to begin by thanking you, really, just profoundly

09:47AM   5   thanking you.  I know this case has taken longer than we

6   anticipated.  You know, I know there have been technology

7   errors, there have been missteps.  You have been

8   extraordinarily patient, beyond what we should have expected

9   from you.  I really want to apologize for any missteps and any

09:47AM   10  of your time that was taken unnecessarily.  I understand you

11  all have families, jobs, things to do, and this case is

12  extraordinarily important to us.  I hope that as we walk

13  through this closing, you realize that it's extraordinarily

14  important to our -- really our community, our society, and you

09:47AM   15  get to be a part of enforcing the law.

16        And not just on behalf of my client, but really

17  personally.

18        I have dedicated my life and my professional career to

19  helping protect creatives and artists and authors and

09:48AM   20  filmmakers.  Most of my practice is copyright.

21        And the copyright -- our copyright act, it's really an

22  extraordinary act that stands for this idea that we're richer

23  as a society when more people are creating more art and

24  literature and poetry and music.  And if you want to encourage

09:48AM   25  that, if you want to -- I mean, this idea of the starving

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1    artist, it's all too real because there are huge incentives for

2    other companies to take an "artists creative work, and in any

3    way they can, use it without paying.

4         And while most people never think of it, the Copyright

09:49AM  5    Act really is this wonderful model, piece of legislation across

6    the world that is designed to make sure that the creative

7    juices of this country keep flowing, that the tapestry of art

8    and literature and entertainment is rich.

9         And you, today, are now the protector of that law.

09:49AM  10   You have a very important job to do.

11        Later today when all of the evidence is in and the

12   arguments of counsel are in, you are going to get to decide --

13   you are going to get to determine what happened in this case.

14   Whether it's more likely than not that the defendants violated

09:50AM  15   our client's copyright and circumvented their antipiracy

16   measures.

17        And I think when you really put all of the evidence

18   together, there is no other conclusion you can reach.

19        We will walk through that.

09:50AM  20        So let's start.  And I know there is an elephant in the

21   room that we will get to quickly, soon.  But let's start with

22   what is not in dispute, or at least not really reasonably in

23   dispute.

24        First, Harvest Aid owns a valid copyright in *I Believe*.

09:50AM  25        And you are going to see the instruction for ownership

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    of a copyright.  I'm going to have that put up.

2         And really, to establish that the plaintiff is the owner

3    of a copyright in *I Believe*, all that needs to be shown is the

4    plaintiff's work is original and that the plaintiff is the

09:51AM   5    author or creator of the work.

6         The parties have agreed the work is original.  And you

7    heard the testimony of how this film was made over 2015 and

8    2016 by Harvest Aid, and that's not in dispute.

9         So that's the first fact.

09:51AM   10        I think the second fact that is not really in dispute is

11   that *I Believe* was -- there were counterfeits made.  It's not

12   really in dispute that Jeff Jackson had received counterfeit

13   DVDs that he turned over to our client.  You can take a look at

14   those DVDs, and you will see they are of visibly inferior

09:52AM   15   quality.  You can look on the back, and on the originals, you

16   can read the words.  On the one that is not, the small language

17   is blurry, you can barely read it.  You can look at the

18   numbers.  You will have them back there to take a look at.

19        And Mr. Peretzki told you that over 1,000 of these were

09:52AM   20   received in Texas that were all of the same.  Greg Schoener

21   confirmed that what went up to Minnesota, you know, the initial

22   testing -- he initially looked at the discs that were given to

23   him by Kathy, that he went back to the Walmart return boxes to

24   look at others and verify, and they were all the same.  Those

09:53AM   25   discs themselves, they have an IFPI code on them.  They have a

1    couple of codes on them.  One is from the mastering system.

2    The other is from the specific replication line.

3              And Mr. Schoener told you -- he told you that the ones

4    that were made by ADS -- and you will actually see ADS on them

09:53AM   5    on the inner ring.  It doesn't say ADS on the face.

6              And the code that ADS uses is a four or five prefix code

7    followed by a product code, like DV for DVD, followed by a

8    four-digit suffix.

9              The ones on the counterfeit don't say that.  They say *I*

09:53AM   10   *Believe* and you will see just a five digit number.

11             So it's pretty clear that someone made counterfeits that

12   ended up with Jax Distributing.

13             I don't think there is really a dispute about that.

14             And the third thing that I think isn't really in dispute

09:54AM   15   is that someone had to circumvent and antipiracy measures to do

16   that.

17             The evidence before you is that these DVDs have a CSS, a

18   content scramble system.  You can see on the actual packaging

19   -- well, our client paid extra to get this on.  You heard from

09:54AM   20   Greg Schoener from ADS that they have this system.  You can see

21   on the packaging that it says they have an antipiracy system.

22             And yet when Mr. Jurgen watched the counterfeit videos,

23   the quality was fine.  It wasn't scrambled.

24             So someone infringed Harvest Aid's copyright.

09:55AM   25             The question you need to decide is:  Was it defendants?

1    Do you find that it's more likely than not that it was

2    the defendants?

3    And before I get into answering that question, I just

4    want to be really clear about something.  This is civil

09:55AM    5    litigation.  This isn't a criminal case.  It's not proof beyond

6    a reasonable doubt.  It's more likely than not.

7    And what that means is that if you put all of the

8    evidence on a scale -- this would suggest it was Harvest, this

9    suggests it was the defendants, this says maybe it wasn't --

09:55AM    10    when you put all of that evidence on a scale, if it tips ever

11    so slightly in favor of finding that it was more likely than

12    not the defendants, then my client has met its burden of proof.

13    And a verdict establishing their liability is appropriate.

14    All right.  I want to start by addressing what I think

09:56AM    15    will be certainly one of, if not the main thrust, of the

16    defendant's positions.  And that is that this whole case rests

17    on Jeff Jackson, and Jeff Jackson is a liar, and you can't

18    believe Jeff Jackson.

19    You may remember at the beginning of this case when I

09:56AM    20    did my opening statement and I told you that it's not the time

21    to argue.  It's the time to tell you what the facts would be.

22    And there is a reason for that.  There is a reason why

23    argument is not appropriate in opening statement.

24    And that's because it's your job to listen to the

09:57AM    25    evidence, without precondition, as it comes in and decide what

REALTIME UNEDITED TRANSCRIPT ONLY

1    is credible and what is not.

2         But the thing is, when someone comes at you with fury

3    and he's a liar and you are going to see this, when that

4    evidence comes in, you don't listen to it the same way.

09:57AM   5         If I tell you are going to hear from this Nobel laureate

6    about physics, about this physics question, you're like, oh,

7    great, this guy knows what he's talking about, let me listen.

8    If I tell you this guy is a fraud, you don't listen to them in

9    the same way.  It's a psychological trick.  It's psychological

09:57AM   10   manipulation.

11         And that's why I objected during opening.

12         We're going to discuss the big question, the big gotcha

13   moments in just a second.  I think you will see it's all a

14   bunch of hot air.

09:58AM   15        But let me start with this.  Do you remember at the

16   beginning of this case when defense counsel told you you are

17   going to see Mr. Jackson and you are going to see him squirming

18   in his seat.  You didn't see him squirming in his seat.  You

19   saw a man who told you straight what he knew, where he didn't

09:58AM   20   specifically remember, what his normal practice would be, and

21   where he didn't know something and couldn't figure it out, he

22   told you.

23         And so let's talk about that big question.  How could he

24   be offering *I Believe* DVDs to his customers on the afternoon of

09:58AM   25   October 24th, when they weren't delivered to him until the

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    morning of the 25th, right?  That was the big question.

2         And I have got to admit, it's a good question.  My

3    colleague saw something that I didn't see in those records.

4         But there is actually a pretty easy, simple, and clean

09:59AM    5    explanation.

6         And it's an explanation that you can see in those same

7    documents.

8         It's borne out by the documents in this case.  What that

9    answer is is that Mr. Jackson actually went down to the loading

09:59AM   10    dock in Nashville on the 24th and saw those pallets.

11         But that is impossible.  No, it's not.  It's not.

12         And we're going to take a look at those documents in a

13    moment.  But I want to be clear, human memory is faulty.  We

14    all know that.  In fact, Jury Instruction No. 9 on witnesses

10:00AM   15    and credibility specifically tells us this.

16         What Jury Instruction No. 9 -- among the things -- among

17    --  sorry.

18         What Jury Instruction No. 9 tells us is that -- among

19    other things, and this is the law that has been given to you --

10:00AM   20    is that people often forget things or make mistake in what they

21    remember.

22         Human memory is faulty, especially when you are trying

23    to remember something that happened three, four, five years

24    ago.  But documents -- the documents from -- at the time that

10:00AM   25    were kept can fill in that story and tell us what happened.

1          Now, Mr. Jackson didn't have the benefit -- now

2    Mr. Jackson didn't have the benefit of looking at those

3    Unishippers documents to refresh his memory.  And when he is on

4    the stand after an hour of cross-examination, to look through a

10:01AM    5    hundred and -- what was it?  194-page Exhibit 99.

6          And, of course, if you forget something that is

7    important to explaining a timeline, it's hard to answer a

8    question about how that timeline makes sense.

9          But Unishippers records tell a story, and we're going to

10:01AM   10    see -- I'm going to show you that story --

11              MS. SCHULTZ:  We might have to take it pause.  It's

12    freaking out.

13              MR. DONIGER:  What's going on?

14              MS. SCHULTZ:  It won't show it.  When I plug it in,

10:01AM   15    it's going black.  I need to download it.  It was working

16    before and now it's not.

17              THE COURT:  Just take a moment to try.  I know it's

18    been -- difficulties with technology, so, all around.

19              MS. SCHULTZ:  It's showing the first page and then

10:02AM   20    it won't go to the second.  How do I download this?  Help me,

21    please.

22              THE COURT:  The funny thing is -- well, not funny --

23    is all of this technology was updated last year.  We're working

24    out the kinks, so we apologize.

10:04AM   25              (Pause in the proceedings.)

——— REALTIME UNEDITED TRANSCRIPT ONLY———

```
 1              MR. DONIGER:  Okay.  So let's take a look at the

 2   documents that you have in this case, the evidence that you

 3   have, and see if we can figure out what is going on here.

 4              And the first thing that you will note when you get into

10:04AM   5   Exhibit 99 is that many of the shipments that Mr. Jackson

 6   received -- many of them, I think most of them, were actually

 7   -- he picked up at the facility himself.

 8              For example, this is 99-16.  This is 99-16, and in the

 9   special instructions you will see "hold at dock for customer."

10:05AM  10              And that same information is on 99-58, 99-68, 99-70,

11   99-76, and a whole bunch of others.  And what we have in front

12   of us here is 99-51 which are other documents which would

13   specifically indicate dock pick up.

14              Now, we know from these records that Mr. Jackson was, in

10:06AM  15   fact, going down to the dock to pick up these pallets.  Because

16   when he would, there would be a pick up form.  And if you take

17   a look at 99-17, here is one example.

18              And there is a bunch of these in Exhibit 99, right.

19              It's a dock drop -- pick up form indicating that

10:06AM  20   Mr. Jackson, with his driver's license, that he would take his

21   Ford F-150, and he would go down for some of these and pick up

22   the delivery.

23              And all through Exhibit 99 when there is only one or two

24   or three pallets -- what did I just do?

10:06AM  25              When there is only one or two or three pallets, he would
```

REALTIME UNEDITED TRANSCRIPT ONLY

1   go down and pick it up.

2         But of course, the Echo Bridge order was ten pallets.

3   Hold on just a moment, and we will get to that.

4         Now, we're going to take a look at another delivery --

10:07AM  5   sorry, another bill of lading, and this is important.  We're

6   going to take a look at 99-29.

7         99-29.  Two days before he placed his October 18th order

8   for the Echo Bridge shipment -- two days before -- he placed an

9   order for two pallets with New Century Media.

10:07AM  10        And you will note this number ending in 519.  Remember

11   that.

12        And when we go to 99-21, we see that that New Century

13   Media two pallets -- this is the unloading manifest, right --

14   this is the unloading manifest at Nashville shows that those

10:08AM  15   two pallets were scheduled for a dock pick up on the 24th.

16        Now, if we look at Exhibit 19 -- and this is an exhibit

17   you have seen many times before -- this Exhibit 19 is the

18   October 18th order from Echo Bridge, right?

19        And we know Mr. Jackson told you that he placed this

10:09AM  20   bill of lading.  He ordered it on the 18th of October.  And now

21   let's follow -- let's follow the paper trail of this order.

22        At some point I think I'm going to start seeing some

23   heads nodding as you realize what is going on here.

24        There was 99-139.  This is the loading manifest showing

10:09AM  25   that on the 21st it was picked up to be sent -- it was picked

─────── REALTIME UNEDITED TRANSCRIPT ONLY───────

1       up at Echo Bridge with the destination of Chicago.

2               Here we go.  It's that same number.  Echo Bridge, the

3       destination of Nashville, ten pallets.

4               Then if we look at 99-126, this is the pick up from

10:10AM  5       Chicago going to Nashville on October 23rd.  So we can see,

6       right?  We see it arrived in Chicago.  On the 23rd, it's being

7       sent from Chicago to Nashville.

8               Now we take a look at 99-146.  This is the unloading

9       manifest for that same shipment.  You see it down here.  The

10:10AM 10      unloading manifest shows that on October 24th, between 6:30 --

11      0630 and 0930 -- that is 6:30 in the morning and 9:30 in the

12      morning -- the ten pallets from Echo Bridge were unloaded at

13      the Tennessee dock.

14              At Mr. Jackson's local dock.

10:10AM 15              Now, there is also another -- we're not done here.  I'm

16      still going to tie it in.  But there is another document that

17      is interesting which is 99-152, which indicates that there were

18      some pallets that were damaged.

19              So there are some pallets that were damaged.  That was

10:11AM 20      from the 21st, I believe, when it was being picked up.

21              So let's go ahead to -- now let's take a look at 99-146.

22              Again, this is what we just looked at.  On October 24th,

23      between 6:30 -- by 9:30 a.m., the ten pallets from Echo Bridge

24      that came from the Echo Bridge warehouse were at Mr. Jackson's

10:11AM 25      local dock, local facility.

1     And we're going to take a look at what happened after

2  9:30, because the next thing -- if you look at all of those

3  documents, the next thing that what happened after 9:30 is key.

4     We're going to take a look.  And these are internal --

10:12AM  5  what you are looking at right now is 99-27 and -28.  These are

6  internal documents from Roadrunner, and you have seen this

7  e-mail from 1:50 p.m. saying, "please see below and advise" --

8  this is 99-27 -- and when you go to 99-28, Jeff at Jax wants

9  this delivered.

10:12AM  10     Do you remember that bill of lading, 519?  The one that

11  he was going to pick up on the 24th?

12     Mr. Jackson went down there and asked them to instead

13  deliver that shipment, instead of it being dock pick up.

14     So what does this tell us?  This tells us that between

10:13AM  15  the time -- or at least it gives us a reasonable inference --

16  that between the time that the Echo Bridge pallets were

17  unloaded at the local facility where Mr. Jackson went all the

18  time to pick things up, and on the same day he had another dock

19  pick up, he went and the only reasonable inference is that he

10:13AM  20  had the opportunity to see these other pallets -- the Echo

21  Bridge pallets -- maybe even took some of them, and said, you

22  know what -- and placed an order for them to then deliver the

23  other things to his home as well.

24     He was at -- I think the only reasonable inference here

10:14AM  25  is that he was at that loading facility on the 24th.  And four

1    and a half years later, just didn't remember because he's there

2    all of time.  And it should have been inconsequential.

3           It should have been inconsequential.

4           Except my colleague -- and I acknowledge him being very

10:14AM   5    shrewd and realizing it, using it as this ah-ha gotcha moment.

6    But when we take a look at the chart and we take a look at the

7    timeline -- no, go back.  Let's actually go to this.

8           So we have the pallets arriving at the Nashville

9    facility at nine -- unloaded at 9:30 in the morning.

10:15AM  10           We have Mr. Jackson making a request to have his other

11   shipment that he was going down there to pick up that day

12   delivered home at 1:30.

13           And then at 4:45 that same day is when he first -- when

14   he first reaches out to customers offering them *I Believe* DVDs.

10:15AM  15           So there is one e-mail -- and this is 85-1 at 4:45 p.m.

16   -- to Christian Book, and then there is 83-9 which is to Vision

17   Entertainment making the same offer at 4:46.  One minute later.

18           Then, of course, we have exhibit 99-141.  This is the

19   loading manifest from the next morning showing both the two

10:16AM  20   pallets that he went down -- was to go down -- to have gone

21   down to pick up on the 24th, and the other ten pallets being

22   delivered in the morning.

23           So could Mr. Jackson -- could Mr. Jackson have been

24   offering *I Believe* DVDs on the 24th when he didn't actually

10:16AM  25   receive them until the 25th?  Absolutely, if he looked at the

┌─────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────

1    boxes on 24th when he was at the facility.  And again, after

2    two or three or four years, and if he just didn't remember

3    that.

4         Look, I know this case would be much more interesting

10:16AM   5    and exciting if it involved a time machine.

6         I know it would be much more interesting and exciting if

7    it involved super natural powers.  But the sad truth is that it

8    actually involves the opposite.  It involves an older gentleman

9    who, it appears, went down the day before, looked at the DVDs,

10:17AM   10    and why would he remember that?

11        Now, I will talk -- in a bit I will talk about why that

12    actually, really, is the only story that makes sense.  It's the

13    only story that makes sense.

14        But before I do that, I just want to point out that if

10:17AM   15    it is true, if it is true that Mr. Jackson went to the dock,

16    saw pallets, had an opportunity to get in and look at them,

17    saw, like, all of these pallets of DVDs and said you know what,

18    great, I'm not going to pick this other stuff up right now,

19    just have everything delivered tomorrow -- if it's true that

10:18AM   20    that's what happened, everything else that he told you --

21    everything else that he told you makes perfect sense.

22        This was a blind purchase.

23        He didn't know *I Believe* was in there.  He was

24    pleasantly surprised when he saw them.

10:18AM   25        Once he did and he went and he looked them up online and

─────── REALTIME UNEDITED TRANSCRIPT ONLY───────

1       he had customers that he knew would be interested in them.

2           When he got the ten pallets, it took him two to

3       three days to fully sort through everything.

4           Okay.  I mean, all of that makes perfect sense.

10:18AM    5           Especially when you consider the testimony you heard

6       yesterday from Marion Thompson of Walmart who told you that

7       Walmart's return centers consolidate.  Like, they had the code

8       for *I Believe*.  The return centers consolidate product to send

9       back to sellers.

10:19AM   10           So if Echo Bridge had sent a large volume of these DVDs

11      -- of *I Believe* DVDs to Walmart and there is a bunch of

12      returns, they are all going to get consolidated.  They are

13      going to be together.  Mr. Jackson wouldn't have had to go

14      through 20,000 DVDs to know how many he had of *I Believe*,

10:19AM   15      because those *I Believe* would have been consolidated.  They

16      would have been together in boxes and easy for him --

17      relatively easy to see and figure out what was in them, even

18      when he was at the dock.

19           It makes perfect sense.

10:19AM   20           Ms. Thompson told you that they usually use

21      Type 16 boxes, but she looked at the photograph of the Type 10

22      and 14 boxes and said, yeah, those are absolutely -- can be

23      full of DVDs as well.  Those are used as well.

24           You know what else makes sense?  The defendants opening

10:20AM   25      statement or, really, argument.

┌─ REALTIME UNEDITED TRANSCRIPT ONLY ─┐

1          I told you what I thought the evidence would be.

2          I was specific about who would say what, what documents

3    you would see.  And you heard from counsel again, you heard

4    Jeff Jackson is a liar.  He didn't tell you why.

10:20AM   5          And now it makes sense.  He didn't say the evidence will

6    show Mr. Jackson offering *I Believe* 17 hours before he received

7    the shipment.  He just argued with passion he was a liar.

8          And I get it, again, very shrewd.  Because if he had

9    said anything about that, we could have taken a look, we could

10:21AM  10   have -- let Mr. Jackson look through all these documents, see

11   if it refreshed his recollection, but instead it was springing

12   something on us.

13         And honestly, I'm mad at myself for not catching it,

14   because if we had, we could have easily cleared this up.  And I

10:21AM  15   wish that we had Mr. Jackson -- that we'd been able to ask

16   Mr. Jackson about this.  That I had the wherewithal in that

17   moment of, like, that gotcha moment.  But these documents tell

18   a story.

19         Now, let's be clear, there is no direct evidence of

10:21AM  20   this.

21         Again, I wish that we had Mr. Jackson looking these over

22   and saying like, oh, yeah, yes, I had to pick up that day, I

23   went down, great.  I wish we had that.

24         But the instructions you are given are that there are

10:22AM  25   two kinds of evidence.  There is direct evidence and there is

34

REALTIME UNEDITED TRANSCRIPT ONLY

1    circumstantial evidence.

2         And circumstantial evidence is proof of one or more

3    facts from which you could find another fact.

4         And these shipping records are evidence in this case.

10:22AM  5    They are facts.  They are records by reputable logistics

6    companies that the defendants themselves put into evidence.

7         They are records from which you can readily answer the

8    question of how Mr. Jackson could be offering his customers *I*

9    *Believe* DVDs on the afternoon of the 24th.

10:22AM  10         So we have this timeline.

11         And here are my questions for you in determining what is

12    more likely -- in determining what is more likely than not.

13         What are the odds that Mr. Jackson just happens to

14    e-mail his customers at 4:45 and 4:46 on the day that the EBAC

10:23AM  15    shipment was unloaded at the destination terminal if he hadn't

16    gone down there to look at them?

17         What are the odds that hours after that unload, internal

18    e-mails are saying that Mr. Jackson is now requesting that that

19    order that was supposed to be a pick up be delivered the next

10:23AM  20    morning?

21         I think there is really only one conclusion that you can

22    reasonably draw from that.  That he took the opportunity when

23    he was there at the dock to look at these Echo Bridge pallets

24    and saw the boxes of *I Believe* DVDs on October 24th.  And if

10:24AM  25    you find that that is, in fact, more likely than not, then all

35

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    of the defendants feigned indignation that he was lying and

2    this is impossible, it's all a bunch of hot air.

3         Now, of course, the defendants are going to try to push

4    a different story.  They are going to push a story that Jeff

10:24AM  5    Jackson is a liar, and that he did it.

6         They are going to ignore all of these coincidences.

7         They are going to say don't believe -- you can't --

8    don't believe that these actually came from Echo Bridge's

9    facility.

10:25AM  10        Now, here is the thing.  We don't know -- we don't know

11   whether Echo -- Echo Bridge didn't put forth anyone to talk

12   about this.  We don't know whether Echo Bridge used a third

13   party to ship these to Mr. Jackson.  We don't know how these

14   got shipped, but we do know that they came from the Echo Bridge

10:25AM  15   facility.

16        But Echo Bridge is going to say no, no, no, no, no.

17   Even though they provided no evidence, no information about

18   what actually was shipped, they are going to say it couldn't

19   have been us, it had to be Mr. Jackson.

10:25AM  20        And so now I want to take at the other evidence in this

21   case, and there is a lot.

22        The other evidence in this case that I think compels the

23   conclusion that this had to have been the defendants that made

24   and distributed these DVDs and not Mr. Jackson.

10:25AM  25        And in doing that, there is a series of questions that

REALTIME UNEDITED TRANSCRIPT ONLY

1    we're going to look at and I think the answer -- and see how

2    that all pans out.

3          So these are the questions.

4          Who knew that *I Believe* was a great selling title?

5          If you want to know who has the intention to

6    counterfeit, you have to know something is worth

7    counterfeiting.  Who had the greater customer incentive to

8    counterfeit?  Who had a greater financial incentive to make

9    counterfeits.  Who had easier access or ability to make

10   counterfeits?  And whose behavior is more consistent with

11   counterfeiting?

12         We're going to walk through these one by one.

13         Who knew *I Believe* was a best selling title?

14         You guys have seen Exhibit 8.  Exhibit 8 is the records

15   shown from Echo Bridge -- sorry, the records that show Echo

16   Bridge placed order after order, and ADS made shipment after

17   shipment.  39,400 units shipped.

18         Then we have the e-mail -- Exhibit 43, the e-mail from

19   Mary Reagan where she says -- and this is from February

20   of 2018 -- *I Believe* has done very well and remains in 1,000

21   stores.  This is our first title to remain in new release this

22   long, and in this many stores.

23         It was placed -- it was placed stores as new release on

24   11/7 at $12.96.

25         The life cycle for this title looks great.

1          Now, remember that $12.96 as well.  That number is going

2     to come up a bit.

3          So, the life cycle for this title looks great.  We

4     expect this title to keep selling for sometime.

10:28AM   5          The defendants, unquestionably, knew that this was a

6     great selling title.

7          What did Mr. Jax know?  Remember the testimony.  Were

8     you familiar with *I Believe* before you received the shipment

9     that came from the Echo Bridge facility?  He was, like, I mean,

10:28AM   10    I heard of it.

11         So when you consider -- and, in fact, how could he have

12    known how well it was selling?

13         So when you consider the answer to that first question,

14    who knew that *I Believe* was a great selling title, it was the

10:28AM   15    defendants.

16         So let's look at the next question.

17         Who had the greater customer incentive to counterfeit?

18         And we have this e-mail from Mary Reagan on June 8th,

19    right.  Again, this is four months later.  It's done very well

10:28AM   20    in Walmart.  Continues to show strong sales.  Currently, the

21    producer is refusing to ship product to us because of lack of

22    payment.  As you know, every title is critical to our business

23    in Walmart.  Will you consider addressing this with Terry and

24    resolve the issue?

10:29AM   25         What is going on here?  This is an e-mail from Mary

REALTIME UNEDITED TRANSCRIPT ONLY

1      Reagan saying, look, we are going to need -- we may need to

2      continue replenishing Walmart, and it's going to be a problem

3      if we don't have any more of these, and the producer isn't

4      shipping because they are not getting paid.

10:29AM  5          If Walmart needs you to replenish and you can't do that,

6      that is a problem.

7              On the other hand, Mr. Jackson didn't have any customers

8      specifically asking for this title.

9              I mean, heck, he was getting 20,000 DVDs from -- that

10:30AM 10     were being sold off from Echo Bridge that he got delivered,

11     plus two other pallets from New Century.  He had his hands

12     full.  He didn't need top specifically be counterfeiting

13     anything.

14             So when you look at who had the greater customer

10:30AM 15     incentive, clearly, it was the defendants.

16             Now, let's look at who had easier access or ability to

17     making counterfeits.

18             And you may recall Mr. Jackson's testimony.  He couldn't

19     even get a local replicator to make some copies for him.

10:30AM 20         There is no evidence that he ever had anyone replicate

21     anything for him.

22             He placed orders with New Century, right.  You could see

23     that in Exhibit 99 through those shipments.  But there is no

24     evidence that any of that was anything he was having

10:31AM 25     replicated.

——— REALTIME UNEDITED TRANSCRIPT ONLY ———

1      And, heck, New Century was the defendant's partner.

2  That's who they were shutting down their Wisconsin facility so

3  that they could send their replication equipment and all

4  logistical stuff to New Century in Los Angeles.

10:31AM   5      Right?  And you are remember Exhibit 98 that we looked

6  at, and this is a part of Exhibit 98 that when you look at 98

7  -- on page 1, there is a purpose -- this is not from page 1,

8  but there is -- the purpose of the agreement and it is to move

9  basically, the replicating facility -- sorry, the operations at

10:31AM  10  Wisconsin to New Century.  And, here, there is even a purchase

11  of agreement from the Wisconsin facility.

12      And if anyone -- if either of those companies -- if you

13  remember, in his deposition Mr. Jackson mentioned the local

14  company, we make tapes and discs, another company -- if they or

10:32AM  15  New Century or anyone else had manufactured any DVDs of *I*

16  *Believe*, you can bet they would have been subpoenaed and put in

17  here.

18      You saw all of the records that were obtained from all

19  of Mr. Jackson's other -- his customers and shippers.

10:32AM  20      There is no evidence that Mr. Jackson had ever worked

21  with anyone to replicate anything or had the ability to do so.

22      On the other hand, the Echo Bridge warehouse had

23  replication machinery.  Now, the defendants couldn't deny that.

24      But they want you to believe that, well, it was never

10:33AM  25  operational.  Matt Otto, who kind of told you he works for,

—————— REALTIME UNEDITED TRANSCRIPT ONLY ——————

1    well, I work for SP kind of, I also work for Echo Bridge, and

2    there is a theme here.  There is a theme that these companies

3    really are not really different companies.  They are all

4    jointly acting.

10:33AM   5        He told you -- he told you that before the Wisconsin

6    facility closed, it had not -- they had not done any

7    replicating there, ever.

8        But then you heard from Brett Lauter.  Mr. Lauter told

9    you that he had worked with Echo Bridge.  In 2015, he was

10:33AM  10   having DVDs replicated there.  Like, what are they talking

11   about?

12       In 2017, he met in person with Steven Paul who offered

13   to continue replicating DVDs out of the Wisconsin facility.

14       And from that testimony, you get to decide -- in fact, I

10:34AM  15   think you have to decide that Matt Otto was not truthful with

16   you.

17       Brett Lauter, with his ridiculous memory, he gave you

18   dates and who he spoke to and -- do you remember that?

19       I wish Mr. Jackson had his memory.  God, I wish

10:34AM  20   Mr. Jackson had his memory.

21       The defendants cross-examined Mr. Lauter about

22   litigation that he had had with them in the past -- I didn't

23   ask anything about his litigation with them -- trying to

24   suggest that he was somehow biased.  I think all that the

10:35AM  25   defendants established is that they keep ending up in

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1  litigation with everyone they are doing business with.

2  But I want to focus for just a moment right now on what

3  happened after Mr. Lauter, after he told you about his in

4  person meeting with Mr. Paul in 2017.

10:35AM  5  We're going to take a look at Jury Instruction No. 7.

6  You may consider the ability of each party to provide

7  evidence.  Obviously, consider the ability of a party to

8  provide evidence.  If a party provided weaker evidence when it

9  could have provided stronger evidence, you may distrust weaker

10:35AM  10  the evidence.

11  How is my client supposed to establish the replicating

12  capabilities of a Wisconsin facility that closed in 2018?

13  Now, the defendants could have put on any number of

14  witnesses.  They could have put on Mr. Paul to address, if not

10:36AM  15  Mr. Lauter, just to address the replicating abilities.  They

16  could have put on anyone from their company who was actually at

17  the Wisconsin facility, anyone who knew about it.  They put on

18  nothing, no one.  The only thing you heard from them was when I

19  -- when I asked Mr. Otto a handful of questions to establish

10:36AM  20  for you that they in fact had replicating machinery.  And then

21  he told me, well, it was never in operation, and that got

22  impeached.  The defendants put on no other evidence.

23  Why?

24  I mean, I think it was so they could smugly sit back and

10:37AM  25  be like try to prove it, try to prove it without us giving any

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    witnesses.

2         So when we look at the question -- let's go back, when

3    we look at the question of who had easier access and ability to

4    make counterfeits?  I don't think there is any question that

10:37AM  5    that X goes in the defendant's column.

6         So let's talk about who had the greater financial

7    incentive to make counterfeits.

8         All right.  And Mr. Jackson had he used -- you heard

9    testimony about what it would cost to replicate DVDs.  You

10:38AM  10   heard at a low end, it's maybe $0.50 to a dollar.  And you saw

11   that he was selling these DVDs for between $2.00 and $2.50.

12        So what that means he was making $1?

13        That is a lot of work to make a dollar.

14        On the other hand, if Echo Bridge was making these DVDs

10:38AM  15   in-house, they were costing pennies.  And we know that Walmart

16   was paying -- was $8 something, I think it's in the records,

17   per DVD.

18        If these are DVDs that my clients and Wax Works' don't

19   know about, all of that money is going right into defendant's

10:38AM  20   pocket.

21        Now, in their opening statement, the defendant's counsel

22   said, well, why would they counterfeit if they were getting the

23   DVDs for free?  Why would you spend any money on something if

24   you are getting it for free?  That doesn't make any sense.

10:39AM  25        What a disingenuous and bad faith argument.  And it was

REALTIME UNEDITED TRANSCRIPT ONLY

1  an argument because you heard no evidence from the defendants

2  about that.

3          And it's a disingenuous and bad faith argument because

4  it's taking a fact and twisting it.

10:39AM  5          Of course -- of course, the deal was that Harvest Aid

6  would send the DVDs at no cost, and we take a look at

7  Exhibit 13, this is the agreement with Wax Works, right?

8          Our client -- Echo Bridge -- sorry, Harvest Aid is

9  responsible for providing the *I Believe* DVDs.

10:40AM  10          And there is going to be a flat rate commission totaling

11  35 percent.

12          Put differently, the rights holder, which is our client,

13  was to get 65 percent of all net sales.

14          And in that agreement, it makes clear -- look, I

10:40AM  15  acknowledge this is not an agreement with defendants, but you

16  are going to see the defendants certainly understood this

17  agreement.

18          In this agreement, it specifically says there shall be

19  no third party distribution fees.

10:40AM  20          Who are the third party -- who's the third party

21  distributor?  SP Releasing?  Echo Bridge?

22          Those are the parties that were contemplated to be the

23  third party distributors that Wax Works was going to work with

24  to get these into Walmart, right?

10:41AM  25          So, this is a simple deal.

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    Our client ships to whatever the deal ends up being --

2    if it's Echo Bridge, our client then gets 65 percent of what

3    comes back from Walmart, that 35 percent is split.

4        All right.  And it's clear that the defendants

10:41AM  5    understood this because -- I don't have it here, but you will

6    take a look at Exhibit 71.

7        Remember Mr. Woodward talked about Exhibit 71?

8    Exhibit 71 was the statements showing what was actually paid --

9    or do we have this page?

10:42AM  10    Yeah.  So this is the first page -- it's a multi-page

11   document.  But as of February of 2018, there are these

12   statements showing what was actually paid.

13       And on 5,000 units, amount received by Wax Works, less

14   distribution fees, amount due.

10:42AM  15    This shows that that percentage was initially being paid

16   by the defendants to Wax Works, and then Wax Works was paying

17   our client, and everything was fine.

18       If you look at those statements, there is no other

19   percentage, there is no other cost deductions.  But then what

10:42AM  20   happened?

21       Then the defendants got Terry Woodward to sign that

22   ridiculous agreement you saw.

23       It was obvious to me that he didn't understand the

24   implications.  He thought it was just confirming what the deal

10:43AM  25   was.  And that is not really my issue, right?  It's not really

REALTIME UNEDITED TRANSCRIPT ONLY

1  my client's issue.

2       But it's clear to me they bamboozled him.  It is one of

3  the most offensive and dishonest things I have ever seen.

4       To do business with someone, have a deal with them --

10:43AM  5  clearly, they -- Echo Bridge was distributing these DVDs in

6  November.  They first landed in Walmart in November.  November,

7  December, January, and February you are making payments based

8  on no other cost deductions.

9       And then they get Mr. Woodward ward to sign this

10:43AM  10  agreement that you would need a lawyer to understand half of

11  it.  And then based on that, under those new terms, they go

12  back to him like now you owe us money.  He's like what?

13       And then they put him on the stand in this trial and act

14  like he wronged them.

10:44AM  15       That's the way they do business.

16       As a result of them bamboozling Mr. Woodward, my client

17  wasn't getting paid.

18       And that means no more DVDs.  And that means that --

19  getting back to what we were saying a moment ago -- the

10:44AM  20  defendants arguments, why would they counterfeit DVDs that they

21  were getting for free.  The answer is clear.  Because they knew

22  they were not getting any more free DVDs.  Because they knew

23  that the plaintiff -- the producer was -- my client, Harvest

24  Aid was not getting paid and was not going to keep sending them

10:45AM  25  DVDs.

─────────────── REALTIME UNEDITED TRANSCRIPT ONLY───────────────

1          And they knew they had a title that was doing well at

2     Walmart.

3          So who had the greater financial incentive to make the

4     counterfeits?  Unquestionably, the defendants.

10:45AM  5          Now let's look at the last question.  Whose behavior is

6     more consistent with counterfeiting?

7          And I want to remind you of something we discussed in

8     opening and in the trial, there was that whole e-mail exchange,

9     Exhibit 24, and this is just the very start of it.  It's a

10:46AM  10    multi-page chain.  I don't think we have the whole thing up

11    here.  But if you recall, beginning in March, March 1st, you

12    know, when our client says can you let us know how many DVDs

13    are left to be returned and send them to ADS Group.

14         Yeah, we have got 4600 to be returned today.  We have

10:46AM  15    another 7300 that need to be sorted and boxed.

16         Do you remember that?

17         And after March, and April, May, June, all the way

18    through July, the end of July, where -- hey, what is going on?

19         Our client never got those DVDs back.

10:46AM  20         Why?  Is it more likely that a facility that one of

21    their actual functions is sorting and distributing DVDs --

22    that's what they do -- isn't able to do that for months and

23    months?  Or is it more likely that they knew -- they knew they

24    couldn't send those DVDs back to my client because they knew

10:47AM  25    that my client would see them and know they were counterfeit.

─────── REALTIME UNEDITED TRANSCRIPT ONLY───────

1     The evidence in this case is pretty clear.  You know,

2  when you look at those DVDs, if you don't have both of them,

3  you might just think this is bad printing or whatever.

4     When you have both of them, it's obvious.

10:47AM  5     And the testimony that you heard is that the defendants,

6  once there was an order placed with Walmart, the defendants got

7  to decide what stores to send it to, right.  Like, those are

8  facts that we put in front of you that have been agreed to.

9     What that means is that -- and they knew what -- the

10:48AM  10  defendants could send those counterfeit DVDs to the stores that

11  they knew had no other inventory, and you would never be able

12  to compare them.

13     And we will talk about that in just a moment, because I

14  think it really goes to this whole argument that, well, they

10:48AM  15  were never do this because it's so important and they are like

16  if they got caught -- I'll circle back to this in a moment, but

17  the odds of them getting caught, they set this up smart.

18     And so when we go back -- I'm sorry.

19     Now, I want to contrast -- I want to contrast the

10:48AM  20  defendants refusal inexplicable refusal, to this day, to even

21  tell our client where those DVDs are.

22     Although, I think we know where they are.  They went to

23  Jax.

24     But I want to contrast that to Mr. Jackson.  What did

10:49AM  25  Mr. Jackson do when he got -- when my client reached out and

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1    said, hey, like, these came from a channel that shouldn't have

2    been distributed anywhere other than Walmart, I'm so sorry,

3    here you go.

4         Who in their right mind would turn over a whole bunch of

10:49AM   5    DVDs that they had counterfeited to the actual producer?

6         And then be willing to sit through deposition, be

7    willing to appear in trial, testify at trial -- more than

8    Mr. Paul did.  So when we go back to our last question, whose

9    behavior is more consistent with counterfeiting?  Absolutely

10:49AM  10   the defendants.

11        But the proof that the defendants were making

12   counterfeits and selling counterfeits is even more compelling

13   than that.

14        The information they provided essentially admits it.

10:50AM  15   And before I point out that admission, I want to remind you of

16   something.

17        Remember Mr. Peretzki telling you that the DVDs had been

18   selling at Christian Books for $14.99?

19        And then you heard Walmart yesterday.  You heard Walmart

10:50AM  20   giving its numbers.  And I'm going to put those numbers up.

21        Walmart gave us the numbers that the in store net sales

22   of *I Believe* were 26,486 units.

23        And they told us that was $342,682.  That was their net

24   sales, right?

10:51AM  25        And when you just do the math, that is an average sale

─────────── REALTIME UNEDITED TRANSCRIPT ONLY───────────

1    price of $12.94.  That is exactly right.

2            It's exactly what you would expect.

3            But then yesterday I read to this jury an interrogatory

4    response, and you were instructed that an interrogatory

10:51AM    5    response is the same as testimony under oath.  It's a statement

6    by SP Releasing.

7            I read an interrogatory response from SP to

8    Interrogatory 12 that said identify the amount of all monies

9    defendants has received in connection with the distribution,

10:51AM   10    exploitation -- distribution, monetization, licensing, and

11    exploitation of the picture.

12            I don't know why this is all fogged out, but the answer

13    -- if you remember, the answer was 469,690.

14            How did SP Releasing receive more in receipts than

10:52AM   15    Walmart's total sales?

16            They were selling counterfeits.  They were selling

17    counterfeits.  There is no other answer.

18            Now, I want to be really clear.  Don't get thrown by

19    this word "gross."  Because gross is a word that the defendants

10:52AM   20    use in their own -- let's take a look at Exhibit 9, right.

21    Remember Exhibit 9, the agreement between the defendants and

22    Wax Works?

23            You know, they used the word gross as meaning all monies

24    actually received and retained.  And retained, okay?

10:53AM   25            I'm sorry.  I'm actually looking in the wrong place.

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    So, that is adjusted gross.  Adjusted gross is after all their

2    deductions for all of their distribution costs.

3         Their gross is all revenues earned from the units

4    shipped to third parties.

10:53AM   5         Now, Echo Bridge is not going to want you to focus on

6    any of this, of course.

7         Instead, they will tell you that our whole case is Jeff

8    Jackson, Jeff Jackson's story is impossible, he must be lying.

9         Well, I already showed you that his story is not

10:54AM  10   impossible.

11        I truly thought Mr. Jackson was a very credible witness

12   and a solid human being.

13        He has been in this industry for a long time, and he

14   realized there were a lot of opportunities to buy and sell

10:54AM  15   closeout inventory.  And in this case, he produced Exhibit 19,

16   which, again, you have seen.

17        We haven't heard from anyone at Echo Bridge to dispute

18   that Mr. Jackson received ten pallets from that facility.

19        There is no question they were picked up from Echo

10:55AM  20   Bridge.

21        We haven't heard anyone dispute that the warehouse

22   facility was, in fact, selling off overstock inventory when it

23   was closing down.

24        The defendants simply haven't provided any records at

10:55AM  25   all, including, again, records of what happened to those 7,300

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    DVDs that they had that for month after month after month they

2    just wouldn't return to our clients.

3              So let's take a look at Exhibit 23.

4              You have seen Exhibit 23.  This is from April 1st of

10:55AM   5    2020.

6              All right.  Mr. Jackson testified about this.  He said,

7    yes, I sent this e-mail on April 1st of 2020.  And he said we

8    purchased a quantity of *I Believe* as they were -- from Echo

9    Bridge as they were going out of business in November.

10:56AM  10             Now, he did tell you he didn't know exactly who they

11   were dealing with, who he was doing with.  It could have been a

12   third party that was helping to facilitate that.  He doesn't

13   know.  But these came from Echo Bridge's facility.

14             And here is the question.  Let me see if my colleague

10:56AM  15   can answer this when he gets up and speaks to you.

16             How, on April 1st, could Mr. Jackson have known that

17   Echo Bridge was a distributor of *I Believe*?

18             How is this e-mail possible if he hadn't received those

19   DVDs through the Echo Bridge closeout?

10:57AM  20             Mr. Jackson may have seen the DVDs in Walmart, but you

21   will see the packaging.  There is nothing on the packaging that

22   indicates that Echo Bridge is the distributor.  There is no

23   public record of that.  There is no evidence that there is any

24   way he could have known.

10:57AM  25             You heard from Mr. Peretzki there are literally hundreds

REALTIME UNEDITED TRANSCRIPT ONLY

1   of DVD distributors.  How, on April 1st, if he got these from

2   someone else, is he identifying Echo Bridge?  Did he guess?

3   Because if he guessed and then turned these over in Walmart

4   boxes, he would have had egg all over his face if it turned out

10:57AM   5   that Echo Bridge was not the distributor for Walmart.

6        And there certainly were other distributors for Walmart,

7   right?

8        The only logical conclusion you can draw from the fact

9   that on April 1st, 2020, without any prompting from anyone

10:58AM   10   else, he's saying I got these from Echo Bridge is that he got

11   them from Echo Bridge.  He told you that.  He told you that on

12   the stand.

13        The idea that Mr. Jackson would not have gotten them

14   from Echo Bridge and sent this e-mail, it just makes no sense.

10:58AM   15        One second.

16        All right.  And then there are the boxes that I just

17   mentioned.  Let's take a look at Exhibit 20.

18        These boxes returned for credit?

19        How would he have known to put them in these boxes as

10:59AM   20   Walmart returns?

21        Let's take a look at Exhibit 21.

22        Overstock.  And you remember the Walmart representative

23   testifying that eight was overstock returns.

24        Echo Bridge Acquisition.

10:59AM   25        Was this just a lucky guess?  It doesn't make any sense.

─────────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────────

1    I told you a moment ago we were going to circle back to

2  this question of motive.  In his opening, my colleague told you

3  that you would hear that Echo Bridge would never do this

4  because Walmart is one of their biggest customers and they

11:00AM  5  would have jeopardized their business.  Well, you didn't hear

6  that.  No witness told you that.

7    That was just attorney arguments.

8    Look, I'm sure at some level there is or should be a

9  concern about one of your customer finding out you are selling

11:00AM  10  them counterfeits.  Sure.

11    But these were passable, unless you looked at the two

12  together.  My colleagues made a point with Mr. Jackson of

13  saying when you got these, you didn't recognize these as

14  counterfeits, you didn't -- I mean, there was no obvious tell

11:00AM  15  unless you compare them.

16    And they were all the same, right?

17    And again, Echo Bridge decided what stores to send these

18  to.  And could have sent them only to the stores that had no

19  more inventory.  And who's going to think the authorized

11:01AM  20  distributor is selling counterfeits?

21    And even beyond that, there has been zero evidence that

22  Walmart would terminate a vendor relationship if counterfeits

23  were being sold.  Zero.

24    Is there any evidence about how many times Walmart has

11:01AM  25  been sued for copyright infringement?  Is there any evidence

1    whether Walmart would do anything other than turn to the vendor

2    and just say handle this?

3         Any evidence that it would create any real trouble for

4    Echo Bridge?

11:01AM   5         Again, on the other hand, it would cause real trouble if

6    Echo Bridge couldn't stock its stores.  Because that's what

7    Walmart's concern is -- making sure it's got the inventory to

8    sell so it's making money.

9         And if you can't provide the inventory, I would argue

11:02AM  10    that's where you get in trouble.

11         So I think it's clear what happened here.

12         It's really clear.

13         The defendants got what really was a hot new released.

14    They admit that.  They played nice for a while.  They say they

11:02AM  15    honored the agreement of giving 65 percent over and taking

16    their 25 percent.  They built up some inventory, and then they

17    assumed that the new release was going to sort of run its

18    course, stop paying.

19         But then the new release kept performing strongly.  It

11:02AM  20    was clear that they needed to keep that flowing.

21         And then, when they closed their facility, knowing they

22    couldn't return them to the producer, they sold them out --

23    they allowed them to be sold out the book door of their

24    warehouse without any paperwork -- except for a bill of lading

11:03AM  25    and the Echo Bridge stickers on the boxes, if you consider that

1    paperwork.

2         I think the evidence in this case is overwhelming that

3    the defendants committed copyright infringement.

4         And you are going to need to consider Harvest Aid's

11:03AM    5    claim separately as to each defendant, so I want to talk

6    briefly about that.

7         Let's start with Steven Paul.

8         The evidence before you is that Steven Paul owns Echo

9    Bridge Acquisition Corp and SP Releasing.  He's the chairman

11:04AM   10    and CEO of both companies, and their employees of all of them

11    ultimately report to him.

12         We also know he was the one dealing with Wax Works.

13         He was the one dealing with Walmart.

14         He was the one that Mary Reagan wrote to say hey, we

11:04AM   15    need to make sure we can keep getting these DVDs from the

16    producer, can you take care of this payment issue.

17         He was the one then dealing with Wax Works.  And he was

18    the one who then jumped on poor Brian Lusk, the Echo Bridge

19    employee who was giving our client -- working with our client,

11:05AM   20    cooperatively, giving them -- saying, hey, like, okay, we need

21    more for the store, they are out here, sales are going great,

22    this is what's going on.

23         You will see in Exhibit 24 there is a whole series --

24    you will see in Exhibit 24, which is not up right now, a whole

11:05AM   25    -- all of those -- that exchange about -- where Mr. Lusk was

REALTIME UNEDITED TRANSCRIPT ONLY

1    working with Stacey and Jurgen and telling them what was going

2    on.

3          And then in August of 2018, after the Mary Reagan e-mail

4    saying please work out this payment because we need to get

11:05AM   5    DVDs, after that didn't happen -- and I'm guessing after

6    counterfeits were made and now the numbers of what was legit

7    and what wasn't are getting -- we have got to be really careful

8    we give Echo Bridge.  You get this e-mail from Steven Paul to

9    Brian Lusk, why are you communicating with our producers?  Who

11:06AM   10    gave you this authorization?

11          Why would you not let someone who has been working with

12    the client for months and months to make sure that they have

13    stock and know what the sales are and everything cooperative --

14    why would you shut that down?

11:06AM   15          And then from there, it goes to -- let's take a look at

16    Exhibit 24-8, right, where Brian Lusk then -- then tells our

17    client, I have been told I'm sharing information with you I

18    shouldn't be and I need to stop.  So considering I need my job,

19    that is what I will be doing.

11:06AM   20          Why is sharing information with the producer about the

21    sale of that producer's titles a fireable offense?

22          After that, no more updates on sales.

23          I think it's clear from the documents that this was

24    absolutely a Steven Paul production.

11:07AM   25          He was the boss.  He was involved from beginning to end.

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1       You can't think for a minute that any of this was not at his

2   direction.

3           Now let's talk about SP Releasing.  We will never know

4   what specific employees or employee did the replication.  But

11:08AM   5   we do know that SP Releasing and Echo Bridge shared a bunch of

6   employees.  We also know that Echo Bridge did what it did for

7   SP.

8           SP had the agreement with Wax Works.  And SP and -- SP

9   admits in response to Interrogatory No. 3, you will recall, SP

11:08AM  10   admitted that everything, all of the distribution was done on

11   its behalf.  All of the sales to Walmart, everything was

12   literally on its behalf.

13           That was -- those were the words from the interrogatory,

14   Interrogatory No. 3.

11:08AM  15           Now -- and Walmart told you that it paid Echo Bridge.

16   But I want to remind you of that Interrogatory No. 12 where we

17   asked SP what revenues it received.  And it gave us that number

18   of 469,000.

19           So it's telling you that all of the sales to Walmart

11:09AM  20   were its sales.

21           The revenues earned, the actions were on its behalf, the

22   sales were its sales.  This was all joint action all around.

23           All roads lead back to not only Echo Bridge, but all

24   defendants jointly.

11:09AM  25           When you go back into that jury room, you are going to

┌─ REALTIME UNEDITED TRANSCRIPT ONLY ─┐

1    have a verdict form to fill out.  In my last moments with you,

2    I would like to walk through that verdict form together.

3         The first question is going to be:  Do you find that any

4    of the defendants in this case infringed Harvest Aid LLC's

11:09AM    5    copyright in the film *I Believe*?

6         And there are two ways you can make that finding.

7         One is by finding that they made unauthorized copies,

8    unauthorized replications.

9         The other is by finding that they distributed

11:10AM    10    unauthorized copies, unauthorized replications, whether to

11    Walmart or anyone else.

12         Now -- so, we're going to ask that for this first

13    question that the jury find yes for each defendant.

14         In order to reach that question -- in order to answer

11:11AM    15    yes, you are going to see Instruction 23.

16         And Instruction 23 says the plaintiff has the burden of

17    proving by a preponderance of the evidence that the plaintiff

18    is the owner of the copyright.  And also as to each defendant,

19    that the defendant either made unauthorized copies of the DVDs

11:11AM    20    or distributed unauthorized copies.

21         All right.  And we had taken a look at the very

22    beginning, if you recall, at the ownership.  And I don't want

23    to repeat myself.  Everyone has agreed the movie is original

24    and there is no question that our client is the author.  So

11:11AM    25    ownership is easy.

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1          Let's take a look then at -- well, yes, yes, and yes.

2     For all of the reasons we have discussed so far.

3          Now let's take a look at the next question.  I'm sorry

4     -- I'm so sorry.

5          If you find that --

6          THE COURT:  I think -- I know you are in the middle

7     of your closing, but we're going to have to take a break.  So

8     we may take about ten minutes.

9          MR. DONIGER:  No problem.

10         THE COURT:  Ladies and gentlemen of the jury, go

11    ahead and take a recess.  I will remind you not to discuss the

12    case, do not begin any deliberations, or do any type of

13    research.

14         THE COURTROOM DEPUTY:  All rise for the jury.

15         (Jury exits the courtroom at 11:12 a.m.)

16         THE COURT:  I apologize.  I could tell one of the

17    jurors -- the same one that needed to go to the restroom

18    yesterday, I think she raised her hand and she needed to go.

19    Okay.  So we will be back in about ten minutes.

20         MR. KATRINAK:  Thank you, Your Honor.

21         THE COURTROOM DEPUTY:  The Court stands in recess.

22              (Morning recess.)

23         THE COURTROOM DEPUTY:  All rise for the jury.

24         (Jury enters the courtroom at 11:27 a.m.)

25         THE COURTROOM DEPUTY:  All rise.  This Court is

—— REALTIME UNEDITED TRANSCRIPT ONLY——

1    again in session.

2            THE COURT:  Okay.  You all can be seated.  Thank

3    you.

4            When you are ready, please continue, Mr. Doniger.

11:29AM   5            MR. DONIGER:  Thank you, Your Honor.

6            All right.  As I was saying before we took our break, I

7    think if you find infringement, you have to find willful

8    infringement.  There is no, oops, we made a mistake and

9    replicated their DVDs.  No oops we made a mistake and sent

11:29AM  10    counterfeit DVDs to Walmart.

11            An infringement is willful when the plaintiff has proven

12    both of the following.  That the defendants engaged in acts

13    that infringed the copyright, and that the defendant knew that

14    those acts infringe the copyright, or the defendant acted with

11:30AM  15    reckless disregard for, or willful blindness to, the copyright

16    holders rights.

17            So when you fill out the verdict form, we're going to

18    ask that you find that the defendants were willful.

19            And I don't know why those X's are off, but now I see

11:30AM  20    there are three.

21            All right.  Next, you are going to have to decide

22    damages.

23            And the instruction on statutory damages provides that

24    in determining -- the amount of statutory damages, if it is

11:30AM  25    neither willful nor innocent, it's 750 to 30,000.  But if you

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1   find it was willful, you may award as much as $150,000.

2       And this is important because as you will read here, the

3   purpose of statutory damages is not just to compensate someone.

4   It's to deter bad conduct.  It's to deter infringement.

11:31AM  5       It's to penalize the infringer, and you need to take

6   into account the circumstances, whether it was intentional, the

7   potential profits earned.  There is a whole bunch of factors

8   here.

9       And I'm going to leave it to you to do what you think is

11:31AM 10  appropriate.  But note that this is a company that is not small

11  and knew what it was doing.  These are defendants.

12       And so, let's take a look.  And you will have this, you

13  will fill out what you think is appropriate.  The thing I want

14  to note about this is -- and I think all parties agree -- these

11:32AM 15  damages are not added together.  So if you were to find 100,000

16  as to each, it would just be a single 100,000.  We agree to

17  that.  It's not -- you are not multiplying it because it's the

18  same infringing conduct.

19       So let's take a look then at the next -- Instruction 31.

11:32AM 20       We're going to take a look at -- this is for

21  circumventing technical measures, and this is just a part of

22  that instruction that tells you that in order for us to prove

23  that the defendants have circumvented technological measures

24  controlling access to the film *I Believe*, we need to show that

11:32AM 25  we own a work protected by under the copyright act -- that's

1    agreed by the parties -- the work uses a technological measure

2    that controls access to that work.  There is no dispute about

3    that.  And that the defendant affirmatively accessed what

4    protected those technological measures without authorization,

11:33AM  5    and actually circumvented the technological measures to do so.

6        You may have to spend a little time working out the

7    jargon here, but the bottom line is that if you find that the

8    defendants counterfeited DVDs, I think you have to find that

9    they circumvented technical measures to do so.

11:33AM  10       We know that Harvest Aid specifically ordered and paid

11   for that antipiracy program.  We can see that it's on the DVDs.

12   It's on there, yet the qualify is just fine.

13       So let's take a look at the next.  We're going to ask to

14   you find yes to each of these, and I'm not going to go over the

11:33AM  15   statutory damage instruction for this, but that statutory

16   damage amount is in your discretion between $2,500 and $25,000.

17       There are a couple more questions on the verdict form,

18   and those relate to the claims between -- that the defendants

19   are making against poor Mr. Woodward.

11:34AM  20       And I don't -- I'm not going to address this.  On my

21   client's claim, I'm going to submit that this case shouldn't

22   even be a close call.  Let's look at what we know for a fact.

23       Fact, as late as July of 2019, Echo Bridge was admitting

24   that it had 7,300 DVD copies of *I Believe*.

11:34AM  25       Fact, at that point, Harvest Aid had been asking for

REALTIME UNEDITED TRANSCRIPT ONLY

1    those back for like five months.

2          Fact, those DVDs were at the Wisconsin facility.

3          Fact, that facility had replication equipment.

4          Fact, ten pallets of DVDs got sent by someone from that

11:35AM  5    Echo Bridge facility to Mr. Jackson.  We have a bill of lading.

6    We have got the pick up.  There is no question about that.

7          Now, there is something I need to address.  Even though

8    it is -- you may think it contrary to the totality of the

9    evidence in the case, there is a stipulated fact, No. 4, that

11:35AM  10   EBAC, Echo Bridge, was a sub-distributor of SP Releasing who

11   distributed DVDs of *I Believe* exclusively to Walmart Inc.,

12   brick-and-mortar stores.

13         And that is a fact that, setting aside the why, that we

14   have agreed to.

11:35AM  15         That certainly does not mean that the DVDs that were

16   shipped to Jax were not DVDs from that warehouse.

17         At most, it means that Echo Bridge did not directly ship

18   them.

19         But we heard from Mr. Otto who told us that he also

11:36AM  20   works -- that works for SP Releasing and he oversaw the closing

21   of the facility.  SP Releasing was involved in that.  So you

22   could find that they were shipped by SP.

23         But either way, if you find that Echo Bridge had, in

24   fact, sent these counterfeits to Walmart and they got returned,

11:36AM  25   that is liability.

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    And there is nothing in this fact about Mr. Paul, about

2    SP.

3    All roads leads back to the defendants.

4    And the conclusion that they made unauthorized copies of

11:36AM  5    *I Believe* and those unauthorized copies got in the hands of

6    Jeff Jackson and, ultimately, our client and its replicator in

7    Minnesota.

8    In a moment counsel for the defendant is going to get up

9    here, and he's going to tell you how all of this evidence, all

11:37AM  10   of this common sense establishes nothing.

11   He will tell you that what was important to his clients

12   and what they would and wouldn't do.  But, again, you never

13   heard from his client.

14   At the end of this case, I trust you.

11:37AM  15   My client trusts you to reach the right decision, trusts

16   to you see through all of the smoke screen and realize that the

17   only story that makes sense, the only version of facts that

18   makes sense is that the defendants manufactured counterfeit

19   DVDs when they knew they weren't going to be getting more from

11:38AM  20   my client, and got caught.  They got busted.  I'm going to ask

21   you to find against them, find them liable.

22   Because my client has the burden of proof, I'm going to

23   have a very brief opportunity to speak to you again after

24   counsel finish their closings.

11:38AM  25   And then counsel for the defendants will have a chance

REALTIME UNEDITED TRANSCRIPT ONLY

1    also to give you a brief rebuttal on his claim against Wax

2    Works.

3         And after that, you have an important job to do.

4         You get to decide what more likely than not is the truth

11:38AM   5    in this case.

6         You get an opportunity to take a stand against

7    unscrupulous business practices.

8         And specifically, counterfeiting, and return a verdict

9    in our client's favor.

11:38AM  10        Again, you have been patient beyond what we should have

11   hoped -- what we could have hoped for you.

12        And you really have my heartfelt thank you for the

13   attention you have given this case and the attention you have

14   given me here today.  And we will leave it in your hands.

11:39AM  15   Thank you.

16        THE COURT:  Thank you very much.  On behalf of the

17   defendant, Mr. Leichter.

18        MR. LEICHTER:  Thank you very much, Your Honor.

19        Ladies and gentlemen of the jury -- I'm sorry.  Let me

11:39AM  20   get my water.

21        Ladies and gentlemen of the jury, it's my chance to talk

22   to you again.

23        I really appreciate having this chance.  I really do.

24        I'm going to try to keep it as short as possible because

11:40AM  25   as I told you at the beginning, your time is precious to me.

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    You heard the evidence and I heard the evidence.  Everybody in

2    this room heard the evidence over the last five days and is now

3    hearing the arguments.  We did it together, and I know you

4    heard what I heard.

11:40AM  5        I don't think Mr. Doniger heard what you and I heard,

6    but we know what happened in this case.

7        But before I start talking about the case, I have to

8    talk about something else.

9        I have to talk about who I am and who you are and what

11:40AM  10   is going on here.  And I have to put it in context.

11       The oath that you took at the beginning of this case to

12   act as jurors, the act that you took to answer that jury

13   summons, that was an act of love.

14       That oath is an act of love.

11:40AM  15       Behind the Court -- behind the Judge -- we call the

16   Judge "the Court" here -- is the court.  It's the symbol of the

17   justice that we're here to do.  It's the great seal of the

18   United States of America.  That is what you see behind the

19   Court.

11:41AM  20       And you can see the eagle that represents the United

21   States of America.  That is our national bird.  You can see in

22   one hand the arrows of war, and in the other hand, the laurels

23   of peace.  You can see above -- it's hard to read -- there is a

24   ribbon, and that ribbon says, in Latin, it's a Latin phrase it

11:41AM  25   says e *pluribus unum*.  That phrase means "from many, one."

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    Why do we have juries?  Remember at the beginning of the

2   case the judge explained to you that there is a Constitutional

3   provision that says we are going to have jury trials.

4    We're going to have ordinary folks with their common

11:41AM   5   sense come in and be the judges of the facts.

6    Judges are not the judges of the facts in a jury trial.

7   People are.  People are.

8    And we come together in events like this, and you come

9   to events like this in order to deliver justice.  To deliver

11:42AM  10   the justice that the Constitution promises to every citizen of

11   the United States.  Every person who comes into a Court here is

12   entitled to get justice.

13    And what is the justice?  That is the wrong question.

14    Who is justice?  Folks randomly selected from the

11:42AM  15   district to come in here and listen to the parties talk, to

16   listen to the evidence, to listen to witnesses.  That's what is

17   justice, that is who is justice, and that's what you are here

18   to deliver.

19    So I agree with my opposing counseling on a couple of

11:42AM  20   things, and one of them is this is very important what is going

21   on here and your role is very important.

22    I also agree with him on another thing, which is that

23   this case is not a close call.  It's just not a close call in a

24   different way from what he is saying.

11:43AM  25    There has been a complete failure of proof in this case.

1          I'm going to talk about it in a moment.

2          There are some details.

3          But first, I want for say what the Court has instructed

4    you about in your duties to deliberate.  You have to use your

11:43AM   5    common sense.  You have to take the evidence of the witnesses

6    and ask yourself what was true, what was not true, what made

7    sense, what didn't make sense.

8          And as you do that, and in that process, you don't act

9    like a lawyer, you act like a person.  I'm not a copyright

11:43AM  10    lawyer.  I'm not Mr. Copyright like Mr. Doniger.  I'm just a

11    person who whose job it is to present cases and to argue cases

12    to people like you in order to get the justice that we are

13    promised by that great seal.

14          I'm going to say I really appreciate the opportunity to

11:43AM  15    do that here for you, and I appreciate my client's confidence

16    in me to have me present their side of things and to have me

17    talk on their behalf to you.

18          And I really appreciate that when I come here and I talk

19    to you that you are listening to me and that you are paying

11:44AM  20    attention to the words that I say because they matter, I think.

21    Not just for this case, but because we're part of a greater

22    enterprise.  What we're trying to do is deliver justice.

23          And I submit to you that justice in this case is easy to

24    find.  Justice is a verdict of the defense when we're talking

11:44AM  25    about what the plaintiff has accused here.  Justice is a

─────────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────────

```
        1    verdict for the defense.

        2         I put together a little set of slides that would just

        3    help me -- help guide me through talking about the case and

        4    help, I hope, you in thinking about the case.

11:45AM 5         Before I actually turn on those slides -- because it's

        6    going to take a moment for that to happen anyway -- I have to

        7    say I not only thank you for what you are doing, I want to

        8    thank the Court for all of the time and effort the Court has

        9    put into this.  I want to thank the Court staff for all of the

11:45AM 10   careful attention and for the many kindnesses that all parties

        11   have been afforded here today.

        12        And I want to thank opposing counsel.  There has been

        13   some contentious moments in here, but I want to thank him and I

        14   want to thank his team for being here and for participating.

11:45AM 15   Because as I said, this is a process that leads to justice.

        16   And even if they are wrong -- and they are completely wrong --

        17   even if they are wrong, they are part of this process, and I

        18   appreciate whatever contribution they made here.  Even if it

        19   didn't prove the case, I appreciate that they came here.

11:46AM 20        There we go.

        21        Now that is not working.

        22        There we go.

        23        This is a case about counterfeiting.  That's what we are

        24   here to talk about.  This is not a case about technological

11:46AM 25   this and circumvention of that, you know.  Those are all fancy
```

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1   words.  The case is about counterfeiting.  It's right there in

2   the instructions.  The plaintiff accuses the defendant of

3   counterfeiting.

4        So did it happen?  There was no counterfeiting here.

11:46AM  5   There is no proof of counterfeiting by any defendant.  Remember

6   I talked -- we will go into my opening in a minute.  But I

7   stood up here, as Mr. Doniger referenced, I stood up here and

8   said you are going to listen to this trial.  The counterfeiter

9   is Jeff Jackson.  He's going to get up here and he's going to

11:47AM  10   lie.  And I didn't know if we would be playing a deposition or

11   he'd be in person.  As it turns out, he was remote testifying.

12   And I said you are going to watch him sweat.  He sure did,

13   didn't he?

14        He didn't prove anything about my clients.  I will get

11:47AM  15   into the details.  Nothing.  The only thing that he proved, at

16   least to me, is that he is one shady character.

17        And he proved to me that part of that shadiness is that

18   he's willing to lie to you.

19        And beyond that shadiness is the fact that plaintiff

11:47AM  20   hook, line, and sinker presented those lies to you as part of

21   its case.  And it's only after they completely crumbled that

22   you hear this new story being spun by Mr. Doniger.

23        To come to that story, it is remarkable.  I took 20

24   pages of notes to listen to that.

11:48AM  25        That's when we heard it.  Because they had no case.  It

—— REALTIME UNEDITED TRANSCRIPT ONLY——

 1   failed.  And you heard it.  It happened right here.  We were

 2   all part of the event.

 3          Plaintiff's entire case was built on a lie.

 4          And they took that lie and they added more lies to it

11:48AM  5   and more lies to it and more lies to it.  And when they were

 6   proven to be lies, they added even more lies.

 7          This is shameless.

 8          It shouldn't happen.

 9          In the opening statement, I made a contract with this

11:48AM 10   jury, with all of you.  I made a contract.  I promised you what

11   this case would come out and how it would look.  I kept my

12   promise.  I told you Jackson would lie, and he lied.

13          He lied so bad that he retracted his testimony.  I said

14   that my clients were wrongly sued.  I proved that.

11:48AM 15          Because there was no basis to have sued them.

16          Just think about Steven Paul.  You heard the closing.

17   The best he could come up with was, well, he's in charge of the

18   company, and you know, there is a lot of companies.

19          That doesn't proof that he's a counterfeiter.  Use your

11:49AM 20   common sense.

21          I told you that there would be no proof of any of the

22   claims.  Was there proof?  Did you hear it proved?  No.  You

23   heard a bunch of things being thrown up in the air.  Don't look

24   over here, that is not true, but look over here, no, no, no,

11:49AM 25   that is not true either.  Now you are being led through

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1   documents in this crazy way where, oh, look, it must have

2   happened.  This document shows at 9:23 a.m. something arrived

3   on some loading dock -- I don't even know that it shows that --

4   but let's imagine that Jeff Jackson went down there.  This is

5   crazy.  This is not the evidence in the case.

6        The ten pallet story, that is what this case was based

7   on.  You heard Mr. Doniger get up there -- up here, right where

8   I'm standing now -- at the beginning of the case and tell you

9   that ten pallets, the ten pallets, they were shipped from Echo

10  Bridge, this is proof of counterfeiting.

11       The ten pallets is a counterfeit itself.

12       The whole story is a lie.  He admitted it.

13       Liars can spin their lies, and I am standing here

14  calling Jeff Jackson a liar.

15       And anyone who supports him, shame on them.  Shame on

16  them.  This man cannot be believed.

17       But you know, it's not only liars and their lying lies

18  that you have to watch out for.  It's the nice people who can

19  make mistakes.  Who can think, oh, let's accuse Echo Bridge,

20  let's accuse Steven Paul.  Maybe they are well-intentioned,

21  maybe, but that is not proof.

22       That doesn't mean they proved their case.  It just means

23  that they were wrong.

24       So you don't have to decide that Jurgen Peretzki is an

25  evil man.  You don't have to decide than Stacey Peretzki is

```
 1    evil.  You just have to decide that they have no case.

 2          Which they don't.

 3          The plaintiffs have failed to meet their burden of

 4    proof.  The judge instructed you, and you are going to take the

 5    instructions into the room -- and you will see it's their

 6    burden of proof.  They have to prove their case.

 7          So shame on Mr. Doniger for saying, oh, you know,

 8    Mr. Leichter didn't present any witnesses.  It's not my job to

 9    present witnesses.

10          That is not my job.

11          His job is to prove his case.  And I listened to that

12    case.  I listened to every witness.  I looked at every

13    document.  And you know what?  I didn't have to take your time

14    up presenting witnesses to talk about things that -- other

15    things that never came up in the trial.

16          All I had to do was go, you know what, that is a total

17    failure of proof.

18          I told you your time was precious, and I wasn't going to

19    make this case go on for days and days more with additional

20    witnesses because I didn't need to.

21          Because there is no proof.

22          There was no proof of counterfeiting.  No proof.  Not

23    even the barest link was made to counterfeit goods.  I will

24    talk about whether the four DVDs that were discussed with you

25    during this trial whether any of those, not -- let's assume
```

Line timestamps: 11:51AM (5), 11:51AM (10), 11:51AM (15), 11:51AM (20), 11:52AM (25)

1    they were counterfeits for this moment.  Where is the link to

2    my client?  Not even the barest link.  Because once Jeff

3    Jackson and his ten pallets and his Unishippers, et cetera,

4    upon which this case was built, once you take those things

11:52AM    5    away, what is left?  Nothing.  Ten pallets of stuff.  What was

6    it?  Did it include *I Believe*?  The only way you can believe

7    that it included *I Believe* is to believe Jeff Jackson.

8            But remember, in the end he didn't even believe himself.

9            There is no link.

11:53AM    10           There is no proof of technological circumvention.  I'm

11    going to talk about Greg Schoener and the sleight of hand that

12    went on with him with regard to proof of counterfeiting.

13           But you can put in your mind, wait, did I hear experts

14    come in here?  Did they talk about how they took apart the

11:53AM    15   DVDs?  How they looked at the bits and bytes?  No.  You are not

16    going to hear any of that.  None of that.  There was no proof

17    of distribution of *I Believe* to Jeff Jackson.

18           The only proof is a bill of lading that Jeff Jackson --

19    that doesn't say *I Believe* -- and that Jeff Jackson ultimately

11:53AM    20   set himself on fire over.

21           There is no proof of distribution to anyone other than

22    Walmart, and that means no proof, no case.  It's a verdict for

23    the defense.

24           Because accusations mean nothing.

11:53AM    25           There is a Court of law.  Proof, evidence, that's what

1    matters.

2           So I have a few questions.

3           These are -- I have got, you know, why and how and

4    things like that.  I have been using them to orient some of my

11:54AM  5    analysis of the case that I'm sharing with you.

6           Why would anybody pay for something he could get for

7    free?  That is a fundamental question that this evidence --

8    this case calls out for a good answer for.

9           It came for free.  And you heard the testimony, these

11:54AM  10   things could cost over a buck to make.

11          Right?

12          Why would you take that and take your money out of your

13   pocket when you could just order it.  And remember the

14   testimony, they stopped ordering, that's why they stopped --

11:54AM  15   that's why ADS wasn't shipping anymore, because Echo Bridge

16   stopped ordering.  And why did they stop ordering?  They had

17   stuff in inventory.  They didn't need to order more.

18          So why would they counterfeit?  Why pay to counterfeit

19   something when you have thousands of them in inventory?

11:55AM  20          You just heard the plaintiff relies on the notion that

21   4,600 of these were returned.  Were returned.

22          So they can't deny that inventory was at least 4,600 at

23   EBAC and they were returned to ADS.

24          But did you hear any evidence about the tests that were

11:55AM  25   performed by ADS on the ones that actually came from Echo

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    Bridge?  Did you hear about whether there were counterfeits

2    with regard to the 4,600 that were returned?

3         Besides, not only that, why pay to counterfeit if you

4    have thousands in inventory?  Why pay to counterfeit if you

11:55AM   5    could just order more?  Why pay to counterfeit at all if they

6    are being returned?

7         There is overstocks.  Why would you risk your biggest

8    customer with fakes?

9         You know, I was really -- my ears burned when I heard a

11:56AM  10    argument a few moments ago from Mr. Doniger about that.  He

11    said there was no proof here that Walmart would be upset if it

12    was shipped counterfeits.

13         Use your common sense.  You think Walmart wants to deal

14    with counterfeiters?  You think that after they say, oh, yeah,

11:56AM  15    no problem, you deal with the counterfeiting, and they keep on

16    selling the goods.  You think that Walmart is going to say

17    that?

18         Use your common sense.

19         This is a giant corporation.  In fact, I think it's one

11:56AM  20    of the biggest corporations in the world.

21         You think they deal with counterfeiters?  You think they

22    risk their reputation like that.  Come on.  Nobody would risk

23    their vendor number.

24         You heard testimony from Terry Woodward about how

11:56AM  25    important the vendor number is.  You saw in the documents how

1    -- what they were trying to do.  How what Harvest Aid was

2    trying to do was access the vendor number, because that was the

3    key to EBAC.

4         95 to 99 percent of its business -- this is stipulated

11:57AM  5    -- came from that one customer.  Use your common sense.  You

6    don't fool around.  Why would you risk your biggest customer?

7         Here is another big why.  Why is all of the evidence in

8    this case that is being presented to you by Mr. Doniger, why

9    does it all go through Jeff Jackson?

11:57AM  10    There is no road here that doesn't travel through his

11   garage.  None.

12        Because remember the testimony from Jurgen Peretzki.

13   Remember he pulled the things out his backpack, pulled a couple

14   of DVDs out of his backpack and he said, oh, look at these,

11:58AM  15   right?  I compared them and they didn't seem the same.  One had

16   a bad label and then I played them and it looked great and it

17   sounded great.  Right?  Remember that?

18        He said he got them from Jeff Jackson.

19        He had no personal knowledge or any knowledge that it

11:58AM  20   came from EBAC except for the lies being spun by Jeff Jackson.

21   Jeff Jackson who, by the way, was working directly with Jurgen.

22   You saw the e-mail, Exhibit 23.  Sent it to him, okay, even

23   though he denied knowing Jurgen.  He sent it to him.  Working

24   with the lawyers, you saw the declarations Jeff Jackson

11:58AM  25   prepared for them, that they wrote for him and that he signed

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    accusing my client of counterfeiting based on the ten pallet

2    story.  The ten pallets, the ten pallets.

3         Mr. Doniger just told you a few minutes ago he said, oh,

4    the ten pallet story Mr. Jax just made a mistake.  Look at

11:59AM  5    Exhibit 23.  Here he is.  Why would he notify Jurgen of this --

6    that it was Echo Bridge unless it actually was.

7         You want the answer?  You know the answer.

8         I gave it to you in opening.

9         The Echo Bridge buy was cover.

11:59AM 10         He knew Echo Bridge was going out of business.  He

11    figured out buy a bunch of closeout, then when I'm caught

12    counterfeiting, I will put it on Echo Bridge.  It was posited

13    to you how would he know that *I Believe* -- how would he have

14    access to it.

11:59AM 15         Jeff Jackson said -- you saw it -- Amazon.  He had -- he

16    sent to one of his customers the Amazon.com listing for this

17    product.

18         He obviously had access to it.  He could tell it was a

19    good seller from that, if not from just his knowledge as a

11:59AM 20    person who dealt with the Christian Book -- Christian movie

21    world.  That was his focus, remember?

22         So where is the motivation to counterfeit?  It's his.

23         Is there a tie to EBAC?  No.

24         THE COURT:  Counsel.  I know I'm interpreting you

25    but.

REALTIME UNEDITED TRANSCRIPT ONLY

1      MR. LEICHTER:  We are close.

2      THE COURT:  We are there.

3      MR. LEICHTER:  I will finish this slide and be done

4  if the Court gives me one minute.

12:00PM  5      THE COURT:  Yes.

6      MR. LEICHTER:  All of the evidence that is claimed,

7  every claimed piece of evidence of counterfeiting travels

8  through Jeff Jackson.  All of the testimony about this comes

9  through Jeff Jackson, one way or the other.  No other witness

12:00PM 10  besides Jackson and Peretzki and Schoener talked about

11  counterfeits.

12      And why allege counterfeiting and not test the goods?

13  Where is -- we will talk about the slide of technological

14  circumvention.  Where is the expert testimony of Mr. Schoener?

12:01PM 15  About the tests that he admitted he performed, but which

16  Mr. Doniger wouldn't ask him about.

17      What happened in those tests?  Why were you not

18  presented with evidence of tests, real expert tests to show

19  duplication of DVDs and stripping of the secret encryption

12:01PM 20  things.

21      You know why?  Because there wasn't any evidence.

22      Thank you, Your Honor.

23      THE COURT:  Okay.  So ladies and gentlemen of the

24  jury, in order for us to be able to get through -- in order for

12:01PM 25  us to get through everything we need to get through for today,

```
                    ──── REALTIME UNEDITED TRANSCRIPT ONLY ────
```

1    I'm going to have you all come back at 1 o'clock to start

2    earlier.  Just making sure you all are okay with that?

3            Okay.  Then I will remind you, please do not discuss the

4    case, form any opinions, begin any type of deliberations, and

12:02PM  5    we'll start back at 1 o'clock.

6                    THE COURTROOM DEPUTY:  All rise for the jury.

7                    (Jury exits the courtroom at 12:02 p.m.)

8                    THE COURT:  All right.  We will see you back at

9    1:00.

12:02PM  10                        (Lunch recess.)

11                    THE COURTROOM DEPUTY:  All rise for the jury.

12                    (Jury enters the courtroom at 1:06 p.m.)

13                    THE COURTROOM DEPUTY:  All rise for the Court.  This

14    Court is again in session.

01:08PM  15                    THE COURT:  Thank you, all.  Be seated.  Welcome

16    back.

17            Okay.  Counsel, whenever you are ready, you can

18    continue.

19                    MR. LEICHTER:  Thank you very much, Your Honor.

01:09PM  20            So where we left off before lunch, and I hope you all

21    had a nice break, we were talking about some of my why

22    questions that common sense demands be asked about this case,

23    about what plaintiff's have presented you.

24            I ended with why would you allege counterfeiting, like

01:09PM  25    they have, and not test the goods?

1    And the answer is they did test the goods.  There was an

2  admission by Greg Schoener that he tested the goods.  But you

3  know what?  They didn't present that test to you, did they?

4    Why?  Why?  If they wanted to prove counterfeiting and

01:09PM    5  all of this technological stuff, why would they call this guy

6  -- who is obviously closely associated with them, right -- why

7  would they do that and not say, sir, can you please describe

8  the test you did and what the result was?

9    Why?  What are they hiding?

01:10PM    10    Now, I'd like to talk about my how questions.  And also

11  a little bit about when and where.

12    First question, how did this counterfeiting happen?

13  Where is the exact evidence of how it happened?  What is the

14  machine that was used?  How does that machine work?  Were

01:10PM    15  witnesses called from Harvest Aid to talk about that?  Were any

16  witnesses even called from EBAC to talk about that -- except

17  for Mr. Otto who was called by plaintiff -- and asked was there

18  a capability to counterfeit?  And he said -- sorry, to

19  replicate at the facility, and he said no.  We had a machine

01:10PM    20  that was all boxed up.  It hadn't been put into service.  And

21  he said that.

22    That's the testimony that was elicited.  This stuff that

23  came from Lauter -- and I'll get to it in a minute -- the judge

24  has specifically instructed you that it is not evidence.  It is

01:11PM    25  only evidence to the extent that you think it makes Matt Otto a

REALTIME UNEDITED TRANSCRIPT ONLY

1    liar.

2         Mr. Doniger was dishonest when he asked you to consider

3    that as evidence.

4         He went contrary to the judge's instructions.

01:11PM   5         Because the judge told you that's only admissible for

6    that tiny, little purpose, and there was specific and good

7    reasons why that is the case.  And they go beyond Lauter's

8    personality.

9         They go to the root of how our justice system has to

01:11PM  10    work.  That witness does not get to come in and say what

11    Mr. Doniger says he said.  He only gets to come in to challenge

12    Mr. Otto.

13         And if you think that because there is some Lauter said

14    about something Steven Paul supposedly said, if you think that

01:11PM  15    makes Matt Otto a liar, well, fine, you took that evidence the

16    right way.  But it doesn't make me feel that way, and it

17    shouldn't make you feel that way because he's not a liar.  And

18    there is no truth coming out from Lauter's testimony, it can't

19    be taken for the truth.

01:12PM  20         So for Mr. Doniger to ask you to rely on that was wrong.

21         How did the counterfeiting happen?  This is one of the

22    questions he never answers.  There is no dispute at all here

23    that EBAC can make -- can replicate.  Whether it's in house or

24    through third parties, there is no dispute about the ability to

01:12PM  25    do that.  They're a DVD company.  This contract provided they

REALTIME UNEDITED TRANSCRIPT ONLY

1    would get all of the DVDs made for them, otherwise, replication

2    services were done by others.  For example, New Century.  And

3    you saw the contract where they were going to provide the

4    replication services for EBAC.

01:12PM    5    We don't deny EBAC had the ability to make copies of

6    things.  What we deny is that they actually made any fake

7    copies of *I Believe*.  Because they didn't have to all of those

8    other reasons.  And here is no proof that they did that.

9    The only proof that they have offered you is Schoener,

01:13PM    10   who doesn't even test the ones that come from EBAC, and Jurgen

11   who said here is a couple of DVDs, look how, you know, they

12   look different.  One of them is fuzzy.

13   One of them -- then Schoener who says one of them has

14   numbers and other doesn't have numbers.  Okay.  What do they

01:13PM    15   prove?  Counterfeiting?  No.  They proved that some DVD has

16   numbers and another one doesn't have numbers.  They proved that

17   one is blurry and one is not blurry.  That is not proof of

18   counterfeiting by my clients.

19   Maybe it's some kind of circumstantial evidence that

01:13PM    20   somehow copies were made that were different.  But does that

21   prove that my client's counterfeited them or overcame

22   technological protections inside them?  No.

23   Another one of these questions, there is no where it

24   happened, there is no when it happened, there is no, you know,

01:14PM    25   Mr. Jones did this.  Certainly no evidence of Steven Paul doing

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    anything.  There just isn't any evidence here.

2         And you got to ask yourself another how question here.

3         Because there is inconsistencies in plaintiff's case all

4    over.

01:14PM    5         Here is a how question.  How can a case be, on the one

6    hand, based on overstocks and thousands of returns, and even

7    tens of thousands of returns.  That is evidence is clear -- and

8    they -- it's part of their case in chief that these were

9    overstocks and returns that were coming back from Walmart,

01:14PM   10    right, and going to Jax?

11         All of those returns.  And yet, on the other hand, they

12    wanted to say this was such a hot seller, it had to be

13    counterfeited.

14         These things don't exist in the same universe of

01:15PM   15    reality.  You have got to use your common sense.  If it's an

16    incredibly hot seller, then there is none left.  There is none

17    being returned.

18         If tons of them are being returned -- and the evidence

19    is tons of them are being returned, we don't dispute that --

01:15PM   20    then how can it also be true that there's sell outs and we

21    needed more.

22         This is just a fake argument that has been presented to

23    you.  It's fake.  It's just another lie to patch up earlier

24    lies, and it doesn't work.

01:15PM   25         And I would submit to you that if a person comes to you

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    and lies and lies and is caught lying, and then lies again and

2    is caught lying again, you shouldn't believe anything they say.

3    I think that is common sense too.

4         Who.  A quick point to make.  My clients are three

01:15PM   5    separate clients.  Separate.  And the admitted facts that you

6    were told about here show how each of those clients relate to

7    the distribution in question here.

8         SP Releasing took a license, or at least believed they

9    got a license, to distribute from Wax Works.

01:16PM  10         Then it gave a sublicense that made SP Releasing a

11    sub-distributor of Wax Works, and then Echo Bridge became the

12    sub-sub-distributor.

13         That is how it worked.

14         Steven Paul, all he did was run the companies as CEO.

01:16PM  15    That's it.  That's what he did.  Those are the three whos on my

16    side of the case.  And a question was asked by -- or a point

17    was raised, I guess I would call it that -- by Mr. Doniger

18    during his closing about, you know, the return of counterfeit

19    DVDs.  Well, who would return counterfeit DVDs?  There is no

01:16PM  20    reason to, right?  If you are counterfeiting and you make the

21    returns, right, who would return counterfeit DVDs?  We returned

22    4,600.  But what an inconsistency that is because Mr. Doniger

23    says that the -- that EBAC had no real inventory and had to

24    counterfeit.

01:17PM  25         Again, these two things don't exist in the same

─────────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────────

 1    universe.  At least not for people who have common sense.

 2        These are the whos that you have to focus on on the

 3    other side because these are the witnesses they brought before

 4    you.

 5        This is the entirety of the case that plaintiff

 6    presented was through these witnesses.

 7        I'm going to talk about each of them.  Very briefly, but

 8    I'm going to talk about each.

 9        MR. DONIGER:  Your Honor, I'm going to object.  It

10    is improper to be name calling of witnesses and clients.

11    Counsel has written "Looney Lauter" up there.  This is clearly

12    improper closing.

13        THE COURT:  I'm not going to make him take it down,

14    whether or not it's improper, you called attention to it and

15    the jury has seen it.  Move on.

16        MR. LEICHTER:  Okay.

17        THE COURT:  We will deal with it later.

18        MR. LEICHTER:  Thank you, Your Honor.

19        This is a list of the witnesses who came before you that

20    were presented by Mr. Doniger.  Every witness in this case was

21    presented by him, except Terry Woodward came in through my case

22    because I had to prove a cross -- a third party complaint

23    against Wax Works.  I didn't need any witness on this

24    counterfeiting thing -- Jurgen Peretzki, Jax Jackson, Greg

25    Schoener, Matt Otto, Looney Lauter, Terry Woodward, and the

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    Walmart reading.  None of that proved counterfeiting.  None of

2    it.

3         Let's talk about Witness No. 1, the heart of their case.

4    More than the heart.  It's the legs, the arms, it's their whole

01:18PM  5    case.  There is nothing left of their case if there is no Jeff

6    Jackson.  The ten pallets was the promise that was made to you

7    by Mr. Doniger, and that was a lie.

8         In fact, it was not only a lie, ladies and gentlemen, it

9    was a big, fat lie.

01:18PM  10        What is the difference?  Okay.  A lie, it's just

11   deception.  A big, fat lie is when you build deception upon

12   deception upon deception and use it to try to get money that

13   you don't deserve.

14        That's what he wants.

01:19PM  15        And by the way, speaking of money that you don't

16   deserve.  He told you --

17             MR. DONIGER:  Your Honor, I need to object again.

18   Personal attacks on counsel are not an appropriate part of

19   closing arguments.

01:19PM  20             MR. LEICHTER:  I heard them in his.

21             THE COURT:  Regardless, if they were heard or not,

22   it is improper, so I will ask that you all refrain from that

23   conduct.  All sides.

24             MR. LEICHTER:  The plaintiff's case is dishonest.

01:19PM  25   Somebody associated with the plaintiff's case argued to you

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    that you could award $25,000 on circumvention of copyright

2    protection systems.  That was not true.  That was not true.

3    Read Instruction No. 32, 2,500 bucks.

4         That is just an example of what we're talking about.

01:19PM    5         By the way, I can give you another example.  Remember

6    all of those big numbers that come out of their evidence?

7    Remember all of those tax been documents?  And you remember

8    Walmart had to come in here and say what the gross was of

9    $400,000 or something.  Never mind the net, the gross, right,

01:20PM    10   that is just an effort to put big numbers in front of you to

11   make you think about big numbers so they could get money.

12        Because that's really what they are here to do -- ask

13   you for money that they don't deserve, based on lies.  That's

14   why it's more than just a lie.  That is why it's a big, fat

01:20PM    15   lie.

16        Jeff Jackson -- I took his deposition, he admitted it on

17   the stand that I took it.  I asked him to produce these

18   documents.  He admitted that on the stand.  He said, yeah, I

19   produced the documents.  But he didn't produce the documents.

01:20PM    20   He was hiding documents.  He was hiding the documents that

21   would show he was a liar.  Thank goodness that we had the

22   foresight to go out to the third parties, like Christian Book

23   Distributors and Vision Video and get his e-mails that he never

24   gave us.  He thought he was safe making the lie in his

01:21PM    25   deposition.

─────────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────────

1    He thought he was safe making the lie in Exhibit 23.

2         Which, by the way, is not evidence, it was admitted not

3    for the truth despite the things that somebody or that

4    plaintiff's case wants to you believe.

01:21PM   5         MR. DONIGER:  Objection.  Misstates the evidence.

6    It's not evidence.

7         MR. LEICHTER:  I'm sorry, Your Honor.  The Court

8    should maybe handle that objection.

9         THE COURT:  Well, it's evidence with a limited

01:21PM  10    purpose, and I already gave you instructions on that, ladies

11    and gentlemen of the jury, as to how to view that evidence in

12    Exhibit 23.

13         MR. LEICHTER:  Right.  And specifically the

14    instruction that was given, and you will see it in the jury

01:21PM  15    room in Instruction No. 36 is that the only reason -- the only

16    thing that Exhibit 23 is here to do is to explain the state of

17    mind of Jax and the effect on the recipient of the e-mail.

18    That is Jurgen.  That is the only thing.  It's not evidence of

19    counterfeiting.  It's not a link to EBAC.  And to suggest to

01:22PM  20    the contrary to you is wrong.  It's a lie piled on a lie, piled

21    on a lie.

22         He thought his story was safe.  He didn't think --

23    because, you know, I guess he's a counterfeiter, he's not a

24    great liar, he didn't think we would catch him.  He didn't

01:22PM  25    think we would find the e-mails and the shipping documents that

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    showed the dates, that showed the truth.  He thought he was

2    safe, but I got the records.

3        And, you know, when we were done cross-examining him,

4    someone in this courtroom an hour ago blamed it on me for being

01:22PM  5    mean to him.  "Fury" was the word used to describe Kevin

6    Leichter.  I'll tell you something.  I do get upset when people

7    lie.  I don't like liars because they break their contract that

8    we have as a society that is represented by that great seal.

9        When they lie under oath, that is wrong.  It is wrong.

01:23PM  10   And so, yeah, I'm upset about it.  But you know what?  When it

11   was all done, he admitted his story, quote, made no sense.  And

12   he said, quote, I don't see how I could have known about it --

13   meaning the *I Believe* DVDs.

14       He had no special powers.

01:23PM  15   Here is the -- this is truth.  This is reality.  This is

16   his testimony right here.  This is it.  It's in this Roadrunner

17   exhibit.  It's 99-138.  You remember that before he suddenly

18   realized that he had been caught lying, he took a look at it

19   and he said, yeah, it's my signature, it's the shipping, the

01:23PM  20   delivering receipt -- this is the -- excuse me, delivery

21   ticket, I think it's called -- delivery receipt, there it is.

22   This delivery receipt was signed for him on the 25th.

23       On the 25th.  This is evidence.  Came from Roadrunner.

24   It's real.  He vouched for it.  He admitted it was his

01:24PM  25   signature.

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1           Let me say something else about this before I move on.

2   You know, I was really startled when I heard the story this

3   morning, the lies that were meant to patch up on lies.

4           Do you remember being told --

01:24PM   5           MR. DONIGER:  Objection, Your Honor.  Continued

6   attacks on counsel.  Calling me a liar is not appreciated.

7               MR. LEICHTER:  It's argument, Your Honor.

8               THE COURT:  Well, argument doesn't permit calling

9   counsel a liar or saying what -- attacking counsel

01:24PM   10   individually.  You can attack his case, but you cannot attack

11   him individually.

12               MR. LEICHTER:  And what -- I'm sorry.

13               THE COURT:  You need to be more mindful of your

14   words.

01:25PM   15               MR. LEICHTER:  What I'm saying, to be very, very

16   clear, the argument that was presented by him is a lie.  That

17   is what I'm saying.  The argument was false.  It was an attempt

18   to patch a failed witness with a bunch of additional lies.

19   That argument cannot be accepted.  Period.  It's not true.

01:25PM   20           And what did he do?  He offered you the argument that

21   based on a few documents that he flashed back and forth on the

22   page -- that no witness testified about, no witness, he didn't

23   bring up anybody to say what these documents are.  Not even

24   Jeff Jackson was asked about this stuff.  Right?

01:25PM   25           He showed you those documents and he said, oh, Jeff

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    Jackson must have gone there on the 24th, must have looked in

2    the pallets, and then that is how he knew so at seven whatever

3    p.m. -- sorry at 4:30 p.m. he could write those e-mails.  Wow.

4    That is preposterous, ladies and gentlemen of the jury.  That

01:26PM   5    is preposterous.  Remember Jeff Jackson said it took him days

6    to sort this?  Remember he said he did it on the floor?

7    Remember how these were all shrinkwrapped pallets that were in

8    shipment?  You really believe, based on no evidence at all,

9    that he went over to this intermediate shipping thing just

01:26PM  10    because he asked another shipment to be put onto the truck?

11         It just makes no sense at all because there is no

12    evidence for it.

13         And maybe this is the most important thing to take from

14    counsel's attempt, you know, to hail Mary his way out of a dead

01:26PM  15    case.

16         This is what makes sense.  Is that the premise of the

17    argument that was offered to you about visiting the center --

18    the trucking center on the 24th, is that everything else he

19    said was a lie.

01:26PM  20         In order to believe the latest story you have to believe

21    that the past story was a lie.  Well, one of the instructions

22    the Court has given you is that a liar is not to be trusted,

23    and you can reject his entire testimony.

24         So I would suggest that you reject his entire testimony.

01:27PM  25    And I would suggest you do even more than that.  You reject the

REALTIME UNEDITED TRANSCRIPT ONLY

1  effort to pull the wool over your eyes with an argument that

2  there was a visit to Mount Juliet by Jeff Jackson, that he

3  never testified to.

4        MR. DONIGER:  Objection, Your Honor.

01:27PM  5        MR. LEICHTER:  There is no evidence.

6        MR. DONIGER:  This needs to stop.  That I'm trying

7  to pull the wool over a jury's eyes?  This is ongoing attacks

8  on me.  This is not appropriate.

9        MR. LEICHTER:  It's the argument I'm attacking.  If

01:27PM  10  he wants to be the proponent of it, it does spill over onto

11  him.

12        THE COURT:  Can I speak?

13        MR. LEICHTER:  Yes.

14        THE COURT:  Because I think there was an objection

01:27PM  15  made and I need to address the objection.  Then if I ask you to

16  respond, you need to respond.

17        MR. LEICHTER:  Okay.

18        THE COURT:  So there is a way to attack argument and

19  there is a way that attacks counsel.

01:28PM  20      So there is -- obviously there's -- the line here, I

21  think, has been breached so I'm going to advise you again that

22  you can attack the arguments being made, you can attack the

23  case itself, but not directly attacking counsel.

24        MR. LEICHTER:  Okay.  I don't think I was doing

01:28PM  25  that.  And what they think of counsel and what I think of

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    counsel is irrelevant.  What should be talked about here is the

2    arguments that counsel was made -- has made.

3              THE COURT:  Just the case.

4              MR. LEICHTER:  And the arguments, Your Honor.  Not

01:28PM    5    just the evidence, but what he argued about the evidence is

6    fair game for me to rebut.  And I'm doing that, I think.

7              THE COURT:  You can rebut it without attacking his

8    credibility and that he's as a liar.  You can do that.

9              MR. LEICHTER:  Well, okay.  But I do want to be

01:28PM   10    clear, to the Court and the jury, the case that has been

11    presented to you and the arguments that are presented to you

12    about it are false.  They are lies based -- and patches of lies

13    upon lies upon lies.  That is plaintiff's case.

14              And it doesn't get any better based on the argument that

01:29PM   15    was given to you.

16              How about this?  Remember the green wrapping?  A big

17    deal was made about green wrapping.  Remember that Jeff Jackson

18    said those are Size 10 and 14 boxes?  Remember he said, oh,

19    yeah, I got those, I saved them for months and months from my

01:29PM   20    Echo Bridge delivery on the 25th, right?  Well, Walmart says

21    Size 16 boxes are what are used for DVD returns.  Come on.

22              Let's talk about Greg Schoener for a minute.  Let's just

23    talk about him for a minute.

24              This was their witness.  He is clearly biased.  He

01:29PM   25    worked with Harvest Aid for years.  He worked with the

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    plaintiff's counsel.

2           MR. DONIGER:  Objection, Your Honor.  Arguing

3    outside the evidence.  My firm has never worked with

4    Mr. Schoener.  This is making up facts now.  They are outside

01:29PM  5    of the evidence.

6           THE COURT:  I don't recall there being any evidence

7    of that, so I will sustain it.  If that -- I don't --

8           MR. LEICHTER:  Could I have a sidebar for a moment?

9           THE COURT:  In regards to that issue?

01:30PM  10          MR. LEICHTER:  In regards to precisely what the

11   Court has said.

12          THE COURT:  Okay.  Come to sidebar.

13                    (Sidebar begins.)

14          THE COURT:  We're waiting.

01:30PM  15          MR. LEICHTER:  I'm sorry.

16          THE COURT:  Yeah.  I don't recall if --

17          MR. LEICHTER:  I object to the Court's instruction.

18   That is an improper instruction, with great respect to the

19   Court.  Okay?

01:30PM  20       The proper instruction to say on that is ladies and

21   gentlemen, you are the judges of the facts and you know what

22   you heard and didn't hear.  This is just argument.  And don't

23   trust it if you didn't believe it, and trust it if you do.

24          THE COURT:  Was there evidence of that?

01:30PM  25          MR. LEICHTER:  That's the proper instruction.

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1          There's all kinds of evidence.

2              THE COURT:  That they represented Schoener?

3              MR. LEICHTER:  He worked -- he prepped Schoener.  He

4    worked with Mr. Schoener.  He brought him here.

01:31PM   5              THE COURT:  Well, I think what you said is that he

6    represented him.

7              MR. LEICHTER:  I didn't say he represented him,

8    okay?  Never.  He's a cooperating witness, brought here without

9    a subpoena.  I'm entitled to argue that he's cooperating with

01:31PM  10    the plaintiff.

11              MR. DONIGER:  If he is saying I had a conversation

12    with him before he took the stand, true.  I have never worked

13    with him before.  And this is outside the evidence, and that is

14    a perfectly proper objection.  Counsel is --

01:31PM  15              MR. LEICHTER:  When it's his turn, he can argue that

16    is not working with, all I did was meet him to prep him for his

17    deposition.  He can argue that.  That is arguing the evidence.

18    But it's not right.  This is why I'm here.

19              THE COURT:  It's not right to be acting the way you

01:31PM  20    are acting either.  So that is not right either.  If you want

21    to talk about what's not right, then we can talk about that.

22    Because how you have been acting this entire trial, not every

23    day, but regularly, and I have had to discuss this with you on

24    multiple occasions outside the presence of the jury, in the

01:32PM  25    presence of the jury, at sidebar, throughout the entire trial.

1   So you know that you can't attack counsel and call him a liar.

2   You can talk specifically about his case and about the

3   evidence, but you know that.  And you know it is improper to be

4   -- to talk -- to have "Looney Lauter" and to say all of those

01:32PM  5   things.  That is improper.

6           MR. LEICHTER:  I'm --

7           THE COURT:  I don't want to hear -- don't interrupt

8   me.

9           MR. LEICHTER:  Okay.

01:32PM  10          THE COURT:  You know these things.  And if you think

11  you can just get away with it in front of me, I'm not going to

12  take it.  I understand the frustration you may have or

13  Mr. Doniger may have, but this Court has similar frustrations.

14          This shouldn't be this hard.  It's just closing

01:32PM  15  argument.  You each have your cases.  You are presenting it.

16  It shouldn't have to go through all of this.

17          But I heard you.  So I think you all -- you know your

18  jobs.  You know what needs to be done.  You know what is

19  improper.  You know what is inappropriate.  I just hope that

01:32PM  20  you both can do that.

21          MR. LEICHTER:  If I might --

22          THE COURT:  I don't need to hear any more.  We're

23  done.

24          MR. LEICHTER:  I would request that the Court change

01:33PM  25  its instruction.

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    THE COURT:  I don't wanted to hear any more.

2    MR. LEICHTER:  Thank you.

3              (Sidebar ends.)

4    MR. LEICHTER:  Let me change tax for just a minute.

01:33PM  5    THE COURT:  I'm going to say something.

6    MR. LEICHTER:  Thank you, Your Honor.

7    THE COURT:  So, ladies and gentlemen of the jury, in

8    regards to that last objection, I'm leaving it to your

9    province.  Because, as you know, I can't remember everything in

01:33PM 10   this trial.  Everything.  I'm sure you all can't either.  That

11   is why we have a record.  That's why you all take notes.  So

12   whatever was said by whomever as it relates to Mr. Schoener,

13   that is in your decision.  It's not mine.  You are the trier of

14   facts, so just so you all know that.

01:33PM 15   Thank you.  Go ahead.

16   MR. LEICHTER:  Thank you, Your Honor.

17   That is actually what I was going to say.  In this

18   country, you make the decisions.  You hear the evidence, you

19   hear the arguments, you make the decisions.  In this country,

01:34PM 20   the judge does not make decisions about issues of fact, not

21   when there is a jury here.  It's not up to the judge, it's up

22   to you.

23   I'm standing here not to attack Mr. Doniger.  He will

24   have to answer to whatever he answers to, wherever it is.  It

01:34PM 25   ain't me, and it ain't anybody.  Because what has to be

```
 1    answered for here is the case.
 2          And he happens to be presenting it.  I'm sorry if he is
 3    upset, and I apologize to him if he thinks that this attack is
 4    an attack on his character.
 5          His character is only involved to the extent that he
 6    stands up here and makes promises to you, and I'm not
 7    interested in that.
 8          I'm interested in how those promises fail.
 9          And I'm interested in how the case doesn't shake out.
10    And that's what I'm talking to you about.
11          So let's talk about Greg Schoener.
12          Let's talk about the head of technology at ADS, the
13    contracting partner with the plaintiff, Harvest Aid.  The man
14    who was brought here to testify by plaintiff.  And to offer
15    evidence to you through questioning from plaintiff.
16          Where did he admit he got the DVDs from?  Not Echo
17    Bridge.  He said I didn't get them from Echo Bridge, I got them
18    from Jax Jackson.
19          There is no link to my client in that evidence.
20          He admitted he did technical tests.  But the plaintiff
21    never asked him about the tests he performed or what the
22    results were.
23          And we know why that is.
24          We know why people don't come with evidence if it's
25    going to be strong evidence.  The reason is it don't exist.
```

01:34PM  (line 5)
01:34PM  (line 10)
01:35PM  (line 15)
01:35PM  (line 20)
01:35PM  (line 25)

REALTIME UNEDITED TRANSCRIPT ONLY

1   They couldn't.

2        It wasn't within their power to prove it.

3        He admitted -- and this is crucial -- he was never even

4   asked to test the one that came from Echo Bridge.

01:36PM   5        Let's talk about Jurgen Peretzki.

6        He's biased.  He is here to get money.  You heard the

7   closing argument that money was requested.  And was it too much

8   or too little?  You will look at the instruction and you will

9   decide.  But that is what he is here to get.  Money.

01:36PM   10       Something happened in his testimony that I think you

11  probably were paying attention to.  This weird thing that was

12  elicited from him about how, oh, yeah, well, Stacey and I, you

13  know, schmirdle@AOL.com, even though she signs all the e-mails

14  Stacey -- or somebody signs them, they are really our joint

01:36PM   15  e-mails.

16       You have to ask why this contortion?  Why was this

17  contortion done?  Does Jurgen sign his e-mails "Stacey"?  What

18  is going on?  It's just weird.

19       What is it about Stacey that she can't come up here and

01:37PM   20  talk.  He admitted, though, that he had no personal knowledge

21  of the defendants.  None at all.  No personal knowledge of any

22  counterfeiting.  This is not a counterfeiting witness.

23       And he admitted that everything he got came from Jax

24  Jackson.  Everything.  Those DVDs -- I'm sorry, could I have

01:37PM   25  those, Madam Clerk.

REALTIME UNEDITED TRANSCRIPT ONLY

1    Thank you.  This is Exhibit 100.  Excuse me, this is

2    101.  You can take it back in the jury room.  That is 101.  And

3    then there is also exhibit -- I believe it's 10 -- Exhibit 12

4    which is some pictures that Jurgen Peretzki identified.

01:37PM  5    Those pictures that he identified and these DVDs, all of

6    them came from Jax, according to the testimony you heard that

7    was elicited by plaintiff in this case.  All of it came from

8    Jax.

9    His entire testimony is based on things that came from

01:38PM  10   Jax, not things that came from Echo Bridge, and he admitted it.

11   Therefore, he offered no evidence of counterfeiting.

12   In fact, what was the real substance of the testimony?

13   And you also heard this in the closing argument.  I made a

14   great movie.  I'm a great creative director.  I made a million

01:38PM  15   and a half dollars.  It's a wonderful movie.  It was so

16   popular.  It was the bestseller of all time on Amazon.  Okay.

17   Whatever.  It just doesn't matter.  It doesn't matter whether

18   it's, you know, *Gone With the Wind* or the *Godfather* or, you

19   know, whatever the stupidest video movie you could imagine.

01:38PM  20   The content isn't at issue.

21   Nobody -- well, the drafters of copyright law didn't

22   care whether or not it was a good work or a bad work.  It gets

23   the same protection, and we admit that.  It's not a problem.

24   That's exactly the way it should be.

01:39PM  25   I mean, my clients are in this business.  They are in

REALTIME UNEDITED TRANSCRIPT ONLY

——— REALTIME UNEDITED TRANSCRIPT ONLY———

1   the business of distributing movies and making movies, so why

2   would they not respect the copyrights?  Of course they respect

3   copyrights.

4        So, I'm glad he likes his movie.  I'm glad he thinks

01:39PM  5   it's great.  It's perfectly fine.  It doesn't matter.  It

6   doesn't matter.  And the arguments that were presented to you

7   about how, you know, copyright protects poems and artwork and

8   so forth, they have nothing to do with the case.  They are just

9   a distraction.

01:39PM  10       Now, here is an interesting thing, because this is

11   something I want you to listen to and it's contrary to what has

12   been argued to you by the plaintiff.  The plaintiff here has

13   argued that -- about why the shipment stopped, right?  I didn't

14   ship any more.

01:40PM  15       EBAC -- he testified, under oath, the reason that he

16   stopped shipping was that EBAC stopped ordering.  And it's been

17   suggested to you stop ordering because they were chock-full of

18   counterfeits.

19       They were chock-full of returns.  According to the

01:40PM  20   testimony you heard, they had over 10,000 in inventory -- 4,300

21   -- sorry, 4,600 that they returned and -- I think it's in the

22   next slide -- and another 7,000 or so that they are complaining

23   were never returned.

24       That's not proof of counterfeiting.  Jurgen did not

01:40PM  25   prove any counterfeiting.

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    Stacey Peretzki, I have nothing to say about Stacey

2  Peretzki.  At the beginning, a contract was made with you by

3  somebody in this room.  And that contract was that Stacey

4  Peretzki would be here.  In fact, she was here for several

01:41PM   5  days.  But you know when she wasn't here?  On the day I

6  presented my case.  And you know, you never heard from her from

7  the plaintiff.  Mr. Peretzki, Jurgen Peretzki wasn't here on

8  the day I presented my case.  They were both absent from the

9  courtroom.  Stacey Peretzki had nothing to offer here today.

01:41PM  10  And I have to ask you to ask yourselves, Stacey Peretzki, maybe

11  her absence from the testimony was somehow connected to the

12  weird way in which Jurgen was asked questions about e-mails

13  that plainly she was signing and seems plain to me he wasn't

14  even involved in.  I don't think he knew about any of that

01:41PM  15  stuff.

16    But it doesn't matter because, you know what, he

17  admitted he didn't know about counterfeiting.  And he admitted

18  that his testimony about similarity of DVDs, that that

19  testimony was based on things that came from Jax.

01:42PM  20    So who cares.

21    Steven Paul, you know, he was here in this courtroom.

22  He was here in this courtroom all day -- from mid-morning

23  forward, waiting to be called as a witness.  Instead, they

24  called Jeff Jackson.  He never got called.

01:42PM  25    They took your time -- instead of calling Steven Paul,

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1     who they are attacking here as counterfeiter -- they took your

2     time to present Jeff Jackson.

3                 MR. DONIGER:  Objection.  Arguing outside the

4     evidence and misstates the proceeding.  Mr. Jackson was on

01:42PM   5     before Mr. Paul showed up in the afternoon, and this is not

6     appropriate argument.

7                 THE COURT:  I'm going to overrule the objection.  Go

8     ahead.

9                 MR. LEICHTER:  And yet, you heard that their case is

01:42PM  10     based in part on attacking him for telling Brian Lusk to do his

11     job.  As if that is evidence of counterfeiting.  You are

12     smarter than that.  It's not evidence of anything.

13           Now, if only Steven Paul had been here to deny what

14     Mr. Lauter attacked him for, impeachment only, not substantive

01:43PM  15     evidence, but Mr. Paul was -- that testimony wasn't put on when

16     Mr. Paul was here.  It wasn't.

17           And you have to ask yourselves why.

18           And along with that, ask yourself about other evidence

19     that they didn't present.  Where is Brian Lusk?  Where is Nancy

01:43PM  20     Campbell?  Where is Mary Reagan?  Where are these people who

21     actually worked at EBAC, as opposed to people like Lauter who

22     said he never even went in the facility or Schoener who never

23     went to the facility or Jurgen Peretzki who never went to the

24     facility.  Nobody.

01:43PM  25           Where is New Century, who we know -- undisputed evidence

──── REALTIME UNEDITED TRANSCRIPT ONLY ────

1    -- we know New Century was shipping back all of the stuff that

2    was in the warehouse in October.  They were the ones with the

3    trucks in October.  Why wasn't New Century called?

4        You just have to ask yourself about the absence of

01:44PM  5    evidence and the failure to bring evidence before you that

6    could strongly prove the plaintiff's case instead of bringing

7    the one that was brought, which was based upon false testimony

8    and innuendo, and, honestly, no proof.

9        We even stipulated -- you heard the stipulation read by

01:44PM  10   the Court about what Steven Paul would say if he were called by

11   plaintiff.  Did you hear anything in there, in that stipulation

12   about -- talking about replication or about him confessing that

13   they had replication ability in house?  No.  No.  You heard

14   what -- a bunch of innocuous things about how Echo Bridge does

01:44PM  15   business with Walmart.  That is it.  That is no evidence of

16   counterfeiting in there.

17       They prove nothing against Steven Paul except that he

18   runs two companies, has a couple of other companies that are

19   entertainment companies.  And you know what, in the United

01:45PM  20   States of America, there is no guilt by association.  You want

21   to prove something against the person?  You want to accuse them

22   of something?  You got to have proof.  Because accusations mean

23   nothing and proof means everything.  You don't just talk the

24   talk, you walk the walk.  This is a court of law.  That is a

01:45PM  25   great seal of the United States.

REALTIME UNEDITED TRANSCRIPT ONLY

1        Matt Otto -- he was called by plaintiff.  That's fine.

2    He told the truth.  All he talked about was the fact that it

3    was closing on the 31st.  And why was that elicited?  Because

4    it sort of fits with Jeff Jackson's little story about, oh, I

01:45PM  5    was buying all of these closeouts.

6        Whatever.  I don't know.  I have no idea.  Neither does

7    Mr. Otto.  He didn't say one way or the other.  But he did say

8    that it closed on that date.  And you know what, it's not an

9    issue.  Not an issue in this case because New Century was doing

01:45PM  10   the shipping at that time, not even EBAC.

11       And why would Matt Otto lie about the in-house

12   replicator?  It's not even at issue.  Of course EBAC could

13   replicate things.  Of course.  Just like the plaintiff has a

14   copyright in the movie, not the cover art.  Comparisons of

01:46PM  15   cover art are not comparison of movies.  Comparisons of cover

16   art are not the same thing as comparison of bits and bytes and

17   technological stuff.

18       So because that is not an issue, it really doesn't

19   matter.

01:46PM  20       But the reason to bring him up, of course, was to find

21   Brett Lauter and put him up in front of you.

22       And you know what, I have decided not to say anything

23   more about Brett Lauter.  Because what the judge said about him

24   what you saw is enough.  It's not evidence.

01:46PM  25       Here is the interesting point about Walmart.  This is

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    real the only thing I found interesting because everything else

2    was just an attempt to put big numbers up in front of you.

3            This is something she talked about, Box 16.  And I'm

4    looking here at this, and it's 14 and 10, and we got that

01:47PM    5    confirmed by Jeff Jackson.

6            Otherwise, that was just a big yawn.

7            And now I want to talk about Terry Woodward for minute.

8    I'm going to begin to talk about my case against Wax Works as I

9    do this.

01:47PM   10            This was kind of interesting.  Do you remember the

11    testimony when he was -- when Terry Woodward was being asked

12    questions about when -- this is a when question -- same thing

13    with Jurgen, both of them were asked questions by the plaintiff

14    and by the third party defendant.  And the questions were

01:47PM   15    designed to push him to say he never sent the Exhibit 9

16    agreement, the Wax Works/SP Releasing agreement, never sent

17    that to Jurgen until 2020.

18            Why?  Why?

19            That was impeached in spades.  There was the e-mails

01:48PM   20    showing it was sent July 2 of 2019.

21            Why were they trying to push that back?  Why do that?

22            It was -- they were caught in lies.  Both of them.

23            And you have to ask, why were they trying to push that

24    back?  Here's the answer.  Because in their hands was our

01:48PM   25    distribution agreement, and they wanted to sue us for copyright

—REALTIME UNEDITED TRANSCRIPT ONLY—

1    infringement and say that they were the owner of the

2    distribution right.

3         The owner of the distribution right.

4         One of these instructions that the Court has for you

01:48PM  5    says that an owner can transfer his ownership in one of the

6    rights in copyright to another person if it's an exclusive

7    license.

8         And the Exhibit 9 is an exclusive license to my client,

9    SP Releasing.

01:49PM  10        Remember Jurgen said he had this big objection?

11   Remember that objection?  I saw that.  I objected to it right

12   away.  I objected.  I objected.

13        The objection was, in his contract, no rights were

14   transferred.  We're going to look at the contracts, Exhibit 9

01:49PM  15   and 13, in a moment.

16        You look at Exhibit 13 which is from Harvest Aid to Wax

17   Works, no rights are transferred.

18        You look at Exhibit 9, it promises exclusive rights are

19   being transferred.

01:49PM  20        This is very important.  And that's why the date had to

21   be manipulated in the presentation of the case.

22        Because if it's early in the process and there is an

23   objection, then you get to ask yourself the question, and I

24   think you should.  Wait a minute, you objected to this and you

01:49PM  25   never said anything to Steven Paul or SP Releasing or anybody?

1    You never said anything.

2         Wow.  Wow.

3         I guess that is something for Wax Works to work out with

4    Harvest Aid.  But the way we see it, if that Exhibit 13, the

01:50PM  5    master distribution agreement between Harvest Aid and Wax

6    Works, if that Exhibit 13 didn't transfer any rights, then Wax

7    Works is liable to us because in their contract, they promised

8    that they were the owner of the rights.  Why does that matter?

9         Because only the owner of the rights can sue.

01:50PM  10        And we wouldn't be here in this lawsuit if that promise

11   that Wax Works was the exclusive owner was in fact true.  We

12   wouldn't be here.  It would have to be a lawsuit with Wax

13   Works, which this isn't.

14        There is no reason for us to be in the case with Harvest

01:50PM  15   Aid.  We believed we were dealing with Wax Works as our

16   licensor, but it turned out that was false.  Because behind the

17   scenes, right from the get-go, the conflicts -- the contracts

18   conflicted.  That is why you saw Mr. Woodward try every way

19   that he possibly could to weasel out and to squirrel away from

01:51PM  20   the contract that he signed.

21        But he couldn't do that.  He brought a lawsuit based on

22   it against my clients, which later disappeared.

23        And in that, he made judicial admissions.  He stood on

24   the contract.  He affirmed the contract, and those admissions

01:51PM  25   are binding.  It's a deal.  No matter how much he tried to

1  claim, oh, that is not the deal, this is an oral deal, there's

2  an oral deal -- it's not -- come on.  Come on.

3        It's conclusively true.  The judge instructed you.  It's

4  part of our process that you take that as true.  A deal is a

01:51PM  5  deal, and this deal was real.  And it's conclusively real and

6  the admissions prove it.  And they can't be denied.

7        And if you look at the admitted facts that are in your

8  instruction, you are also going to see that a deal is a deal.

9  And take a look at our subdistribution agreement.  It's going

01:52PM  10  to say in there "exclusively distributed to Walmart stores."

11  That is an admitted fact.  EBAC exclusively distributed to

12  Walmart stores.

13        Not to Jeff Jackson.  It's an admitted fact.

14        So, one point I'm going to make -- I'm going to talk

01:52PM  15  about Instruction 28.

16        Could you be ready with that.

17        This is the exclusive licensing instruction.  I just

18  want you to take a quick look at this when you go back in the

19  jury room.  That instruction -- you ready?

01:52PM  20        Oh, boy.  Can you make that a little bigger?

21        Sorry, it's not 28.  It's that one.  Exclusive license.

22  That's it.  27, it is.

23        A copyright owner may transfer exclusively to another

24  person any of the rights comprised in the copyright.  To be

01:53PM  25  valid, the transfer must be in a writing signed by the

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    copyright owner.

2          Right?

3          So if Harvest Aid never transferred the copyright -- the

4    right to distribute to Wax Works in writing, if there is no

01:53PM    5    writing in evidence that shows that, then Wax Works didn't have

6    the power, the right, the ability to assign and provide to SP

7    Releasing, a license.

8          Because to be valid, a transfer must be in a writing

9    signed by the owner.  And if Wax Works wasn't the owner because

01:54PM   10    it didn't receive a license, then its transfer to my client

11    wouldn't be valid.

12          And that's a breach of the representation and warranty

13    in the agreement, in agreement Number 9 -- in Exhibit 9.

14          That is a breach.

01:54PM   15          That is a breach.

16          We're going to look at it together.  That is one of the

17    representations that was breached here by Wax Works.  And it

18    was breached because of the way that they were dealing with

19    Harvest Aid, which is not something that my clients were privy

01:54PM   20    to.

21          Objections of Jurgen in 2019 were not raised with my

22    client.  Nobody said, hey, this is a problem.  And yet Jurgen

23    said I raised the objections to Terry Woodward.

24          Did he go to Steven Paul?  No.  There is no evidence of

01:54PM   25    that.

REALTIME UNEDITED TRANSCRIPT ONLY

1          There is no evidence of any of that.

2          There we go.  So this is the rights flow, and I just

3    want to talk about it for a moment.

4          It's up on the screen.  Follow along with me, if you

01:55PM    5    would.

6          So, the first line here, okay, Talks about the Harvest

7    Aid to Wax Works deal.  The one my client isn't part of, isn't

8    privy to.

9          Okay.  That Harvest Aid to Wax Works deal had no written

01:55PM   10    grant of rights.

11          Remember I walked through it?  And in it, it sat with

12    Mr. Woodward.  I think I did this with Mr. Peretzki too.  It

13    had these things in it that say no rights are being

14    transferred, no rights are being transferred.

01:55PM   15          But then when you get to our deal, a deal is a deal, you

16    have got the written representations regarding rights.  You

17    have got the promise of indemnity.

18          So just to circle back -- just to circle back to the

19    failure of the plaintiff at this moment, they proved no

01:56PM   20    counterfeiting, they proved no circumvention, they proved no

21    distribution of *I Believe* to Jax Jackson, they have no proof of

22    distribution to anyone other than Walmart, and it's admitted

23    fact that we distributed exclusively to Walmart.  There is no

24    proof, therefore, there is no case.

01:56PM   25          Now, before I get to actually that point, because we're

──── REALTIME UNEDITED TRANSCRIPT ONLY ────

1  going to talk about justice in a moment, I would like to talk

2  about a couple of jury instructions besides the one we looked

3  at.

4       Let's look at No. 7, please.  You know what, this is

5  easy.  You are right.  It's been suggested to me that the

6  document camera will work very well, and it does.

7       You may consider the ability of each party to provide

8  evidence.  If a party provided weaker evidence when it could

9  have provided stronger evidence, you may distrust the weaker

10  evidence.

11       This instruction could have been written for Greg

12  Schoener and Jurgen Peretzki and plaintiff's case.

13       Because you are looking -- in a few minutes we will look

14  at it -- there is an instruction about technological stuff.

15  Where was that?  They had the power to provide that evidence.

16  They had the power.  They had Greg Schoener.  He admitted he

17  did the test.  All they had to do was say, "And Mr. Schoener,

18  what was the result of the test?"  They didn't do that.  Why

19  not?

20       You should distrust the weaker evidence because they

21  could have provided stronger evidence.  You should distrust all

22  of these e-mails that they showed you and tried to make so much

23  of?  These Brian Lusk things, and Mary Reagan things?  Why

24  don't they just bring the witness in to talk under oath?  You

25  know, to look you in the eye and say here is my testimony under

—— REALTIME UNEDITED TRANSCRIPT ONLY——

1   oath, I swear it's the truth, the whole truth, and nothing but

2   the truth.  They didn't do that.  Why did they bring in a bunch

3   of e-mails that get them authenticated by their client?

4       Distrust the weaker evidence.

01:58PM   5       Credibility of witnesses.

6       You get to decide -- you are the deciders of the facts.

7   You get to decide which testimony to believe and which not to

8   believe.  You can believe everything, you could believe none of

9   it, or you could say I will take some of it and not others.

01:59PM   10  I'm not going through every bit of it.  Your time is precious

11  to me.

12      But look at this.  If you have any doubts about how to

13  evaluate the credibility of witnesses, ask yourself this:

14      Do they have bias?  Do they have a memory problem?  Do

01:59PM   15  they sweat and shake?  And do they hesitate when they are on

16  video and, you know, look, he's -- I'm talking about Jeff

17  Jackson.  He's in an air conditioned room in Nashville.  You

18  can see it's a conference room, right?  By the time that

19  deposition ended, he's covered with sweat.  His brow was

01:59PM   20  covered with sweat.  He was freaked out.  Consider that.

21      And then consider how reasonable it is in light of

22  everything.

23      You can read this back in the room if you have doubts

24  about credibility.  Those were the high points I wanted to

02:00PM   25  raise.

1      Here is a quick point I would like to make from No. 22.

2  This has to do the argument that Steven Paul is liable just

3  because he was the CEO.

4      A corporation is responsible for the acts of its

5  employees, agents, directors, and officers performed within the

6  scope of authority.

7      Right?  What did Steven Paul supposedly do?  What did he

8  do?

9      What about Brian Lusk?  Where was the testimony about

10  the scope of his authority?  The only thing we know is that the

11  guy who works in the warehouse -- we did find that out.  He

12  works in -- at least we found out that Jurgen thought so.

13      He worked in the warehouse, and he was told he didn't

14  have authority to report numbers.

15      And if you look at the e-mails, you will see who does.

16  And he was told you tell them -- sorry, he told Jurgen and

17  Stacey or whoever Schmirdle is, go ahead, call Steven Paul,

18  here is his cell number.

19      Do you have any stronger evidence about that?

20      Did they call Steven Paul and say can you explain this?

21      You heard nothing.

22      Only liable for acts within the scope of authority, and

23  that's very important.

24      I'm going to talk about copyright in a moment.

25      Here we go.  So this instruction was shown to you by

REALTIME UNEDITED TRANSCRIPT ONLY

1    somebody at some point in this trial.

2         And it says here, the plaintiff is the owner of a valid

3    copyright if the work is original, et cetera.

4         You know what, I don't even know why this is argued to

02:01PM 5    you.  It's an admitted fact.  We admitted it.  It's one of the

6    stipulated facts in the case.

7         Why hang up on the originality of the work and the

8    authorship and creatorship of the work?

9         Ask yourself, is that just a smoke screen?

02:02PM 10        Is that just an effort to make you fall in love with

11   Jurgen and Stacey, because they made a nice movie, because it

12   ain't evidence.

13        I'm not going to talk about the innocent and willful

14   infringement instruction, Your Honor.  You know why it's almost

02:02PM 15   a joke.  There is no infringement at all.

16        Where is the evidence of intentional and reckless,

17   copying, and stealing things?

18        There is no evidence of that, it didn't happen in this

19   case.

02:02PM 20        There is another thing that didn't happen in this case.

21   I'm looking at Instruction Number 31 with you.

22        This says to circumvent -- first of all, it has to be a

23   technological measure, right?  This is the contention.

24   Technological measures, right, controlling access, a

02:03PM 25   technological measure is also of these things, right?

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1          To circumvent, means to avoid, bypass, remove,

2   deactivate, or impair a technological measure without the

3   authority of the copyright.

4          It requires proof of descrambling, decrypting, avoiding,

02:03PM  5   bypassing, removing, deactivating, it requires proof of that.

6          Greg Schoener was on the witness stand.

7          Did they provide proof of that?  No.

8          And, you know, no further comment needs to be made about

9   that.

02:03PM  10         Now, you could put up Exhibit 9, please.

11         There are actually a couple of copies of Exhibit 9 there

12   is testimony that there are three copies in the word, one copy

13   from Harvest Aid, one copy came from the defendant's files and

14   one copy came from Wax Works' files, from their file.

02:04PM  15         Only two of them actually in the exhibits and there was

16   testimony that the Wax Works document is the same with the

17   exception of Exhibit A.  Remember that schedule A of costs?

18         So we good?

19         Okay.  This is going to be a little hard to read, but

02:04PM  20   let's go -- let's take a look at Paragraph 3 first.

21         Can we make that a little bigger, it's going to mess up

22   my presentation.

23         Is this readable, you guys can read it?

24         Wax Works authorizes and grants to SPR an exclusive

02:05PM  25   license to distribute DVD units of the pictures to Walmart

─────── REALTIME UNEDITED TRANSCRIPT ONLY───────

1   stores located in the territory.

2           If Wax Works didn't have that right, it couldn't grant

3   it.  Very important here.  That is the grant of rights.

4           Paragraph 3, Sentence 1.  Let's look at Paragraph 8

02:05PM   5   before we go too far.

6           Thank you, Andy.

7           Okay.  Distribution costs.

8           I don't want to go past this because it's important for

9   another reason in the case.

02:06PM   10          Wax Works is to provide all costs in connection with the

11   replication, campaigns, of each picture.

12          There it is.  This was not a burden under this contract,

13   it was not a burden of SPR.  Those costs between $0.50 and

14   $1.10, I think was the testimony, over a dollar, those costs

02:06PM   15   were to be borne by somebody else.

16          Let's go now to Section 18, please, the representations

17   and warranties.

18          Lease look at 18(b) as in boy.

19          Here it is.  Both parties, that is both Wax Works and SP

02:07PM   20   Releasing, warrant and represent that each has the right and

21   power to enter into this agreement and to grant all rights.

22          Okay.  That was breached.  That representation was

23   breached.  That is a breach, because they didn't get the

24   rights, so they breached.

02:07PM   25          This is like a guarantee one party to the other.  I'm

1  warranting and representing you to, I'm promising to you, I

2  have got the right to give you what you think you are getting.

3  I'm promising you are getting an exclusive license, and I'm

4  representing to you that I have the right to do that.

02:08PM  5       I have got rights and power, I have the right and power.

6       The Judge's instructions make it really clear if they

7  don't have an exclusive license.  They are not the owner of the

8  right, and they do not have the right and power.

9       That is a breach.

02:08PM  10      It's a breach, and people have to be responsible for

11  their breaches.

12      That's what the next line says.

13      Either party, that would be either side, but in this

14  case, it's Wax Works shall indemnify and hold harmless the

02:08PM  15  other from and against any claims, damages, liabilities, costs,

16  and expenses relating to any breach or warranty or

17  representation made by the other herein.  There it is.

18      Was the indemnity due, was the representation breached?

19      It's obvious, it's right here.  It's in writing.  It's

02:08PM  20  in the evidence.  There is no dispute.

21      You will look at Exhibit 13, and just like everybody who

22  testified, Exhibit 13 the master agreement, there is no grant

23  of rights in it.  That's it.  That's it.

24      This is case against Wax Works, first half of it anyway.

02:09PM  25      Let's go to 18(c) please.  It's on the next page.

─────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────

1          Here is another very similar representation by Wax

2   Works.

3          Wax Works represents and warrants that it owns the

4   rights to the picture and all videograms, those are DVDs,

02:09PM  5   provided to SPR, pursuant to the license hereunder and has the

6   authority to grant the SPR the license.

7          Now, this overlaps very largely with the proceeding

8   representation, but here it is again.

9          Has the authority to grant SPR the license, owns the

02:09PM  10  rights to the picture and all videograms.

11         That is a promise, that is a representation and

12  warranty.  It was breached.  It was breached.

13         Well, what happens when there is a breach?

14         Here it is, the next sentence, next sentence says what

02:10PM  15  happens.  Wax Works shall indemnity and hold harmless SPR and

16  Walmart from any claims and/or damages based on SPR's placement

17  of the picture of Walmart and the sale of each videogram of the

18  picture through Walmart.

19         Remember, admitted Fact No. 4?  We exclusively went

02:10PM  20  through Walmart.

21         The claims here are claims about returns from Walmart.

22         Remember, the whole thing is based on ten pallets, the

23  box business of returns, that is what the claim is.

24         That is what the claim is, and we have a promise here

02:10PM  25  that we will be -- we, SPR, will be indemnified and held

REALTIME UNEDITED TRANSCRIPT ONLY

1    harmless, harmless by Wax Works from any claims and/or damages.

2        So a couple of things fall from here -- flow from here

3    directly.

4        What is the first thing that flows from here?

02:11PM   5        I don't think you are going to do this.  If you think

6    that there were counterfeit goods that were flowing through us,

7    through SPR through Echo Bridge, through Walmart, back to Jax,

8    and you think that my client is responsible for those damages?

9    Well, they promised to pay for them.  They promised to pay for

02:11PM  10    that because they were the ones delivering the goods to us, and

11    let me stop right here.

12        What goods were being delivered to us?

13        You heard the testimony, I have no reason to disbelieve

14    it.  Some of them came from Jurgen, they were his stock, some

02:11PM  15    of them came from ADS, they were made for Echo Bridge, right,

16    some of them got mixed in a little bit of returns which include

17    Walmart.com returns and customer returns.

18        Do you remember that those all flow into this flow of

19    goods that is being shipped to us, and then reshipped, and

02:12PM  20    reshipped, that is how this whole business works.

21        How do you know if a counterfeit or two accidentally

22    gets in there, you don't.

23        It is possible -- it's possible that one of these DVDs

24    is a fake but it doesn't mean my client counterfeited it.

02:12PM  25        But if you thought that my clients were handling

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    innocently, handling counterfeit goods, and you are going to

2    award the money that is being asked, you have to grant the

3    counterclaim against -- sorry, our third-party claims against

4    Wax Works.

02:12PM    5    But it goes each further than that, ladies and gentlemen

6    of the jury, it goes a little bit further.  The analysis --

7    take it to the last page.

8    Anything having to do with the placements of the picture

9    with Walmart is something that we were promised an indemnity

02:13PM    10    for.  No matter what you find in this case, there is liability

11    for that.

12    Now, I'm not here and you didn't hear any evidence about

13    the costs of defense of the case because that is just the way

14    we do it in court.

02:13PM    15    The Judge will decide costs of defense issues, you don't

16    do that.

17    I'm going to show you the verdict form in a minute, so

18    don't make any assumptions about how much the defense costs.

19    They are not part of the damages you would be asked to award.

02:13PM    20    But part of those damages are the damages that might

21    flow, if you thought there was counterfeiting here, if you

22    thought that we were somehow dealing in these goods, it became

23    the responsibility of our supplier, even this they voiced

24    placed that responsibility onto Harvest Aid for their

02:13PM    25    convenience, that was the testimony of Terry Woodward.

1    He said, why ship it from Minnesota to Kentucky, back to

2    Minnesota, and deliver it directly, that made sense.  It was a

3    good idea.

4    Fine, but that doesn't relieve Wax Works of the duty it

02:14PM  5    assumed to make sure all of the goods being delivered were

6    clean and right, because that was the promise they were making

7    to their licensee, or at least, the people who believed they

8    were the licensees.

9    I'm sorry for all of this, it's such a mess.  It's right

02:14PM  10   here.

11   Claims or damages based on SPR's placement of the

12   pictures with Walmart.

13   Take a look at paragraph -- sorry, Exhibit 9

14   Paragraph 18(c).

02:14PM  15   And now, if we could just -- I keep working with this

16   here, also (c), has two provisions, and I'm just going to touch

17   on them, because, you know, it's a little bit redundant at this

18   point.

19   There is another representation of authority to enter

02:14PM  20   into the agreement.

21   At the end, there is another representation that the

22   products don't infringe and all rights have been obtained.

23   That's just another way of saying what I have been

24   saying all along.

02:15PM  25   This contract is drafted to make sure you can read it

─ REALTIME UNEDITED TRANSCRIPT ONLY ─

1    right in there, to make sure that SPR, SP Releasing, is not

2    going to have to get into any lawsuit like we have here today.

3         It's not going to have to defend itself false

4    accusations.  That is going to be Wax Works' responsibility,

02:15PM  5    that was the deal.  The deal is a deal.

6         Now you want to know why they want to run away from it

7    now you know Terry Woodward doesn't want to admit it.

8         Now you know why they want to claim it is

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

———————— REALTIME UNEDITED TRANSCRIPT ONLY ————————

1    some other oral agreement that doesn't have these

2    representations to it, because he doesn't want to give the

3    benefit of his bargain to SP Releasing.

4         I want to spend a moment talking about that Exhibit A,

02:15PM   5    that Schedule A.

6         It's a little bit of a red herring.

7         What the costs were that were taken off or not, are just

8    irrelevant in this case.  This isn't a case about the royalties

9    that were due.

02:16PM   10        This isn't a case about the accountings that were due.

11        This isn't a case about whether this cost or that cost

12    was good or not.

13        I'm so sorry, you had to listen to that evidence.  I

14    didn't present it to you.  Other people presented that to you

02:16PM   15    in this case.  It's irrelevant.

16        The statements mean nothing.

17        They don't mean anything.

18        They don't prove counterfeiting.

19        A parties' revenues, the amount of money you are making,

02:16PM   20    doesn't prove counterfeiting.  It just doesn't.

21        It's just an attempt to have you listen to a lot of

22    large numbers, and a failed one, I would suggest.

23        So let's talk about the breach of contract instruction

24    for just a moment, Number 33.

02:17PM   25        Number 33 is an introduction to the breach of contract.

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    It says the third-party plaintiffs claim Wax Works

2    breached the contract by supplying third-party plaintiffs

3    counterfeit DVD in violation of the contracts express

4    warranties.

02:17PM  5    It's really -- I don't contend it, but it's that if you

6    believe it, then I would contend, and my client contends, that

7    is a violation of the warranties.

8    That is really what we're talking about here.

9    So, I just want to say, I'm not accusing Wax Works

02:17PM  10   directly of making counterfeits, because, you know, I don't

11   know.  I don't know.

12   You know what I do know, there is no proof that there is

13   any counterfeits from my clients, and if things got leaked in

14   there, I really don't know.  I really don't, I have no idea.

02:17PM  15   But I do know that the warranties were breached here.

16   It's time for me to talk about the verdict form.

17   This is the verdict form that you are going to be handed

18   and you are going to be asked to fill it out.

19   Somebody in this case showed it to you and talked to you

02:18PM  20   about how it should be filled out.

21   I think the answers are obvious.

22   Do any of you find that defendants in this case

23   infringed Harvest Aid LLC's copyright in the film, *I Believe*?

24   Remember, the copyright is only the film, it's not the

02:18PM  25   cover art.

————— REALTIME UNEDITED TRANSCRIPT ONLY —————

1           Okay.  So you can throw out the comparisons that were

2      done of the DVD part.

3           The answer here is no.  No and no.  That is what you

4      should put in.  No, because that wasn't proved.

02:19PM    5           You will not get to No. 2, which I think is a ridiculous

6      question, but if you somehow think that innocently got slipped

7      in there and nobody knew, then you would say innocent,

8      innocent, and innocent, just like that.

9           I was trying to figure out why it's part of the page --

02:19PM   10      there we go.

11           You just have to say that because there is no evidence

12      that we did anything, but certainly if something happened and

13      you think there was evidence, well, that's what you would say.

14           And for the infringement, contrary to what somebody in

02:19PM   15      this courtroom said at one point, the instruction says -- you

16      know what, I know what the answer is here.

17           You know what the answer is, I don't care what they say,

18      the answer is zero, nothing, if you each get to the question.

19           Did you find circumvention of technological measures, et

02:20PM   20      cetera, et cetera, yada yada, this one is easy.  No, no, and

21      no.

22           The next question you are going zero, zero, zero if you

23      get to it because there are no damages.

24           Nobody has been harmed.

02:20PM   25           Next question has to do with my case against Wax Works.

REALTIME UNEDITED TRANSCRIPT ONLY

1        I'm going to say this, this is easy, of course, they

2    breached it.  We just went through it, the language is really

3    clear.

4        You are going to say yes.  You are going to say yes.

02:20PM    5        And then, of course, was there harm?  Was there harm?

6    I'm sorry, this is obvious, this is common sense.

7        Does being sued create harm?

8        If you find that there was -- that there is counterfeit

9    goods passing through our hands, then you have to say yes, that

02:21PM    10    is a harm.

11        But there is also a another harm, which is just the harm

12    of being sued, so either one, you say yes, because we were

13    harmed.  You say yes.

14        Question 8:  Don't include the attorney's fees, don't

02:21PM    15    make any assumptions about how much it costs for this case to

16    go on for the last few years.

17        Don't even do that.

18        The Judge is going to decide that.

19        But your yes in Number 7 is important, because that

02:21PM    20    takes it to the Judge.  That makes the Judge -- gives the Judge

21    that duty to then decide, well, how much was it worth it to

22    defend the case.

23        So she will decide that, but you need to say yes in

24    Number 7, but that number matters for defense.

02:21PM    25        And I don't want you to award money that we're not

────── REALTIME UNEDITED TRANSCRIPT ONLY ──────

```
          1    entitled to get from you.  We're not entitled to get our

          2    defense costs from the jury.

          3            But we are entitled to have you say yes, it was a breach

          4    of the contract, and yes, it was harmful to be sued.

02:22PM   5            And again, if you are awarding anything up in the upper

          6    part of this verdict form, then you put that number here.

          7            But I'm going to tell that number should be zero, if you

          8    get to the question.  It's zero.  There is no harm to --

          9    whatever, there is no counterfeiting, and therefore, should

02:22PM  10    have be no judgment, and therefore, you should find my clients

         11    not to be liable.  And that means his client isn't liable

         12    either for the judgment.

         13            It's just how it works.

         14            But his client should be liable for the cost of defense,

02:22PM  15    and that will be decided later.

         16            So, that is how I think you fill in the verdict form,

         17    and that's how I think you think about the case.

         18            So I'm going to make a few closing comments.

         19            I started off by saying that this is an exercise in

02:23PM  20    love, and maybe it's not clear exactly why that is, and why I

         21    believe that.

         22            I mean, you know, we didn't have a lot of love in

         23    courtroom, people are fighting each other.  There is a lot of

         24    back and forth and all kinds of contentious stuff.

02:23PM  25            But it is about love.
```

REALTIME UNEDITED TRANSCRIPT ONLY

1    Because of that, you know, we come together as one
2    country from many one, a pleurbis unum.  All of us together,
3    every member of our society agrees that this is the way we're
4    going to run our country.

02:23PM   5    This is the way that we're going to handle disputes.
6    We're going to have a Constitution that provides for a
7    jury.  You are going to have parties present their evidence to
8    juries and we're going to have them decide.

9    It's a social contract that we make with each other.
02:23PM   10    Where we say, we're going to live together in harmony, and
11    we're going to adopt some rules for how we should live
12    together.  And those rules are going to mean something, and
13    people are going to come forward from their lives.  They are
14    going to take days out of their lives, in this case six days,
02:24PM   15    and they are precious to me.  They are precious to me that you
16    would do this.

17    And you come here to do justice for all of us.  And okay
18    it's one case, but, you know, one case becomes another case and
19    one jury becomes another jury, and we all work together over
02:24PM   20    and over and over again to make this country the way we want it
21    to be, because we love each other.

22    Because we love each other, even when we don't know each
23    other, we are neighbors.

24    We are neighbors, and we have to treat ourselves as
02:24PM   25    neighbors.  That means bringing justice.  When neighbors

1    dispute each other, when neighbors have issues, this is how we

2    deal with it in our country.

3        I treasure the work that you are about to do, and the

4    work you have done for the last six days.

5        It means so much to me.

6        From many one, one love, one justice, one truth.

7        I ask you to go into the jury room when you are all done

8    hearing everybody talk here, there is little bit more talking

9    you will hear, I ask you to go in that jury room and feel the

10   responsibility, and through love reach a true and just verdict.

11       That's all you ever ask for.  I ask you reach a true

12   verdict.  I believe it will be for my client, but I leave it

13   your hands.

14       I than you so much for the time you have given me in

15   your lives to tell you what I think and to represent my clients

16   in this Court.

17       I want to thank the Court very much for that too.

18       We haven't agreed on everything, Your Honor, and I

19   respect that, and I'm so sorry for all of my failures as a

20   person and advocate.

21       I say to my brother counsel, I apologize to you, if I

22   have hurt your feelings.

23       I don't like your case, but I respect you because you

24   are part of this process too.

25       I want to thank my client.  He sat here through this.

—— REALTIME UNEDITED TRANSCRIPT ONLY ——

1    He's a junior executive.  He got the job to be here because

2    Mr. Paul couldn't be here every day.

3         I thank you very much, Matt, for being part of this, and

4    especially, I thank my junior partner, who I said, I started

02:26PM  5    with him when he was a little sprout and then he is a great oak

6    tree, and will be even greater as his branches spread further.

7         I really thank him so much for all of the help he gave

8    me, because if ever I have seen further, it's because I stood

9    on the shoulders of giants, and he's a giant.

02:26PM  10        So, and I'm sorry, Mr. Katrinak, who I have known for so

11   many years, I really appreciate his spirited defense in the

12   case I brought against him.

13        I appreciate -- especially appreciate the way he saves

14   time and the way he has been very, very careful and

02:27PM  15   appreciative of your time.

16        I want to offer my thanks to you.  And as I said, at the

17   outset, to the Court staff, and the court clerk, the reporter,

18   the clerks.

19        Thank you, everybody for listening, and I appreciate the

02:27PM  20   exercise you are about to do.

21        Thank you and thank you.

22        THE COURT:  Okay.  Ladies and gentlemen, we are

23   going to go ahead and take our break.  We will take about ten

24   minutes.

02:27PM  25        I will remind you, please do not discuss the case, form

1    or express any opinions and do not do any research.

2          We will see you in about ten or 15 minutes.

3               THE COURTROOM DEPUTY:  All rise for the jury.

4               (Jury exits the courtroom at 2:28 p.m.)

02:28PM    5          THE COURT:  You all can be seated.

6          I want to see the slide that is referring to Mr. Lauter,

7    so you can pull that.

8               MR. LEICHTER:  The presentation?

9               MR. DONIGER:  Your Honor, I do believe there were

02:28PM   10    two slides.

11               THE COURT:  I knew what they're talking about, there

12    was one that went up briefly.

13               MR. LEICHTER:  It's the "who" slide right here.

14          While it's coming up, Your Honor, I do want to say the

02:28PM   15    Court instructed before the case --

16               THE COURT:  I'm going to take care of this issue.  I

17    will wait.

18               MR. LEICHTER:  Is it coming up?

19               THE COURT:  No, the one that was specific to

02:29PM   20    Mr. Lauter.

21               MR. LEICHTER:  I skipped that one.

22               THE COURT:  No, it was there, because I saw it,

23    right there.

24          That's it.  So can you explain the Judge Sykes portion

02:29PM   25    in quotes, "It's not evidence."

—— REALTIME UNEDITED TRANSCRIPT ONLY ——

1          MR. LEICHTER:  Yes, that is instruction.  It's jury

2     Instruction Number 36.

3          THE COURT:  Which says evidence for a limited

4     purpose.

02:29PM   5          You know it's evidence.  It's evidence for a limited

6     purpose, it's not evidence.  It's evidence.

7          MR. LEICHTER:  It's not.

8          THE COURT:  You put on there, it's not evidence and

9     having put quotes from me, it's completely inaccurate.  It's

02:29PM   10    simply not true.

11         One, I never said it was in evidence.

12         Two, we all know it's evidence.

13         It's just evidence for a limited purpose.

14         So I want you to explain why you are putting me on the

02:30PM   15    slide with quotes saying, "It's not evidence."

16         Because I have never said, "it's not evidence."

17         Did I ever say it's not evidence?  So why would it be on

18    there quoted, "it's not evidence" coming from me, if I never

19    said that.

02:30PM   20         Unless you can tell me I said that, it should not be

21    quoted on the slide.  Judge Sykes, "It's not evidence" in

22    quotes.

23         I went back and I looked, and I have never said that.

24    That was shown to the jury, because I saw it.

02:30PM   25         MR. LEICHTER:  Is the Court ready for me to respond?

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1          THE COURT:  Yes.

2          MR. LEICHTER:  First of all, when I say, "it's not

3    evidence," I'm tracking exactly what Court said.  It's not

4    substantive evidence in support of the case.

02:30PM    5          It's only to be taken --

6          THE COURT:  Is that what that says?  Does it say

7    Judge Sykes quotes, "It's not substantive evidence"?

8          Does it say that?  It says, "It's not evidence."

9          MR. LEICHTER:  When I present -- first of all, I

02:31PM   10   think I skipped through this slide.

11          THE COURT:  I saw it.

12          MR. LEICHTER:  I know it was up there.  I didn't

13   spend any real time.  It discussed three or four points in my

14   presentation.

02:31PM   15          I discussed how Your Honor had instructed that it was

16   only to be taken for Mr. Otto's impeachment.  And I said this

17   over and over again.

18          I was referring to the Court's instruction that they

19   listened to where the Court said, you are not --

02:31PM   20          THE COURT:  My instruction never said it's not

21   evidence.  And that's what I'm getting at right now.

22          You have it in quotes that it's not evidence, so I'm

23   sorry, it's just not true.  You can't tell me that is true that

24   I said it's not evidence.

02:31PM   25          So what I'm telling you now, counsel, it's -- I'm going

1    to correct this by telling the jury, going back to Mr. Lauter,

2    I'm going to tell them again, ladies and gentlemen of the jury,

3    it is evidence.

4        It is evidence for a limited purpose.  I'm going to tell

02:32PM  5    them the instruction that I had previously given to them, and

6    I'm going to ask you to give me a copy of this, because I'm

7    going to potentially do a referral to the state bar, because

8    this is not true, and should never have been shown.

9        And however you want to explain around it, that is

02:32PM  10   simply a false statement.  You are saying the Judge, in quotes,

11   said, "it's not evidence."

12       That is all I'm going to say about that.  If you want to

13   respond to the state bar, then that's fine.  I'm telling you

14   that is how it's going to be.

02:32PM  15   We're going to have our ten minutes now.

16            MR. LEICHTER:  Your Honor?

17            THE COURT:  You can make your record --

18            MR. LEICHTER:  Thank you.

19            THE COURT:  -- in response to the state bar, but I'm

02:32PM  20   not going to.

21       We're having our break now, and that's it.

22            MR. LEICHTER:  Thank you, Your Honor.

23            THE COURTROOM DEPUTY:  This Court stands in recess.

24                (Afternoon recess.)

02:44PM  25            THE COURTROOM DEPUTY:  We're bringing in the jurors.

REALTIME UNEDITED TRANSCRIPT ONLY

1    All rise for the jury.

2         (Jury enters the courtroom at 2:44 p.m.)

3         THE COURTROOM DEPUTY:  All rise and come to order.

4         THE COURT:  Welcome back, and be seated.

02:47PM    5    Mr. Katrinak, are you ready?

6         MR. KATRINAK:  Yes, Your Honor.  Thank you, Your

7    Honor.

8         THE COURT:  Go ahead.

9         MR. KATRINAK:  Good afternoon, ladies and gentlemen.

02:47PM   10   And my client and I also would like to thank you for your time

11   you have spent here in this very long trial.

12        It's much longer than I ever anticipated it would be.

13   Unfortunately, in my opening statement, my client can't be here

14   because of his health issues.  He would have preferred to be

02:47PM   15   here, but he lives a long distance away, as you saw from his

16   testimony.

17        But he takes this case very seriously, as do I.

18        Now, I want to -- there has been a lot of chaos and

19   confusion in this case, and it's gotten very confusing.

02:47PM   20   I have a hard time following it myself, and, you know,

21   it's very hard for you to follow as well, I'm sure, but I think

22   we need to focus on the evidence as opposed to the chaos and

23   confusion.

24        First of all, this case is about counterfeiting.

02:48PM   25   That's what this case is about, whether or not

1   defendants counterfeited the DVDs that were provided to them by

2   Harvest Aid directly.

3          My client, as I said in opening statement, didn't touch

4   any of these DVDs.  Now, counsel for the defense, has made a

02:48PM   5   big issue about Exhibit 9, and we will come to that in a little

6   bit, but I want to make a point about that at the beginning.

7   There is not a word in that exhibit about, we are insuring you

8   if you counterfeit.

9          That would make no sense.  That is not what the contract

02:48PM   10  was about, and that's not what my client's involvement in this

11  case was about.

12         And counsel, I think both made a comment, about common

13  sense.

14         Common sense in this situation is, from my client, he

02:48PM   15  didn't touch a single DVD.

16         I mean, why I had to sit here for two weeks in this

17  trial, and he -- he was subject at the beginning of the trial

18  in having me be here, when he didn't touch a single DVD.

19         I don't understand.

02:49PM   20         I frankly, do not understand why we are here.

21         It makes absolutely no sense.

22         The evidence in this case shows that -- I'm just going

23  to put this up briefly -- you are going to have to bear with me

24  on technology, I have been a lawyer for a while, I usually do

02:49PM   25  paper, this is the first time I'm doing this.

REALTIME UNEDITED TRANSCRIPT ONLY

1    If I can see if I can get this, okay.

2    This is Exhibit 13.  This is the contract between

3    Harvest Aid and my client to distribute these DVDs.  Wax Works.

4    And what is important about this contract, from my

02:49PM  5    perspective, is that it's July 21, 2017.  That is when the

6    contract was entered into.

7    You heard Mr. Woodward's testimony, the contract when it

8    was entered into was July 21, 2017, he had reached agreement

9    with Echo Bridge to distribute the DVDs through Walmart.

02:50PM 10    That's when was the agreement was reached.

11    And the agreement also -- and the defense agreed to

12    this, the defense are agreed to accept all of the DVDs that

13    were shipped under this agreement and under Exhibit 9, which

14    was entered into six months later, they agreed to accept those

02:50PM 15    DVDs from Harvest Aid.

16    There is no dispute in the evidence.

17    The DVDs provided by Harvest Aid to defendants to be

18    sold at Walmart were authentic.  They weren't counterfeits.

19    There is a not a shred of evidence that those DVDs were not

02:50PM 20    authentic.

21    That's what we provided, those DVDs directly from

22    Harvest Aid to the defendants.

23    That agreement was reached in July of 2017.

24    Now, after that agreement was reached where we never

02:51PM 25    would touch a DVD, they agreed to accept the DVDs.

REALTIME UNEDITED TRANSCRIPT ONLY

1        The DVDs started to be shipped, and this is an important

2   fact too.

3        This is Exhibit 8.  We have talked about this exhibit

4   repeatedly in this case.

02:51PM  5        The first DVDs shipped were in October of 2017, 15,000

6   DVDs directly from Harvest Aid to defendants.

7        They were all authentic, all shipped under the agreement

8   reached between Wax Works and SP Releasing, Echo Bridge.  It's

9   unclear from the evidence, and we will come into why that is

02:51PM  10  unclear in a bit, but they were shipped directly from plaintiff

11  to defendant.

12       15,000 shipped October 2017.

13       Was there a contract provided by the defendants to Wax

14  Works in October?

02:52PM  15       No, they wanted the DVDs.  They wanted to sell the DVDs.

16       Mr. Woodward, he hadn't entered into any of the

17  contracts with Steven Paul for any other DVD releases he did

18  for them.

19       Typically, he didn't do a contract.  We get 10 percent,

02:52PM  20  we are a middleman, we get 25 percent, there is a percentage.

21  They don't deal with the costs, because in the industry

22  everybody messes around with the costs.  You are never going to

23  a see a penny, it's like Hollywood profits, I don't know if you

24  ever heard of Hollywood profits.  Oh yeah, I get 10 percent of

02:52PM  25  the back end, but they deduct all of the costs, and you get

REALTIME UNEDITED TRANSCRIPT ONLY

──────── REALTIME UNEDITED TRANSCRIPT ONLY ────────

1    nothing.  That's what happens when you enter into a

2    distribution agreement, which was not the deal.

3          The oral agreement was, we get a percentage, you get a

4    percentage, and we ship the remainder to Harvest Aid, which was

02:52PM  5    operating.  That was the agreement.

6          November, more DVDs shipped, no contract.

7          All of these months -- all the way through February when

8    the agreement for this Exhibit 9 was finally sent to my client,

9    at that point in time, out of the 39,000 DVDs that were

02:53PM  10   shipped, 30,000 had been shipped already.

11         They all were shipped, they were all authentic, they

12   were from Harvest Aid to defendants and that was the agreement.

13   That's what everybody agreed to.

14         Then all of a sudden in February, and you heard Mr.

02:53PM  15   Leichter correct my client with his memory being wrong, it

16   wasn't January, he made a big deal, oh, it was February, not

17   January.

18         Long after these DVDs were shipped, long after they were

19   being sold, Exhibit 9 was sent.

02:53PM  20         And you heard my client's testimony about Exhibit 9.

21         He signed it, there is a dispute on the schedule, but I

22   don't think for our purposes, we don't get into it.

23         He testified he signed it and he had a conversation with

24   Mr. Paul before he signed it.

02:54PM  25         The conversation with Mr. Paul was, hey, our deal is --

────── REALTIME UNEDITED TRANSCRIPT ONLY ──────

```
   1    was we just keep 25 percent, that is our deal.  This contract

   2    -- don't worry about it, don't worry about it.

   3            Now, you heard -- you saw my client, he is elderly, he

   4    had been dealing with Steven Paul before, and he thought, oh no

   5    big deal.

   6            The contract doesn't say, hey, I'm insuring you for

   7    counterfeiting.  Hey, I'm insuring you for any business you do

   8    with Walmart or any of your dealings for Walmart.  I'm going to

   9    pay for your defense.

  10            Hey, if you counterfeit, I will pay for that.  That

  11    contract doesn't say anything like that.

  12            And the defense is making a big issue about the rights.

  13    Again, this is smoking mirrors.  The rights don't matter.  This

  14    rights language, Paragraph 3, Paragraph 8, I'm not going to go

  15    through it.

  16            Harvest Aid is not claiming they didn't have the right

  17    to sell authentic DVDs to Walmart.

  18            Why does that language in there matter?

  19            It makes no sense.

  20            They were shipping the DVDs directly to defendants for

  21    sale.  They are not saying they had the rights to sell

  22    authentic DVDs that were manufactured and produced by them.

  23    They say cannot counterfeit, and that's what this case is

  24    about, but why are we here if there is counterfeiting?  That

  25    makes no sense.
```

02:54PM (lines 5, 10, 15)
02:55PM (lines 20, 25)

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1       Now, Exhibit 9 says as of January -- on the first page.

2  January of -- January 17, 2018, like counsel for the plaintiff

3  mentioned, this contract is unbelievable.  He was bamboozled in

4  entering into it, but it is what I have to deal with.

02:55PM  5       But you heard, again, I'm going to come back to it,

6  Steven Paul says, no big deal, we're going to give you

7  25 percent.

8       Everybody heard Mr. Woodward's testimony.  Steven Paul,

9  where is Steven Paul?

02:55PM 10       He didn't come in and testify about this, he didn't take

11  this case seriously and he really doesn't care.

12       But he didn't come in and say, that's not accurate.  He

13  didn't come in and say anything.

14       And as was pointed out -- I'm going to switch here -- as

02:56PM 15  was pointed out by counsel in this case, jury instruction

16  Number 7, we are all going to talk about this.  This

17  instruction is important.

18       You may consider the ability of each party to provide

19  evidence.

02:56PM 20       If a party provided weaker evidence when it could have

21  provided stronger evidence, you may trust that weaker evidence.

22  Again the dynamic in this case, plaintiff suing defense.

23  Defense is suing me.

24       Defense suing me is the plaintiff.

02:56PM 25       Virtually everything Mr. Leichter, counsel for the

─────── REALTIME UNEDITED TRANSCRIPT ONLY───────

1    defense was saying about plaintiff's counsel, would apply to

2    his case against me.

3           Where is Mr. Paul testifying against my client?  Where

4    is his proof?  There is no proof.

5           They provided no evidence against my client.

6           Mr. Paul didn't come and testify.  Marion Regan didn't

7    come in and testify.  You heard Mr. Woodward's testimony about

8    Mary Regan, she didn't come in and testify.

9           He presented no evidence against my client.

10          His evidence against my client was put my client on the

11   stand, jammed through this Exhibit 9, and say, gee, look we

12   gotcha.  We gotcha with Exhibit 9.

13          We gotcha with this warranty language about, you know,

14   you have the rights to sell this picture.  But you don't have

15   the rights, so you breached the contract.

16          But wait a minute, we're not being sued for not having

17   the rights, we're being sued for counterfeits.

18          We're being sued for the claims being made by Harvest

19   Aid to the defense for counterfeiting.

20          That has nothing to do with the rights to sell the

21   picture.

22          Harvest Aid is not disputing that the defendants had the

23   right to sell the picture that was shipped from Harvest Aid to

24   the defendants that are the only DVDs that even could be

25   remotely associated with my client, so why are we here?

1      Oh, you would think that the defense would put on this

2  case about how Mr. Woodward counterfeited DVDs or Mr. Woodward

3  did something.

4      Here is all of the witnesses that, here is Mary Regan,

02:58PM  5  we never had this deal.

6      Oh, we were damaged because of this breach of warranty

7  in this contract when the DVDs provided were sold.

8      Harvest Aid is not suing over those DVDs.

9      Harvest Aid is suing over counterfeits.

02:58PM  10      Well, Mr. Woodward, you know, you must have

11  counterfeited or being involved in the counterfeit.

12      You heard Mr. Woodward's testimony about that.  He's

13  only making a dollar off of a DVD.  He is the middleman.  And

14  he's getting sued for making a dollar off of a DVD that he put

02:58PM  15  these two people together on.

16      They want to hold him accountable for counterfeits and

17  they want him to pay for the attorneys fees and pay for the

18  whole defense over counterfeiting -- over authentic DVDs that

19  were sent to them, the only ones we were sent with.  We didn't

02:59PM  20  touch a DVD.  Frankly, that is outrageous.

21      But they have -- they produced no evidence other than

22  the contract that Mr. Woodward was -- I'm trying to think of

23  the appropriate word -- he didn't read it obviously.

24      He was told by Steven Paul, hey, our deal is 25 percent,

02:59PM  25  don't worry about it.  That's what it says on the first page of

REALTIME UNEDITED TRANSCRIPT ONLY

1    the contract.

2           He didn't go through and analyze, if I signed this, I

3    become your insurance company, like Nationwide.  If you get

4    sued for anything, I'm responsible.

02:59PM  5           But that is not what contract says.

6           That is the thing that is incredible too.

7           The contract doesn't say what counsel for the defense --

8    I should say third-party plaintiff, the plaintiff in the case

9    against me, the contract doesn't say what he is saying.

02:59PM  10          It wouldn't make any sense.

11          It makes no sense.

12          Paragraph 18, let's look at Paragraph 18.

13          Now, you talked about -- I have to change this, sorry.

14          I apologize, I'm not very good at blowing up these

03:00PM  15   things.  This is best I can do.

16          So you talked about 18(b), both parties here to warrant

17   and represent, that they each have the right and power to enter

18   into this agreement, and grant all rights granted herein to

19   perform all the respective obligations.

03:00PM  20          Our obligation was to provide authentic DVDs to them.

21   We did.

22          The fact that this is buried in Paragraph 5 of

23   Exhibit 13 says, oh we really don't get all of the rights --

24   did I do something?

03:00PM  25          Sorry, the fact that in Paragraph 5 of Exhibit 13, says

┌─ REALTIME UNEDITED TRANSCRIPT ONLY ─┐

1   -- it all shut down.  I'm sorry, one moment, please.

2          I'm sorry, ladies and gentlemen, if you just give me a

3   minute.  I want to make sure everybody can see it at the same

4   time I'm talking.

03:01PM   5          THE COURT:  We will take a moment.  We are all used

6   to this now, for some reason.

7          It's up.  It is very temperamental.

8          MR. KATRINAK:  I like the old days a lot better.

9          Here we go.  13(b), that counsel for defense pointed

03:02PM   10  out:  Both parties here to warrant and represent they.  Each

11  have a right to enter into this agreement, to grant all rights

12  and perform all of their respective obligations.  They are not

13  being sued for anything we did, because they agreed to the DVDs

14  being shipped directly from Harvest Aid to them.

03:02PM   15         They agreed, so if for some reason, somehow we touched

16  it in the middle, I could see maybe there is an argument, but

17  we didn't touch anything.  I don't see any argument.

18         The fact that, yeah, maybe this is breached, maybe if

19  you look at Paragraph 5 of 13, that we didn't have the rights

03:03PM   20  because that agreement didn't say we had all of the rights to

21  do Walmart.  Everybody understood that's what the deal was.

22         Everybody was operating under the deal.  Harvest Aid was

23  operating under the deal.  We had the rights to sell these DVDs

24  at Walmart.  They provided authentic DVDs that we provided to

03:03PM   25  them to sell at Walmart.

──────── REALTIME UNEDITED TRANSCRIPT ONLY ────────

1    I think Paragraph 18 of this Exhibit is inapplicable.

2  If that says, hey, Wax Works, you are insuring us for selling

3  counterfeit DVDs, if we want to sell counterfeit DVDs and make

4  $12 a DVD, and not pay anybody, yeah, I could see why we would

03:03PM  5  have to potentially indemnify, but there would other arguments

6  why we wouldn't, but if the contract said that, great, but the

7  contract doesn't say that.

8    And 18(c), the same thing.  The first line of 18(c):

9  Wax Works represents and warrants that it owns the rights to

03:04PM 10  the picture, and all videograms provided to SPR pursuant to the

11  licensor and has the authority to grant SPR the license.

12    The defense conveniently doesn't talk about that

13  sentence in Paragraph 18(c).

14    You saw the green underlining, I'm unable to do that,

03:04PM 15  the green underlying and all of these circles and squares and

16  everything else, it was everything else but that first line

17  under Paragraph 18(c), because that is pointing to the fact

18  that, oh, the DVDs you are providing, you are warranting they

19  are good and we're not going to get sued for it and Walmart is

03:04PM 20  not going to get sued for it.  If Walmart or we get sued for it

21  you are responsible.

22    They can't point to that because all of the DVDs we

23  provided were authentic.

24    They are antipiracy-coded, were all sent by Harvest Aid

03:04PM 25  directly to the defendants.

REALTIME UNEDITED TRANSCRIPT ONLY

1        There is no breach of this paragraph either.

2        There is no basis for us to here, and incur these

3   incredible costs when it's a counterfeiting case that there is

4   no evidence we counterfeited anything.

03:05PM    5        We didn't even talk to Jax, Jax's testimony, yeah, I

6   kind of -- I talked to him maybe ten years ago.

7        There is no involvement of my client at all with

8   counterfeiting.

9        Again, under the agreement, it would make more sense

03:05PM   10   because we're making a dollar a DVD.  It takes a dollar to

11   replicate and if he gets a dollar for a DVD, why would he

12   counterfeit?

13        I want to take you to another jury instruction, I'm

14   going cause more chaos for me.

03:05PM   15        So I stopped that.  Okay, this is jury instruction

16   Number 33.  You will get that in the back, and you will see

17   this in the jury instruction.

18        Now, this is the breach of contract claim against Wax

19   Works, against us.

03:06PM   20        And in this jury instruction, it says we breached the

21   contract in the second paragraph, third-party plaintiff's claim

22   that Wax Works breached this contract by supplying third-party

23   plaintiffs counterfeit DVDs in violation of the contract's

24   express warranties.

03:06PM   25        So, for us to be liable for breach of contract, we have

─────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────

1    to give them counterfeits.

2         We didn't give them counterfeits, we didn't give them

3    any DVDs.

4         There is no way we could be liable for breach of

03:06PM    5    contract, but the evidence is without dispute, if you get away

6    from all of the chaos and the smoke and the theatrics.

7         The evidence is simple.  We did nothing wrong.

8         We didn't provide any counterfeits.  We didn't provide

9    any counterfeits.  How could we be liable for breach of

03:07PM   10    contract?

11         Now, the defense argued that, oh, there is some returns,

12    some returns that came from various sources, and maybe in those

13    returns, maybe we innocently got a couple of counterfeits.

14    We're talking, like, 5,000 counterfeits or something like that.

03:07PM   15    It's kind of hard to believe.

16         But in any event, if they got them through the returns,

17    those aren't DVDs provided by us.

18         The DVDs provided us, the evidence is without dispute,

19    from Harvest Aid to the defense -- I want to make sure it is

20    clear, and I will say this ten times, I want to make sure, we

21    didn't touch these DVDS.

22         I am stuck sitting here, where we didn't touch any of

23    these DVDs.  We didn't provide any counterfeits.  There is no

24    evidence that any counterfeits were provided.

03:07PM   25         Under the instruction, you have got to find we provided

1    counterfeits.

2         There has been zero evidence in this case of any

3    counterfeiting by Wax Works or us providing any counterfeits to

4    anybody.

03:08PM   5         Okay.  Let's go to this, I'm trying to make this short,

6    I don't really have a lot to say, other than there is no

7    evidence, but literally, there is no evidence against me.

8         You know, let's do this, okay.

9         This is the verdict form you are going to see.

03:08PM  10         Counsel for the defense started going through it, and it

11   says on 6:  Did you find that Wax Works breached the terms of

12   its contract with SP Releasing?

13         Now, I would submit it should be, no, notwithstanding

14   the language of this contract that Mr. Woodward was bamboozled

03:08PM  15   in.

16         But the reason why it should be no, is because

17   80 percent of the -- 90, almost 90 percent of the DVDs were

18   shipped before this contract was even a glimmer in somebody's

19   mind to put in front of Mr. Woodward and get them to sign it.

03:09PM  20         Okay.  All of the DVDs that were provided we know from

21   the evidence were authentic and were provided by Harvest Aid to

22   the defendants with codes on them, piracy codes, and everything

23   else.

24         Everything we provided are authentic.

03:09PM  25         How could we breach a contract if we provided authentic

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1    DVDs.  Notwithstanding the noise, well, this contract says, oh,

2    there is this warranty, and we provided authentic DVDs.  They

3    weren't sued for authentic DVDs, we didn't breach a contract,

4    okay.

03:09PM  5        However, if you find there was a breach, which I'm not

6    saying there wasn't, you know, I don't want to make it sound

7    that it's absolutely no way there was a breach.  The language

8    of the contract is not good for my client, but he was

9    bamboozled into signing it, but it's not good, but I still

03:10PM  10   think, if you look of the course of the dealing of the parties

11   and what happened before this contract even came up, we were in

12   compliance.

13        But, the next question is:  Do you find that SP

14   Releasing was harmed as result of Wax Works' breach of

03:10PM  15   contract?

16        This was an unequivocal no, that there was no harm to SP

17   Releasing for breach of contract, for us providing authentic

18   DVDs to them to sell.

19        That's an unequivocal no.  It doesn't say counterfeit.

03:10PM  20   Hey, we're going to indemnify you for counterfeit DVDs.

21        It says the DVDs we provide, we're going to indemnify

22   you, and the ones we provided, they are not getting sued for

23   those.  They are getting sued for manufacturing counterfeit

24   DVDs, that's what they are getting sued for.

03:10PM  25        And then the last one is what amount do you award for SP

REALTIME UNEDITED TRANSCRIPT ONLY

1    Releasing for Wax Works' breach, that's if you find there is a

2    release.  I would say there is not.

3         At the end of the day, Wax Works, my client, Mr.

4    Woodward, a nice man, I think he's a nice man, he seems like a

03:11PM 5    nice old southern gentlemen, we ask for a verdict in our favor.

6         Please let us go, and out of this mess, because we

7    shouldn't be here.

8         Thank you very much, ladies and gentlemen.

9         THE COURT:  Thank you, Mr. Katrinak.

03:11PM 10    We will go back to Mr. Doniger.

11         MR. KATRINAK:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         MR. DONIGER:  Thank you, Your Honor.

14         All right.  I spoke to you for a long time before, I'm

03:12PM 15    going to try to keep it reasonably short.

16         The closing arguments of the defendant are hard to

17    respond to.

18         They are filled with personal attacks.

19         If they appear to have been designed to put me

03:12PM 20    personally on the defensive and throw me off my game, maybe

21    it's a tactic or a strategy because I was putting too much

22    evidence to throw out, I don't know.

23         But you heard over and over again there is no proof,

24    there is no proof, there is no proof.

03:12PM 25         Yet, my closing, the time that I spent with you was

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1    literally going through document after document after document

2    looking at the evidence and explaining the difference between

3    direct evidence and circumstantial evidence.

4           And it really seems to me like there is no evidence in

03:13PM  5    the world, and I'm sure there is not, that is going to convince

6    the defendants that we got them.  That we got caught them.

7           That's fine.  They can take that position.

8           But the position if there is no evidence?

9           Defendants -- look, I agree, we have to respect your

03:13PM  10   time.  This whole where is Mary Regan, where is Brian Lusk, as

11   if we need to bring every person in here to verify and validate

12   every e-mail that was put in front of you that clearly say what

13   they say.

14          Those are internal communications of the defendants

03:13PM  15   establishing their motive to counterfeit.

16          I'm actually really surprised that the defendants have

17   spent so much time talking about Mr. Schoener.

18          Because yeah, we did not present him as an expert.

19          You know why we didn't present him as an expert, because

03:14PM  20   counsel asked that question why did we not get these technical

21   tests from him, and the answer is because what you all need to

22   decide is whether technological measures, antipiracy measures

23   were circumvented, not how.

24          And you may recall when he was on the stand,

03:14PM  25   Mr. Leichter examined him at length and tried to establish he

REALTIME UNEDITED TRANSCRIPT ONLY

1    didn't do any technical testing.  He said, no, I used this

2    other program, I figured out how this was done.

3           But the how doesn't matter.  And my colleague asked him,

4    was that technical testing, did that further support your

03:15PM   5    opinion?  He said yes.

6           And then he tried to argue to the Court this is improper

7    expert testimony, but we weren't offering that part because we

8    don't need to.

9           How the technical measures were violated, we don't need

03:15PM  10    to show, just that they were.

11           There is nothing in the jury instruction that we need to

12    show how.

13           By the same token, there is nothing in the jury, in the

14    law, that you have been given that says we can't establish a

03:15PM  15    claim for copyright infringements.

16           For counterfeiting, unless we have specific evidence of

17    how, where, when, on what date the counterfeiting took place,

18    that is not the law.

19           When you go back in that jury room, the main question

03:16PM  20    you need to answer, and it's simple, is it more likely than not

21    that the counterfeit DVDs that came from Jeff Jackson are from

22    Echo Bridge, from the defendants from their Wisconsin facility.

23           If you think it is, if the answer is yes, then your

24    verdict should be for my client.

03:16PM  25           And if you think the answer is no, then your verdict

────── REALTIME UNEDITED TRANSCRIPT ONLY ──────

1    should be for the defendants.

2         And we laid out, at length, the circumstantial case and

3    it's a strong one, that this had to have come from the

4    defendants.

03:16PM    5         And on the other side, you have zero evidence of

6    anywhere else that this could have come from.

7         There is some general, like, well, Mr. Jackson is

8    responsible.

9         How?  How?

03:17PM    10         Is there a replicator he was working with?  Does he have

11    replication equipment?  How?

12         There is zero evidence that makes it at all credible

13    that these could have come from anywhere other than defendant's

14    warehouse facility in Wisconsin.

03:17PM    15         And it sounds like, now, the defendants are admitting

16    they were replicating DVDs there.  If I understood my

17    colleague's closing argument correctly, even though Mr. Otto

18    said they didn't.

19         And well, I'm not going to respond to the majority of

03:18PM    20    dispersions that were cast on me by opposing counsel.

21         I am going to say I have my notes here of exactly what I

22    told you about Mr. Lauter.

23         And I did not, in any way, misrepresent the import and

24    significance of his testimony.

03:18PM    25         What I told you is that Mr. Lauter told you, he worked

REALTIME UNEDITED TRANSCRIPT ONLY

1    with Echo Bridge in 2015 to replicate DVDs.

2          In 2017, he met with Steven Paul who offered to

3    replicate DVDs for him at the facility, that was his testimony.

4          And exactly what I told you is that from that testimony

03:18PM   5    you get to decide, and I think you have to decide that Matt

6    Otto was not truthful with you.

7          That's what I said.

8          And the limiting instruction that you have regarding

9    Mr. Otto's testimony is that it can be used solely to evaluate

03:19PM  10    and believability of Mr. Otto's testimony, that is exactly what

11    I told you.

12          And in contrast, my colleague put something up there,

13    ascribed to the Judge that said not evidence.  It is evidence.

14    It's absolutely evidence.

03:19PM  15          And the question for you again, why would Mr. Otto come

16    up here and not be truthful with you about the replicating

17    capacities of that Wisconsin facility.  I think the answer is

18    obvious.

19          There is some testimony also about some of these DVDs

03:19PM  20    could have been returns from Walmart.  They could have come

21    from anywhere and gotten mixed in, but I hope that at least

22    some of you took some good notes of Marion Thompson's

23    testimony.  Returns are processed separately.  She testified

24    very clearly about this.

03:20PM  25          Returns are processed separately from overstock.

—— REALTIME UNEDITED TRANSCRIPT ONLY——

1          And the overstock were the boxes with the eight.  That

2    is new product.

3          It's new product from the stores that only would have

4    come from the defendants.

03:20PM   5          There is no evidence that it could have come from

6    anywhere else.  And when you look at those boxes, the boxes

7    that Mr. Jackson testified he received it in, the boxes he

8    returned our client to in, those are Walmart overstock return

9    boxes.

03:20PM  10          This argument that there could have been a handful of

11   DVDs that could have come from anywhere.  Its not borne out by

12   the evidence.

13          There is also some comments made about Steven Paul, not

14   being here and somehow as if that were our fault.

03:21PM  15          I can assure you that the stipulation for Mr. Paul, the

16   reason why there are not other facts in there, that I would

17   have loved to elicit him from the trial, is because by its very

18   nature a stipulation has to be agreed to by both parties.

19          I can't get a stipulation of what Mr. Paul would

03:21PM  20   testified to about the replicating capacity of the facility in

21   Wisconsin, unless all parties, all counsel agree to that

22   stipulation.

23          And you have seen the instruction that my colleague

24   pointed out to you, that companies are liable for the act that

03:22PM  25   they are authorized agents.

─── REALTIME UNEDITED TRANSCRIPT ONLY ───

1      And we have seen the acts and the statements in some of

2  these correspondence that defendants had produced to them,

3  their internal correspondence.  We have seen these acts and

4  statements, and you have no evidence other than an e-mails from

03:22PM  5  Mr. Paul saying, why are you sharing this information.  You

6  have no evidence that any acts, any relevant acts, were done by

7  anyone who didn't have authorization.

8      I want to be really clear about one sort of related

9  thing.

03:22PM  10     The other side of that coin, the other side of that coin

11  is if just because someone is an employee of the company or the

12  owner of a company, they are still liable for what they do.

13     So then we get back to Jeff Jackson.

14     Like I said, if you believe that the DVDs that

03:23PM  15  Mr. Jackson turned over to my client, more likely than not came

16  from Echo Bridge, you should find in my client's favor.

17     So the defendants need you desperately -- need you to

18  believe he's a liar and the more -- it's as if the more times

19  they tell you he's a liar, the more vehemently tell you he's a

03:23PM  20  liar, you are going to start to believe it.

21     I don't need to beat this drum more than I need to.  But

22  I'm still really unclear what counsel thinks he lied about.

23     I'm really unclear about it.

24     Mr. Jackson told you, he didn't say, I made everything

03:24PM  25  up.  He literally looked at the date of the 25th, he was on the

1    stand, he told you and I specifically asked him, do you

2    specifically recall the date that you received the product?

3    No.

4         Okay.  Can you explain this?

03:24PM    5         He was looking at it, and, of course, I said this in my

6    initial closing, if you don't remember something, how do you

7    explain that.  It's not lying.

8         And everything else he said is true, if we accept what

9    the documents show us, almost certainly he was at that dock on

03:24PM   10    the 24th.

11         Now, counsel for the defendant said, well, this is a

12    crazy trip through those documents.  We don't know what these

13    documents are.  No one has testified about them, we don't know

14    whether these are true.

03:25PM   15         I'm going to suggest to you that that argument is

16    hypocritical.  It's hypocritical because their entire defense,

17    the entire gotcha rests on the truth of what is in those

18    documents that the delivery was on the 25th.  It probably was.

19         But Mr. Jackson didn't recall the date, he was, like,

03:25PM   20    okay.  He didn't know.

21         And you can't have it both ways.  Either you believe

22    that date, and it creates a question of how he could be have

23    been shipping this on the 24th, or you don't believe that date,

24    there is no -- sorry, offering things on the 24th, or you don't

03:25PM   25    believe that date, there is no inconsistency with him offering

REALTIME UNEDITED TRANSCRIPT ONLY

1     things on the 24th, and there is no problem.

2          But if you do believe that date, and you do believe

3     those documents are valid, you have got to look at the rest of

4     the documents and fill in the story.

03:26PM   5          A couple of other quick things.

6          There is nothing -- well, actually strike that.

7          All right.  There is a lot that I can say, but you guys

8     have listened patiently and diligently and you have listened --

9     you have really -- I see the attention you have given to all of

03:26PM   10    us.  And I'm going to thank you and I'm going to shut up now.

11         I'm just going to say, again, that this process being an

12    attorney, being someone that people on juries can look at, and

13    be like that is what attorneys should be, it's really important

14    to me.

03:27PM   15         This isn't theater, this isn't manipulation.

16         This isn't like, hey, you are my best friends, and I

17    like you, but then I'm going to stab you in the back.

18         This is integrity.

19         Look at the documents, look at what we have gone

03:27PM   20    through.  Look at the circumstantial evidence.

21         Again, if you find that more likely than not that these

22    counterfeit DVDs came from Echo Bridge from their facility, I

23    don't think there is no evidence they could have come from

24    anywhere else.

03:27PM   25         Please find in favor of my clients.  This counterfeiting

—— REALTIME UNEDITED TRANSCRIPT ONLY——

1    is not okay and there was counterfeiting.

2          And there is no one else, realistically, there is no one

3    else that could be behind that.  Thank you.

4          THE COURT:  Okay.  Thank you, Mr. Doniger, and

03:28PM    5    Mr. Leichter.  It's your podium, this is only as to responding

6    Mr. Katrinak's arguments.  We weren't clear on that.

7          MR. LEICHTER:  I will make it very clear.

8          Ladies and gentlemen of the jury, this is the part we

9    sort of all have to go from order and in turn, and the rule is

03:28PM    10   that the plaintiff gets the last word on the plaintiff's case

11   and the third-party plaintiff gets the last word on the third

12   party plaintiff case, so I get the last word, but only as to

13   this part of case.

14         So I'm going to be have to restrict myself to what

03:28PM    15   Mr. Katrinak said.

16         As much as I would like to have comments about what

17   somebody else in this courtroom has said.

18         Let's go with Exhibit 71, which was put up.

19         Now, this was Mr. Katrinak that showed this to you, and

03:29PM    20   he's talking about the, whatever, this is Exhibit 71.

21         He's talking about my client and what my client was

22   reporting.

23         Let me say this to you, this is not my client's

24   document.  This document has been argued to be about my client

03:29PM    25   but this document is Wax Works' document to Harvest Aid.

1    So it really doesn't have to do or doesn't put words in

2    the mouth of my client, nor do I think it has anything to do

3    with who is responsible here under the contract, nothing at

4    all.

03:29PM  5    But we can take that one off.

6    I would like to show -- really, I'm going to hit things

7    quickly.  Actually, before I show something, the argument was

8    made several times, and vociferously by Mr. Katrinak, that his

9    client didn't touch a DVD.  His client didn't touch a DVD, and

03:30PM  10   that he's not responsible for any counterfeiting.  And he says

11   hey never touched me.

12   Okay.  Let's look at Exhibit 99.

13   99 -- there it is, 99-74.

14       THE COURT:  You may need to say that again at the

03:30PM  15   microphone.

16       MR. LEICHTER:  99-74.  Thank you, Your Honor.

17   I'm not sure if we could turn it.

18   You will have a paper copy, if you want to write it down

19   you will have the number.  Thank you so much, Andy.

03:30PM  20   The question was raised by Mr. Katrinak, his client

21   didn't touch a counterfeit DVD.

22   Here is the evidence of who did touch the counterfeit

23   DVD.

24   This is -- can you blow it up a little bit so we can see

03:31PM  25   the date?

—————— REALTIME UNEDITED TRANSCRIPT ONLY——————

1       MR. DONIGER:  Your Honor, I'm going to object.  This

2  is clearly rebuttal to our case, and not Mr. Katrinak's.

3       MR. KATRINAK:  I would join with that objection.

4  It's confusing the jury as well, Your Honor.

03:31PM   5       THE COURT:  I don't believe this document was shown.

6       MR. LEICHTER:  No, but what was argued several times

7  by Mr. Katrinak, there is no evidence that his client touched

8  the counterfeits, and his client -- and no evidence other --

9       THE COURT:  I will give you a little leeway, but you

03:31PM  10  are going to have to tie it in.

11       MR. LEICHTER:  Let me be clear to the jury, I'm

12  making two points.

13       No. 1, is the deal is the deal, and his argument that

14  hey, you know, let's just look at who actually delivered it

03:31PM  15  doesn't make a difference.

16       His promise was whatever gets delivered, under this

17  contract is going to be true and genuine and his promise was

18  also that he had the rights.

19       That is what we're talking about is just what does the

03:32PM  20  plain language of the contract say.

21       These other arguments say, I didn't actually touch it,

22  they don't go anywhere.

23       But, let's talk about I didn't actually touch it.

24       This document shows who actually touched it.

03:32PM  25       MR. DONIGER:  Your Honor, same objection.  This is

1   not relevant to the case against Wax Works.

2       This is an attempt.

3       THE COURT:  Why don't you come to sidebar just for

4   one second.

03:32PM  5               (Sidebar begins.)

6       MR. KATRINAK:  I join in this objection.

7       THE COURT:  If I would have thought about this

8   differently, I would have done this arrangement differently.

9       So it's going to be difficult for me to parse out this.

03:33PM 10       So can't go backwards, but now that this is happening I

11  should have had you go first to respond to them, that is

12  neither here nor there.

13      What you are doing?

14      MR. LEICHTER:  I'm not responding to him,

03:33PM 15  Mr. Doniger.  I'm responding to Mr. Katrinak, and remember Mr.

16  Katrinak is making points off the jury instruction that I take

17  responsibility for this, because I should have asked it to be

18  clear, that he says I'm attacking him on the counterfeiting.

19      I want to be clear about how counterfeit goods, how they

03:33PM 20  exist, how they exist.  I'm going to say his client did not do

21  that.

22      I'm going to say counterfeit goods went through this

23  chain of custody.  I'm agreeing that didn't touch his client.

24  That's what I'm going to say.  I'm entitled to argue that as

03:33PM 25  part of my third party case, just as I'm entitled to say, no

REALTIME UNEDITED TRANSCRIPT ONLY

1    matter what happened in reality, it's a delegation of duty that

2    doesn't relieve their responsibility, and that leaves them with

3    a breach of warranty.

4         That is the argument I'm making, and this document

5    shows --

6              THE COURT:  Did you make that in your initial -- in

7    your initial argument?

8              MR. LEICHTER:  I'm rebutting about what he said

9    about not having touched the counterfeits goods, I'm speaking

10   to that exact issue about what my claim is against his client

11   which he mischaracterized.  I'm trying to make it clear.

12             THE COURT:  You cannot point your finger at me.

13             MR. LEICHTER:  You you are right.

14             THE COURT:  You are right next to me.

15             MR. LEICHTER:  It's a promise.

16             THE COURT:  I have come to realize that, but it's

17   still not appropriate the way you conduct yourself when you

18   talk to me, regardless of that is the way you talk to everyone.

19   So go ahead.

20             MR.  DONIGER:  Two things.  First, the document

21   suggests that it speculates, that Jax may have been the -- or

22   I'm sorry, that New Century may have been the source, does not

23   rebut the statement that they were never touched by Wax Works.

24   So it's statement is rebutted is not rebutted.

25             Second, for my rebuttal, I was prepared to discuss if he

—— REALTIME UNEDITED TRANSCRIPT ONLY ——

```
 1    suggested that New Century might have been the source of this,
 2    and he didn't discuss that in his closing.
 3          So I have my rebuttal, now he's trying to introduce a
 4    document that suggests that New Century may be the source of
 5    counterfeits.  That is entirely improper.
 6          MR. KATRINAK:  Your Honor, this is incredibly
 7    improper.  Wax Works' name is not even on this document.
 8          This is unbelievable.  This has nothing to do with his
 9    case against me.  This has nothing to do with that.
10          THE COURT:  I agree.  You are going to have to speak
11    directly to what he said, not bringing in all of this other
12    information that wasn't said.
13          MR. LEICHTER:  I approach it another way.  It has to
14    do with his argument.
15          The cases have, you know, serious interlock.
16          MR. KATRINAK:  There is no serous interlock.  The
17    confusion that has been created -- I'm sorry, Your Honor.
18          THE COURT:  Okay.
19          MR. DONIGER:  I would request that document come
20    down, please.
21          THE COURT:  The document is coming down.
22          MR. LEICHTER:  The document doesn't come down
23    because what I'm arguing is the chain of custody.
24          THE COURT:  It comes down if I tell you it comes
25    down.
```

03:35PM (line 5)
03:35PM (line 10)
03:35PM (line 15)
03:36PM (line 20)
03:36PM (line 25)

1          MR. LEICHTER:  Of course.

2          THE COURT:  Structure your argument as opposed to be

3    telling me what needs to be done, because there is a way to

4    talk that you just don't seem to understand.

03:36PM  5          So do you want to make an argument or do you want to

6    tell me what do?

7          MR. LEICHTER:  Your Honor, in our view, the argument

8    about the chain of custody of the counterfeit goes directly to

9    the questions in the third party complaint, as in the

03:36PM  10   instruction from the Court, it says that we are accusing him of

11   the counterfeiting.

12         I'm saying we're not.

13         We're saying if you think there were counterfeits

14   somehow, it's his responsibility, and I'm saying I am not

03:36PM  15   asking the jury - I will make it clear, I'm not taking on that

16   burden.  I'm not asking this jury to find that he

17   counterfeited.

18         I'm asking the jury to find someone else counterfeited,

19   but if that is so, they're going to find me liable for it,

03:37PM  20   that's his problem.

21         I'm entitled to rebut that, because he said over and

22   over I never touched any counterfeit goods, and therefore, this

23   little part of this instruction -- what it says.

24         THE COURT:  So what you are saying through going

03:37PM  25   through those documents, you are going to prove he touched the

REALTIME UNEDITED TRANSCRIPT ONLY

1    goods?

2              MR. LEICHTER:  No, it's the opposite.  I agreed with

3    that part.

4              THE COURT:  You can agree with if without

5    reiterating going through other documents and showing that.

6              MR. LEICHTER:  Okay.  Would it make a difference if

7    I just said I have one point to make about this, which is the

8    date on the document?  That's it.  It's just the date.

9              THE COURT:  Okay.  You need to direct your -- what

10   he says.  This is okay -- I'm not going to allow you to work

11   around to then respond to him.  That's the way I see it.

12             MR. LEICHTER:  Okay.  I will skip it.

13                      (Sidebar ends.).

14             THE COURTROOM DEPUTY:  Do you want me to take the

15   document down?

16             THE COURT:  Yes.

17             MR. LEICHTER:  Let's go for the instruction.  I got

18   it.

19        There it goes.

20        Ladies and gentlemen of the jury, I'm going to approach

21   this differently.

22        I'm going to start with jury instruction Number 33,

23   which was raised by Mr. Katrinak.

24        Third-party plaintiff's claim that Wax Works breached

25   this contract by supplying third-party plaintiff's counterfeit

—————— REALTIME UNEDITED TRANSCRIPT ONLY——————

1    DVDs in violation of the expression warranties of the contract.

2         Let me be very clear, I tried to be in my earlier

3    statement.  In this instruction -- this is not quite capturing

4    what I'm saying, and I wanted to be very clear about what I am

03:39PM  5    saying in this case.

6         It is not that they actually did the supply of any

7    counterfeits.

8         If there were counterfeits, as I have argued from the

9    beginning, they are coming from Jax, and they are coming from

03:40PM  10   Jax at a point in time after the 25th of October of 2019.

11        I'm not saying that he did the supplying of those DVDs.

12   The supplying of those DVDs to Vision Video, and the supplying

13   of those DVDs to Christian Book Store went from Jax to them and

14   I have said that from the beginning of the case.

03:40PM  15        So it would be a mischaracterization of my case to say

16   that I am claiming that he delivered them or Wax Works

17   delivered them, and I'm not.

18        I'm making that really clear.

19        The issue here is not that they delivered them because

03:40PM  20   Jax delivered them.  It is whether they are responsible for any

21   harm you would put on my clients for -- if you think that we

22   touched a counterfeit good.

23        I said at the very beginning of the case, I don't think

24   that happened, and I said it at the end of the case.

03:41PM  25        And I think I proved that in spades.

─── REALTIME UNEDITED TRANSCRIPT ONLY───

1          But I can say -- his client is still responsible for

2     that, because of the nature of the contract.

3          That's very important point for you to remember if I can

4     respectfully suggest that.

03:41PM    5          Another point that he made is that he's not the insurer

6     or his client is not a insurer, that is absolutely true.

7          Okay.  A policy of insurance is something that you go

8     out and buy, but an indemnity contract, like this one, is it's

9     a very much like insurance.

03:41PM   10          It says:  I am going to take care of you if X, Y, Z

11     happens.  So the question here is not as he said oh, he's

12     trying to make me an insurer, that is not fair.

13          No, his client made himself or made Wax Works, not Terry

14     this isn't about him personally, made Wax Works responsible by

03:42PM   15     agreeing to indemnity, just like an insurance company agrees to

16     provide insurance in the event of a loss.

17          If you meet the conditions, he agreed to provide an

18     indemnity in the case any of his promises were wrong.

19          That is an indemnity on which SP Releasing had the right

03:42PM   20     to rely.

21          And did rely, and was breached.

22          It was breached, regardless of whether they touched the

23     goods, regardless of whether the goods flowed through Jax

24     Jackson.

03:42PM   25          Regardless of whether they were sent by New Century to

──── REALTIME UNEDITED TRANSCRIPT ONLY ────

1    Jack Jackson in February, as those Vision Video documents say,

2    remember, they are coming in next week, right?

3            Well, go ahead and take a look at the evidence and see

4    when they come in.

03:42PM  5            Can I mention the document number now, Your Honor, with

6    this link?

7                MR. DONIGER:  This is the same objection.

8                MR. KATRINAK:  Objection.

9                THE COURT:  I'm still sustaining the objection.

03:43PM  10               MR. LEICHTER:  Okay.  I won't -- it's somewhere in

11   the documents, please, take a look at them and see if you can

12   find the chain of custody of these DVDs that Mr. Katrinak says

13   his client didn't touch.

14           Contracts in the United States, in our country,

03:43PM  15   contracts have, if they are in writing, have a special place.

16   When we go and put down a contract in writing, it means what it

17   says, we are all bound by it and we all know what it means to

18   sign a contract.

19           To claim you didn't read it or something like that is

03:43PM  20   ridiculous, that is has nothing to do with whether you are

21   bound.

22           You are bound, it's valid and enforceable, in a Court of

23   law, they file pleadings saying it's valid and enforceable, and

24   it conclusively, it's valid and enforceable.

03:44PM  25           That's it.

1          It means what it says.

2          You don't get to vary the terms of a written contract.

3          It's just not allowed in this country.

4          The contract means what it says.

03:44PM 5          And we all know what these contracts say and

6     particularly what that Paragraph 18 says.

7          Now, you know, I don't think Terry Woodward is a bad

8     guy, I don't think it matters.  I really don't.

9          In fact, I'm sure it doesn't matter.

03:44PM 10         Nothing in the instructions say that good guys don't owe

11    indemnities and bad guys do.

12         It has nothing to do with that, it's a promise made, and

13    a promise broken, and when that happens, the indemnity kicks in

14    and the indemnity is a promise itself.

03:44PM 15         And if the indemnity isn't provided, there is liability

16    for that.

17         As I said, the liability here, you are only to put money

18    in that final box if you found that somehow we touched a

19    counterfeit good.

03:45PM 20         I don't think you should find that.

21         But you need to say yes, the indemnity provision was

22    broken, because that takes us to the next phase, where at least

23    we recoup the cost of having been sued here for nothing on fake

24    claims.

03:45PM 25         That's really what we are doing here.  When we are suing

┌─────────────────── REALTIME UNEDITED TRANSCRIPT ONLY ───────────────────┐

1    Wax Works, is we're saying that we were accused, and we are

2    entitled to a defense, rather than pay to prove that there is

3    no counterfeiting.

4            We should be having -- we should be having the

03:45PM  5    indemnitor take care of that problem for us.  And they didn't.

6            And even worse than that, you can tell, because you have

7    been listening in the whole trial, and you sure heard it in the

8    last 15 minutes, instead, they are working together to defeat

9    my case.

03:45PM  10           Why are they cooperating in the way that you see them

11   cooperate?

12           You can answer the question yourself.

13           I'm not taking any more of your time, it's time for you

14   to deliberate and it's time for you to return a just verdict.

03:46PM  15   Thank you.

16               THE COURT:  Thank you.

17               MR. KATRINAK:  May, I request a sidebar, please?

18               THE COURT:  Before I read the instructions?

19               MR. KATRINAK:  Yes, Your Honor, I respectfully

03:46PM  20   request a sidebar.

21               THE COURT:  Very quickly, then.

22               MR. KATRINAK:  Thank you, Your Honor.

23                       (Sidebar begins.)

24               MR. KATRINAK:  I don't like doing this, Your Honor.

03:46PM  25   I had an agreement with Mr. Leichter that he was not going to

REALTIME UNEDITED TRANSCRIPT ONLY

1    argue my client was an insurer.  I withdrew an instruction that

2    talked about it an indemnity provision not being insured.

3         He made the argument now saying I am insuring him for

4    everything, indemnity is like insurance.  I respectfully

5    request that the Court read the instruction on it.  Indemnity

6    cannot be an insurance contract.

7              MR. LEICHTER:  Well --

8              THE COURT:  You never will that discussion?

9              MR. LEICHTER:  We had a discussion about a proposed

10   instruction on insurance.

11        I said it's totally confusing.

12             MR. KATRINAK:  No that's not what he said.

13             THE COURT:  Just, okay.

14             MR. LEICHTER:  Take a look at it.  It is ridiculous.

15   What I argued indemnity is this indemnity.  Sorry, Your Honor.

16             MR. KATRINAK:  I guess I don't have a choice.  I

17   understand, Your Honor.

18             THE COURT:  I was not privy to the discussion.

19             MR. KATRINAK:  I understand.

20             THE COURT:  Okay.

21                       (Sidebar ends.)

22             THE COURT:  Okay, ladies and gentlemen of the jury,

23   I'm going to read to you some final instructions before you are

24   able to go off and deliberate.

25        However, before I get there, I want to just make sure

┌─ REALTIME UNEDITED TRANSCRIPT ONLY ─┐

1   you understood the purpose and the testimony of Mr. Lauter's

2   testimony during the closing argument of the defendant.

3        There was a slide that came up on the screen that said

4   Judge Sykes, with quotes, and I think it said, this is not

03:48PM   5   evidence, or something to that effect.  "It is not evidence."

6   In quotes.

7        I want to remind you all that the testimony of

8   Mr. Lauter is in fact evidence, however, it's evidence that can

9   only be used for a limited purpose, okay?

03:48PM   10        I had told you all that before, but I'm going to read it

11   again just to make sure.

12        You should consider Mr. Lauter's testimony only to help

13   you decide whether or not to believe Mr. Otto and how much

14   weight to give Mr. Otto's testimony.  It should be used for no

03:48PM   15   other purpose, but it is in fact evidence.

16        Okay.  So I will go ahead and continue.

17        Before you begin your deliberations, elect one member of

18   the jury as your presiding juror.

19        The presiding juror will preside over the deliberations

03:49PM   20   and serve as the spokesperson for the jury in court.

21        You shall diligently strive to reach agreement with all

22   of the other jurors, if you can do so.

23        Your verdict must be unanimous.  Each of you must decide

24   the case for yourself, but you should do so only after you have

03:49PM   25   considered all of the evidence, discussed it fully with the

1    other jurors, and listened to their views.

2         It is important you attempt to reach a unanimous

3    verdict, but, of course, only if each of you can do so after

4    having made your own conscientious decision.

03:49PM    5         Do not be unwilling to change your opinion if the

6    discussion persuades that you that you should.  But do not come

7    to a decision simply because other jurors think it is right, or

8    change an honest belief about the weight and effect of the

9    evidence, simply to reach a verdict.

03:50PM    10        Because you must base your verdict only on the evidence

11   received in the case and on these instructions, I remind you

12   that you must not be exposed to any other information about the

13   case or to the issues it involves.

14        Except for discussing the case with your fellow jurors

03:50PM    15   during your deliberations, do not communicate with anyone in

16   any way, do not let anyone else communicate with you in any way

17   about the merits of the case or anything to do with it.

18        This includes discussing the case in person, in writing,

19   by phone, tablet, computer or any other means, via e-mail via

03:50PM    20   text messaging or any Internet chatroom, blog, website

21   application, including but not limited to Facebook, YouTube,

22   Twitter, Instagram, SnapChat, TikTok or any other forms of

23   social media.

24        This applies to communicating with your family members,

03:50PM    25   your employer, the media or press, and the people involved in

—— REALTIME UNEDITED TRANSCRIPT ONLY——

1   the trial.

2        If you are asked or approached in any way about your

3   jury service or anything about this case, you must respond that

4   you have been ordered not to discuss the matter and to report

03:51PM   5   that contact to the Court.

6        Do not read or watch any news media, accounts, or

7   commentary about the case.

8        Although, I have no information that there will be a

9   news reports about there case.

03:51PM   10        Do not do any research, such as consulting dictionaries,

11   searching the Internet, or using other reference material, and

12   do not make any investigation or in any other way try to learn

13   about the case on your own.

14        Do not visit or view any place discussed in this case

03:51PM   15   and do not use Internet programs or other devices to search for

16   or view any place discussed during the trial.

17        Also, do not do any research about this case, the law,

18   or the people involved, including the parties, the witnesses or

19   the lawyers, until you have been excused as jurors.

03:51PM   20        If you happen to read or hear anything touching about

21   the case in the media, turn away and report it to me as soon as

22   possible.

23        These rules protect each parties' right to have this

24   case decided only on the evidence that has been presented here

03:51PM   25   in court.

─────── REALTIME UNEDITED TRANSCRIPT ONLY ───────

1     Witnesses here in court take an oath to tell the truth

2   and the accuracy of their testimony is tested through the trial

3   process.

4     If you do any research or investigation outside the

03:52PM   5   courtroom or gain any information through improper

6   communications, then your verdict may be influenced by

7   inaccurate, incomplete, or misleading information that has not

8   been tested by the trial process.

9     Each of the parties is entitled to a fair trial by an

03:52PM   10   impartial jury.  If you decide the case based on information

11   not presented in Court, you will have denied the parties a fair

12   trial.

13     Remember, you have taken an oath to follow the rules and

14   it is very important that you follow the rules.

03:52PM   15     A juror who violates these restrictions jeopardizes the

16   fairness of these proceedings and a mistrial could result that

17   would require the entire trial process to start over.

18     If any juror is exposed to any outside information,

19   please notify the Court immediately.

03:52PM   20     If it becomes necessary during your deliberations to

21   communicate with me, you may send a note through the bailiff,

22   signed by your presiding juror or by one or more members of the

23   jury.  No member of the jury should ever attempt to communicate

24   with me, except by a signed writing.

03:53PM   25     I will communicate with any member of the jury on

─── REALTIME  UNEDITED  TRANSCRIPT  ONLY───

1   anything concerning the case only in writing or here in open

2   court.

3       If you send out a question, I will consult with the

4   parties before answering it, which may take some time.

03:53PM  5   You may continue your deliberations while waiting for

6   the answer to any question.

7       Remember, you are not to tell anybody, including me, how

8   the jury stands numerically or otherwise until after you have

9   reached a unanimous verdict or have been discharged.

03:53PM  10  Do not disclose any vote count and any note to the

11  Court.

12      A verdict form has been prepared for you.  After you

13  have reached unanimous agreement on a verdict, your foreperson

14  should complete the verdict form according to your

03:53PM  15  deliberations, sign and date it, and advise the bailiff that

16  you are ready to return to the courtroom.

17      Those will conclude all of the instructions, and then we

18  will have the bailiff come up.

19          THE COURTROOM DEPUTY:  Please raise your right hand

03:54PM  20  and state your name for the record.

21          THE BAILIFF:  Dave Williams.

22          THE COURTROOM DEPUTY:  Do you solemnly swear to keep

23  this jury together in a private and convenient place, that you

24  will not permit any person to speak or communicate with them,

03:54PM  25  nor do so yourself, unless by order of the Court, or to ask

---- REALTIME UNEDITED TRANSCRIPT ONLY ----

1    them whether they have agreed upon a verdict, and you will

2    return them into court when they have so agreed or when ordered

3    by the Court, so help you God?

4                THE BAILIFF:  I do.

03:54PM  5                THE COURTROOM DEPUTY:  Thank you.

6                THE COURT:  So you will go ahead, ladies and

7    gentlemen, and follow the bailiff into the deliberation room.

8           You can take your notebooks.  You can take them with

9    you.

03:54PM  10          All of your things, the pens and everything.

11          Thank you.

12               THE COURTROOM DEPUTY:  All rise for the jury.

13               (The jury exits the courtroom at 3:54 p.m.)

14               THE COURT:  We're not going to be able to discuss

03:55PM  15   anything because I have to be somewhere at 4:00.  I already

16   gave you the instructions as to your conduct and expectations

17   while the jury is out deliberating.

18          I understand we had a sidebar that you may want to put

19   something on the record, but we can do that when we come back.

03:55PM  20               MR. KATRINAK:  I apologize for asking for that, Your

21   Honor.

22               THE COURT:  If would you like to.  What I'm saying,

23   though, is when you come back if you want to put something on

24   the record because we stopped, then can you do that.  Otherwise

03:55PM  25   we will just come back and reconvene.  If you have a question

──────── REALTIME UNEDITED TRANSCRIPT ONLY────────

1   from the jurors or if we have a verdict.

2                MR. DONIGER:  How late are we staying today?

3                THE COURT:  Irene will come back and give you the

4   schedule.  They may decide to stay until 5:00, or a little

03:55PM  5   longer, they may decide they had had a enough and come back,

6   she will come back with that information.

7                MR. DONGIER:  All right.  Thank you.

8                THE COURT:  Okay.  We will be in recess then.  Thank

9   you.

03:56PM  10                MR. KATRINAK:  Thank you, Your Honor.

11                THE COURT:  Yes.

12                 (The proceedings concluded at 4:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## CERTIFICATE OF SERVICE

2    I HEREBY CERTIFY that on June 27, 2024, I electronically filed the

3    foregoing Motion for Mistrial using the CM/ECF system.  All parties and/or their

4    counsel are registered CM/ECF users and will be served by the CM/ECF system.

5

6    Dated:  June 27, 2024                    THE LEICHTER FIRM,
                                              A Professional Corporation

7

8                                             By:  _/s/ Andrew E. Hewitt_____

9                                                 Kevin J. Leichter, Esq.
                                                  Steven J. Aaronoff, Esq.
10                                                Andrew E. Hewitt, Esq.
11                                                Attorneys for Defendants and Third
                                                  Party Plaintiffs Echo Bridge
12                                                Acquisition Corp. LLC, Steven
13                                                Paul, and SP Releasing, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE LEICHTER FIRM**
**A PROFESSIONAL CORPORATION**

1